FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA 2010 AUG 23  AM 9: 22
FORT MYERS DIVISION

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

| | |
|---|---|
| TERRY L. DUNN-FISCHER,<br>individually, and the parent and next friend<br>of A.D.-F., a minor, | CASE NO.: _____ |
| | TRIAL BY JURY |
| Plaintiffs, | OF HER PEERS |
| | FOR ALL ISSUES |
| v, | |
| | FOR WHICH A TRIAL BY |
| DISTRICT SCHOOL BOARD OF COLLIER<br>COUNTY, and DR. VICTORIA SARTORIO,<br>Individually, and DR. ELIZABETH MCBRIDE,<br>Individually, FLORIDA DEPARTMENT OF<br>EDUCATION, and LAURENCE RUBLE,<br>Individually, Brian Castellani, individually and<br>THE FLORIDA DEPARTMENT<br>OF ADMINISTRATIVE HEARINGS. | JURY IS PERMITTED |
| Defendants, | |

_____/

## COMPLAINT

Comes Now, Plaintiffs, TERRY L. DUNN-FISCHER, individually, as parent, and next

friend of A.D-.F., a minor,  hereby sues District School Board of Collier County, Dr. Victoria

Sartorio, Individually, Dr. Elizabeth McBride, individually, Laurence Ruble, Individually,

Brian Castellani, Individually, THE FLORIDA DEPARTMENT OF EDUCATION,

FLORIDA DEPARTMENT OF ADMINISTRATIVE HEARINGS, and states as follows:

1

## NATURE OF CASE

This is an action commenced under the Individuals with Disabilities Education Act, as amended, 20 U.S.C. § 1400 et seq. ("IDEA"), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("section 504"), Title II of the Americans With Disabilities Act, ("ADA") 42 U.S.C. § 12132;  Federal Civil Rights Act, 42 U.S.C § 1983, Fla. Stat. § 413.08, through the Florida Civil Rights Act ("FCRA"), § 760.07, Fla. Stat., and their implementing federal and state regulations, <u>Polera v. Bd Ed. Newburgh City Sch. Dist. 288 F.3d 478</u>  (2nd Cir. 2002). In this action, Plaintiffs suffered damages and now seeks declaratory and injunctive relief as well as damages.

## REQUEST FOR ACCOMMODATIONS

Plaintiff is an individual with a learning disability and is requesting accommodations, to enable her to have equal access to this court process.  She requests this court have patience, understanding, and be tolerant regarding her needs, for detailed explanations and her need to place this Complaint in a numbered sequential fashion, to avoid repetition of the issues and facts. The Plaintiff has a language based weakness and lacks the ability to understand and comprehend "certain terms" in written form instruction.  The need for clarification and the request for the same, should be recognized and addressed and feels she has been deliberately discriminated against and was denied a "fair" hearing for the same, during the due process hearing. The CCSD, FDOE, and the FDOAH, intentionally ignored the Plaintiff's pleas and requests for accommodations. They also went as far as, the act of deliberately and

2

intentionally using the Plaintiff's disabilities, against her during her attempts to use the IDEA process from 2005-2009, and during the Due Process Hearing.  The Plaintiff believes, that the Hearing officer's "findings of facts," in both rulings under IDEA and ADA, Section 504, are not consistent with the record, JP v. Sch. Bd of Hanover County VA 641 F. supp 2d 499 (4th Cir. 2008), consistent with and only with the Defendants witness testimony, Amanda J. v. Clark Co Sch. Dist. & Nevada Dept. of Ed, 267 F. 3d 877 (9th Cir. 2001) and supports the "act of conspiring" pursuant to and under the Federal Civil Rights Act, 42 U.S.C § 1983. The Plaintiff believes, that the Defendant and the ALJ have acted in bad faith and are retaliated against the Parent Jarron Draper v. Atlanta Independent School System 518 F. 3d 1275 (11th Cir. 2008),  to go as far as to characterize the parent's advocacy attempts as her having a "mental illness" during her questioning as a witness and in these rulings. The Parent does not and never has had a diagnosis of mental illness, her vast attempts, to obtain an appropriate diagnosis, in the state of Florida, per her child's documented history and evidence based, multiple disability to include Dyslexia was initiated and followed per multiple Educational and Medical Professionals' guidance, under IDEA Goleta Union Elementary Sch. Dist v. Andrew Ordway (C.D. Cal. 2002).  To characterizing the Parents' advocacy efforts as anything different is consistent is an act of retaliating against the Parent, for her attempts to obtain FAPE for the child, Jarron Draper v. Atlanta Independent School System 518 F. 3d 1275 (11th Cir. 2008) and Linda Sturm v. Rocky Hill Bd of Ed (CT 2005) and Polera v. Bd Ed. Newburgh City Sch. Dist.(2nd Cir. 2002).  The parent believes, she was discriminated against under, Title II of the Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12132; Federal Civil Rights Act, 42 U.S.C § 1983.

3

As to the issues, of "the burden of proof" the Plaintiff denies that she as the Plaintiff should carry the burden of proof, for this case's history supports and proves that she was never given clear informed knowledge of her procedural safeguards and never obtained the ability to follow the process pursuant to the same, Amanda J. v. Clark Co Sch. Dist. & Nevada Dept. of Ed. 267 F. 3d 877 (9th Cir. 2001) Because she was not fully informed of her, "due process rights and her procedural safeguards", she was unable to exercise them, thus she was denied her due process of Law.  Because she was not fully informed by CCSD, she lacked the "Knowledge" to be an active participant in her child's educational needs. If she had been provided the necessary "knowledge" to understand the procedural safeguards process, she would have been able to exercise her procedural rights, as early as Kindergarten, Knable v. Bexley City Sch. District (6th Cir. 2001) under IDEA and ADA section 504, Yankton School District v. Schramm (8th Cir. 1996).  Plaintiff's exhibits and evidence supports that CCSD and the FDOE intentionally withheld said "understandable knowledge" from the parent.  The Plaintiff states and refers to: Weast v. Schaffer, 546 US 49, 126 S. Ct. 528, 163 L. Ed. 2d 387 (4th Cir. Jul 29, 2004) "The Fourth Circuit has joined three other circuits (5th, 6th and 10th) in placing the burden on parents to prove that the IEP the school district has proposed is inadequate. According to the opinion, circuits that place the burden on the district include the 2nd, 3rd, 8th, 9th and possibly the DC Circuit (at least in cases of procedural inadequacy".  This parent was misled and unable to understand, the procedural process and she was not referred to the proper resources to do so. All parties were made aware, that she suffers from a language based learning disability herself, (as early as December 2005) and she required a large amount of clarification to understand the "rules of

4

the game". Pursuant to, Weast v. Schaffer, 546 US 49, 126 S. Ct. 528, 163 L. Ed. 2d 387

(4th Cir. Jul 29, 2004), Schaffer v. Weast 554 F. 3d 470 - Court of Appeals, 4th Circuit, 2009

-States; "For the vast majority of parents whose children require the benefits and protections

provided in the IDEA, the specialized language and technical educational analysis with

which they must familiarize themselves as a consequence of their child's disability will likely

be obscure, if not bewildering. By the same token, most of these parents will find the

educational program proposed by the school district resistant to challenge. The dissent would

assign the burden of proof to the school system because of its "distinct, inherent advantage"

over parents when it comes to proposing and evaluating educational plans for disabled

children... Parents... "lack the comprehensive understanding  and means to assess the likely

benefit of available alternatives." When Congress designed and passed the IDEA, it was

keenly aware that school systems have professional expertise and that parents do not.


## REQUEST FOR JUDICIAL REVIEW


This matter involves Plaintiffs' request for judicial review of an administrative decision

issued by a hearing officer appointed by the DOAH, who was contracted by The Florida

Department of Education. Plaintiff filed this Due Process Hearing Request, on the bases that

CCSD failed to Follow Due Process of Law under IDEA and ADA section 504, for her

disabled child.  The provision, responsibility, and accountability to provide a disabled child

FAPE, is the "Districts" responsibility not the parents, under IDEA and ADA section 504.

Plaintiff believes that due to CCSD's refusal to follow the process under Federal law, and

advise the parent of her rights per procedural process safeguards, this act resulted in damages

(actual and punitive) to herself and the child, The DOAH decision is a final order which

entitles a party adversely affected to bring an action in either a federal district court or a state

court of competent jurisdiction. *Id.;* 20 U.S.C. § 1415(c)(2). <u>Doe v. Alabama state Depart.</u>

<u>Of Educ., 915 F 2d. 651,657 n. 3</u> (11th cir. 1990).  Plaintiff believes that the hearing

officers rulings under IDEA and her recommended order under ADA sections 504 are;

grossly erroneous, subjective, non-evidence based, blatantly obscured and not consistent with

the record, <u>JP v. Sch. Bd of Hanover County VA</u> (4th Cir. 2008). Also, Plaintiff was denied

timely Due Process of Law.  Plaintiff believes that she was discriminated against, on the

bases of disability, due to the denial of requested accommodations, enabling the Plaintiff to

benefit from a fair hearing process.  Petitioner requests a total and comprehensive review to

include all transcripts and all evidence referred to in said Transcripts, to include the

deposition and related evidence of  Dr. Victoria Sartorio's,, Director of Special Education,

CCSD, at the Federal level,  <u>JP v. School Board of Hanover County VA</u> (E.D. VA 2008)

and <u>Zachary Deal v. Hamilton County TN Board of Ed. 392 F. 3d 840</u> (6th Cir. 2004) and

42 U.S.C. § 1983, commonly referred to as "section 1983" provides: Section 1983 was

enacted on April 20, 1871 as part of the Civil Rights Act of 1871, Individual employees of

the State and local government may be sued in their individual capacities for damages,

declaratory or injunctive relief. Plaintiff also requests a jury trial, <u>Doe v. Withers</u> (1992),


### JURISDICTION

This Court's jurisdiction is based upon 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A), and

28 U.S.C. § 1331, and supplemental claims jurisdiction pursuant to 28 U.S.C. § 1367.

Plaintiff Terry Dunn-Fischer (hereinafter T.D.F) maintains her permanent resident status as Collier County, Florida. Plaintiffs currently reside, on a temporary status, in the State of Arizona. Plaintiff was forced to relocate and place the child, to gain access to an appropriate public educational environment, (one that recognizes the diagnosis of Dyslexia, and all other related disabilities, exhibited by the child and uses scientifically proven evidence based interventions, uses highly qualified/certified teachers, and is willing and able to comply with the provisions of IDEA, and ADA/section 504 to meet **ALL** of the child's special educational needs), as denied by The District School Board of Collier County. Plaintiff moved the child, after CCSD's director of Special Education, Dr. Victoria Sartorio, testified per her deposition, that CCSD does not have the "proper public placement" ability and there are no private educational facilities, that state they specialize in Dyslexia remediation and education. The Defendants, District School Board of Collier County, (hereafter referred to as "Defendant" or "District" is located in Collier County, Florida. The Defendant is considered a public entity under 42 USC § 12131. All issues in this case, took place while child resided in the CCSD, Burlington Sch. Committee v. Mass. Bd. of Ed., 471 U. S. 359 (1985)). Pursuant to §300.104, if placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child. (Authority: 20 U.S.C. 1412(a)(1), 1412(a)(10)(B))

## REPRESENTATION

This action is brought by Plaintiff Pro Se, <u>Maroni v. Pemi-Baker Regional School District</u> <u>346 F.3d 247</u> (1st Cir. 2003). The financial resources available to Plaintiffs to defend their rights under the IDEA, section 504 of the Rehabilitation Act of 1973, Title II of the Americans With Disabilities Act, Federal Civil Rights Act, and the Florida Civil Rights Act, were exhausted in the (16 month) IDEA, ADA section 504, Due Process administrative proceeding, a precondition to the filing of this lawsuit in the State of Florida.  On May 21, 2007, the Supreme Court issued a unanimous pro-parent, pro-child decision in; <u>Winkelman</u> <u>v. Parma City School Dist., 127 S. Ct.</u> (1994) - Supreme Court 2007  " impartial due process hearing." §1415(f)(1)(A) (2000 ed., Supp. IV).  The Court listed and affirmed parental rights, the importance of parental involvement, and described the essential role parents play in ensuring that their child receives a Free Appropriate Public Education (FAPE).

1.    The Court also refined the definition of a FAPE. The Court reviewed IDEA, considered "the entire statutory scheme," and provided a comprehensive description of parental rights in the IDEA statute. The goals of IDEA include "ensuring that all children with disabilities have available to them a free appropriate public education" and "ensuring that the rights of children with disabilities and parents of such children are protected."  §1400(d)(1)(A)-(B)

(a)    The Court found that parents have a "significant role" and examined four critical portions of IDEA: IEP procedures; criteria to determine FAPE; procedural mechanisms for IEP disputes; and parental reimbursement.

(b)    The Court listed "terms that mandate or otherwise describe parental involvement."

8

(c)     "IDEA requires school districts to develop an IEP for each child with a disability with parents playing "a significant role" in this process." §§1412(a)(4), 1414(d)

(d)     "Parents serve as members of the team that develops the IEP." §1414(d)(1)(B)

(e)     "The "concerns" parents have "for enhancing the education of their child" must be considered by the team." § 1414(d)(3)(A)(ii)

(f)     "IDEA accords parents additional protections that apply through the IEP process."

(g)     The IEP team is required "to revise the IEP when appropriate to address certain information provided by the parents." § 1414(d)(4)(a)

(h)     States must "ensure that the parents are members of any group that makes decisions on the educational placement of their child." §1415(b)(1)

(i)     "A central purpose of the parental protections is to facilitate the provision of a 'free appropriate public education which must be made available to the child "in conformity with the [IEP]"' §1401(9)(D)

    The Court determined that the provisions of IDEA accords to parents rights of their own that can be vindicated in court proceedings, and allows them, in their status as parents, to represent their child in court proceeding.

3. The ADA, Section 504 allows the Parent to file, on behalf of the child, in Federal court for actual and punitive damages, Polera v. Bd Ed. Newburgh City Sch. Dist. (2nd Cir. 2002) and W.B. v. Matula 67 F. 3d 484 (1995)


### PLAINTIFFS ISSUES RELATED TO RULINGS

The hearing officer's administrative decision was issued on May 28, 2010 following a due process hearing conducted pursuant to the IDEA, 20 U.S.C. § 1415(f) and a recommended order issued on June 16, 2010 pursuant to a simultaneous due process hearing for damage claims under the ADA, Section 504, FCRA, and § 1983.  Both hearings took place simultaneously and the rulings, for both took 16 months to obtain. The Plaintiff has exhausted the administrative process under both.  The Plaintiff files this complaint under 20 U.S.C. § 1400 et seq. ("IDEA"), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("section 504"), Title II of the Americans With Disabilities Act, ("ADA") 42 U.S.C. § 12132;  Federal Civil Rights Act, 42 U.S.C § 1983, Fla. Stat. § 413.08, through the Florida Civil Rights Act ("FCRA"), § 760.07, Fla.  These ruling deny the child's eligibility for her multiple disabilities and diagnosis of the same, to include her severe Dyslexia, under IDEA and ADA Section 504 and CCSD denied her protection under IDEA and ADA section 504 for the same, this case is consistent with: Jarron Draper v. Atlanta Independent School System (11th Cir. 2008) and Florence County School Dist. IV v. Shannon Carter (4th Cir. 1991) and Brody v. Dare County Board of Education (1997).  Dyslexia is a learning disability for the purpose of the Individuals with Disabilities Act, 20 U.S.C. Section 1400 *et seq.* (IDEA), and ADA Section 504, as defined by federal law: "An individual with a disability means any person who: (i) has a mental or physical impairment that substantially limits one or more major life activity; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment" [34 C.F.R. §104.3(j)(1)] and (The Civil Rights of Students with Hidden Disabilities under Section 504 of the Rehabilitation Act of 1973).

Plaintiff believes, that these rulings and the "Findings of Fact" under the IDEA and

ADA Section 504, are erroneous, fabricated, subjective opinions, and not consistent with the record as a whole and are not evidence/exhibit based.

1. These "findings of fact" defies the application of the rules of evidence, to the extent, that the Plaintiff's proof, evidence, testimony and case history were, ignored and that the findings of facts are not consistent with the record and refers to :The State Hearing Officer's decision was not consistent with the record, taken as a whole, JP v. School Board of Hanover County VA (E.D. VA 2008).

2. The States Hearing Officer's opinions, in the "finding as facts" are so "independent" they lack objective data and evidence to support the findings. Her "Findings of fact" are based on, and only on the Defendant's vested interest of a collaborative "coached" unsupported by data, testimony, Eason v. Clark County School District NV  (9th Cir. 2002).

3. Plaintiff's exhibits and evidence were documented "objective true data based" and were ignored and the few that were considered were, only considered in a fashion consistent with a myopic approach, to include;

    1. Dr. Dunkin's request to evaluate for a LD ( 5/2006) ,

    2. Psychiatrists ( Dr. Mack) diagnosis of more then one disability, naming Dyslexia and written requests to evaluate for LD (7/2006 and 7/2007),

    3. Psychologists Diagnostic Evaluate (Dr. Mcginnis) Diagnosis the child with ADHD and a LD looks increasingly apparent show a "gap" (7/2006)

    4. Dr. Finkle's Neurologist, Diagnosis of ADHD and 'Dyslexia" and referral to Evaluate (2/2008),

    5. Psychologists (Dr. Chang) LD Evaluation supporting Diagnosis of more then

one disability a LD, shows a greater "Gap"(3/2008) ,

6.  Psychologists (Dr. Grout 3/2008) find's and documents the "gap" and clarifies duel eligibility, of more then one disability, child made SLD eligibility,

7.  Certified Dyslexia Evaluator, screening results diagnosis, Dyslexia, and her exceptionalities and multiple manifestations of the same (3/2008),

8.  Hardman and Associates and a Florida based private Dyslexia Evaluation Centers (7/2008) diagnosed the child with multiple disabilities to now include emotional, to include anxiety, depression and low self esteem, (7/2008) disabilities with a discrepancy of 2.5 years, Educational deficient.

All above noted evaluations and documented diagnosis, where submitted to CCSD, upon availability, for consideration by the IEP team. All CCSD members failed its affirmative duty to provide the Petitioner with prior written notice of their rights to independent educational evaluations and a free and appropriate public education (FAPE).

4.  The most recent diagnostic Dyslexia evaluation, performed by (3/2010) Scottish Rite Dyslexia Center Diagnosed the child with multiple disabilities, and supports the large "gap" discrepancy model.  According to Plaintiff's private evaluations the child had made no academic progress in spelling, reading, math, and written language skills after 2 years in special education at CCSD while under the eligibility of the category of OHI for her ADHD.

5.  Plaintiff's exhibits submitted in this case were all Independent Educational Evaluations, (IEE's)  and revealed a significant drop in the child's IQ score and a constant if not worsening "gap" while in attendance at CCSD.  The analysis of the battery of testing

indicated that the child maintained a large learning disability discrepancy value, from the

start <u>Brody v. Dare County Board of Education</u> and <u>Evans v. Rhinebeck Central Sch Dist,</u>

(S.D. NY 1996).

6.  Plaintiff believes she was discriminated against during these proceedings, for her

testimony was ignored, changed, and restated in a condescending fashion.  She was

harassed during her testimony by the Defendant and belittled, when unable to understand

and answer questions that were stated in a "false positive" fashion. She was belittle in her

inability to "read faster", pursuant to the record and transcripts.

7.   Plaintiff was not accommodated during the proceedings and was refused clarification

to her written request for the same.

8.  These rulings are inconsistent with the record, incongruent and inconsistent with case

law and with the provisions and process of law, under IDEA and under ADA, Section 504.

9.   The findings of facts are not in an appropriate chronological fashion, are not factual

evidence based and fabricated statement were placed to add merit, in support of the

District.  Defendants' actions, witness testimony, and their noncompliance is minimized if

not obscure by the hearing officer and inconsistent with all provisions, under  IDEA and

ADA, Section 504.

10.  The Hearing officers decision regarding witness testimony is an inadequate,

foundation to base her "findings of facts", for they are not evidence based, data driven, and

lack logic or rational.  <u>JP v. School Board of Hanover County VA</u> (E.D. VA 2008).

11.  Plaintiff also requests that additional relevant evidence be submitted which includes

but is not limited to,

A). The 2008, IEP transcript, prepared by a court reporter to be entered into evidence, which was denied by the ALJ, be submitted, *Weast v. Schaffer* and, (Zachary Deal v. Hamilton County TN Board of Ed (6th Cir. 2004) This "transcript" is a true and best objective account and lays witness, to the Districts, denial of parent's rights, their refusal to clarify the process, their **bulling and steam rolling the parent**, by refusing to allow objective data, that the child's present levels per testing, after three (3) years, at Seagate Elementary, were still at a Kindergarten Level,  be entered into the child's IEP, as baselines and present levels, to create an appropriate IEP, to meet her needs.   The Parents' objections to the IEP and the use of "teacher observation" without data to support it, as proof of progress were ignored and her requests for evidence based data were ignored,

B) The plaintiff is also requesting the most recent objective data, obtained by a Full Learning Disability Evaluation, dated 3/2010, performed by the Scottish Rite Hospital, in Dallas Texas, be submitted; This evaluation is a true and non biased assessment of the child's multiple disabilities and her related weaknesses, present levels, and exceptionalities, which was performed by an authoritative objective resource center for the diagnosis and treatment of Dyslexia? The information in this evaluation is consistent with all IEE's submitted by the parent to the IEP team, for consideration of more then one disability, since 2006,

C) The Plaintiff requests that recently obtained evidence, and emails, from Laurence Ruble, " the 504 guy" and the head of Psychological Services, CCSD be submitted. This email, to other CCDS personnel , states "that the child doesn't quality as ESE" and it also affirms that Parent was not given or advised of her procedural safeguards, and that he did

not offer to Evaluate the child over the summer **(as per the ALJ's statement in her finding of facts) but, in fact denied the parent the same,** and that the Plaintiff had contacted him in the past to request help for her child, (Muller v. East Islip (2nd Cir. 1998),

    d)  That a special education case, under IDEA and ADA, Section 504, is a on going collection of data based evidence, and that the Plaintiff believes that to withhold evidence related to the child's academic progress or lack of the same, denies her a fair trial, therefore the Plaintiff requests the ability to submit all relevant evidence, related to all ongoing evaluations, and appropriate IEP's, that address and treat, by way of measurable goals and data based true progress, related to the same, up to an appropriate time, prior to the Trial, be submitted at this level, and are included in this filing.

    e)   That the Plaintiff "reserved the right" in her due process hearing filings to present evidence in this case, as it became available.

### PLAINTIFF'S RESPONSE/ OBJECTION/ CLARIFICATION TO STATEMENT OF ISSUES

1. Plaintiff was given very little direct instruction and clarification prior to her original filing for a due process hearing request. This case was filed on the grounds that CCSD, failed to provide FAPE, the District failed to comply with; in and under the process and provisions of IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("section 504"), Title II of the Americans With Disabilities Act, ("ADA") 42 U.S.C. § 12132; Federal Civil Rights Act, 42 U.S.C § 1983, Fla. Stat. § 413.08, through the Florida Civil Rights Act ("FCRA"), § 760.07, Fla. Stat., and their implementing federal and state regulations.

**2.** The focus of this case, is CCSD, failed to provide FAPE due to their refusal to evaluate as early as Kindergarten and then refused to consider and evaluate for the potential of multiple disabilities. That because of this act, as far back as 2005 the child and the Parent incurred huge damages for the same. They refused to comply with the provisions of FAPE under IDEA and ADA, Section 504:

3.   The mother's contention, over the past 4 years, was that CCSD refused to recognize that the child may have had more then one disability, the disability of ADHD.  They refused to find, appropriately evaluate, and address all of the child's needs regarding her multiple disabilities, dyslexia, dygraphia, dyscalculia, aphasia, depression, anxiety, and the manifestation of frustration, related to their refusal to evaluate, recognize, and provide appropriate interventions to meet her needs. CCSD failed its affirmative duty to provide the Petitioners with prior written notice of their rights to independent educational evaluations and a free and appropriate public education (FAPE).   They denied her any services under ADA, Section 504.  CCSD went as far as to deny, reject and ignore, all 4 (four) of the Parents IEE's dated 2006-2008, that showed, proved, and supported the idea and issue of the strong possibility of more then one disability.  The CCSD failed to continue to re-evaluate or to consider the child in a holistic fashion, to identify and meet ALL her disabilities. Only, after the child had been serviced, in ESE for a year under the diagnosis of ADHD/OHI and made very little progress, to the point she would  now be retained, did the mother start questioning the child's primary diagnosis.  Since the child had been medicated for ADHD, since August 2006, and her symptoms related to her lack of learning did not go away, for she continued to have the same problems, the Parent then requested CCSD to assess the Child for other

multiple disabilities.

4. CCSD intentionally refused to do so and these ruling, lay blame on the parent for her poor advocacy skills. CCSD, the FDOE, and the FDOAH used only subjective data and that "the teachers state she is making progress", by way of "teacher observation" with out data to support their statements, was their bases for ignoring the child's educational needs and her multiple disabilities. Pursuant to IDEA and ADA, Section 504, objective data supported progress, is the foundation to the IEP process. Due to the lack of these provisions, poor monitoring, which created an environment of, the inability to define and make an individually based determination of what the child's actual disabilities were and what was disability related, she was denied the provision of FAPE. They failed to establish, provide, create, and implement an appropriate individual educational plan, (IEP), for the child to make true data driven beneficial measurable progress, in the general curriculum, while obtaining special educational services.

5. That CCSD refused to identify and evaluate the child for her underlying multiple Learning Disabilities related to her Dyslexia. That pursuant to the {Office of Special Education and Rehabilitative Services (OSERS) in the U.S. Department of Education}, A State must adopt, consistent with 34 CFR 300.309, criteria for determining whether a child has a specific learning disability as defined in 34 CFR 300.8(c)(10). In addition, the criteria adopted by the State:

  A. Must not require the use of a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability, as defined in 34 CFR 300.8(c)(10);

  B. Must permit the use of a process based on the child's response to scientific, research-based intervention; and

C.   May permit the use of other alternative research-based procedures for determining whether a child has a specific learning disability, as defined in 34 CFR 300.8(c)(10

"A public agency must use the State criteria adopted pursuant to 34 CFR 300.307(a) in determining whether a child has a specific learning disability. [34 CFR 300.307] [20 U.S.C. 1221e-3; 1401(30); 1414(b)(6)], and if the child does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in 34 CFR 300.309(a)(1) when using a process based on the child's response to scientific, research-based intervention; or the child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments, consistent with 34 CFR 300.304 and 300.305; and the group determines that its findings under 34 CFR 300.309(a)." That CCSD, blatantly REFUSED to comply with the above provisions, for the entire time the child was a Collier County Student, three an one half years ( 3.5 yrs). Mother removed the child from the CCSD and placed her in a LEE county district school, via the McKay Scholarship, due to her lack of progress, her unhappiness, her frustration and the negative environment the child was being exposed to pursuant to T. H. v. Palatine, (N.D. IL 1999) and Burlington Sch. Committee v. Mass. Bd. of Ed., 471 U. S. 359 (1985).

6. On February 24, 2009, Petitioner, A.D.-F. , through T.D.-F., Petitioner's mother, and herein after referred to as " The Parent" filed a due process hearing request, at the guidance from the Mediation Department of FDOE, after an unsuccessful attempt at the mediation process level. Ms. D.-F., was referred to the online, one page simple form to use, her written

request included the issue of a ADA/section 504 hearing. She later found out, after the pre-hearing conference the ALJ, refused to address 504 in his pre-hearing orders.

7. Ms. T. D.-F., then filed a "typed" addendum, to her original due process hearing request, in an attempt to include a due process hearing under both IDEA and ADA/section 504. She also filed numerous Motions for clarification on "tolling the time line" and objections to the same. ALJ, Mandry, refused to address Plaintiffs motions and continued to state that petitioner agreed to tolling, the time line per the Defendants' multiple requests to postpone and reschedule hearing.

8. The Plaintiff also, advised the ALJ, Mandry that she herself suffered from a Learning disability and was not an attorney, that she didn't understand the legal terms that he was using and could not hear him over the phone, she had to ask him 3 times to speak up, he stated after the third time, "I am speaking loud enough" and refused to further clarification, her requests therefore her stated disability based needs were ignored.

9. The Plaintiff, continued to represent herself and participated in a second telephone hearing, at a friend's house as she lay witness to the conversation, ALJ, Mandry, continued to state the Plaintiff agreed to "toll the time line", even though Plaintiff objected to prolonging the hearing process past 45days. He also refused to clarify if he had been given authorization and would also hear ADA/504 issues, to be included in the same due process hearing along with IDEA, per her addendum.

10. The Plaintiff had to file an Amended due process hearing request due to CCSD's , DOAH and the assigned ALJ, Mandry refusal to state and agree that Plaintiff was being granted a hearing under both IDEA and ADA/section 504. Prior to filing her Amended

hearing request, Ms. D.-F. was then, on March 19, 2009, and only then forwarded her

procedural safeguards and 504 Manual, by Larry Ruble, head of Psychological services for

CCSD. The 504 procedural safeguards stated, that the parent must write to the head of

Psychological services to request a hearing under 504, so the Plaintiff, followed the process,

requested a hearing under 504, then filed her Amended due process hearing request. She then

could state that she had requested a hearing under both IDEA and ADA/section 504. These

actions are documented in the case file and should be considered in this appeal.

11.  Due to the Plaintiff filing the Amended Due Process Hearing Request, the issue of

"tolling the time line" was moot, since the Plaintiff, never agreed to a delay in the hearing

process, time was at the essence, and finances were scarce. The first ALJ, Mandry, recused

himself and assigned Holifield to the case.

12.  Plaintiff had no choice but to obtain legal counsel, to enforce the 504 issue, since both

parties, CCSD and DOAH, refused to give affirmation that the Plaintiffs requested hearing

would address both issues, and the Plaintiff's requests were being ignored and denied, by all

parties. Plaintiff has suffered a huge financial hardship, due to this hearing taking 16 months

of costs to include attorney fees.

13, The ALJ, states "that the Petitioner, offered 57 exhibits into evidence", when in fact the

hearing transcripts show, as does the evidence list shows, that the Petitioner submitted, 81

exhibits, plus the additional exhibits related to Dr. Sartorio's Deposition. It was CCSD's

responsibility, to forward all said exhibits, to DOAH, which they had in their possession and

control, since the beginning of the hearing on May 2009 to the ending of Sept. 2009, at the

Administrative building.  This responsibility was established at the hearing, by the ALJ and

CCSD.

14.  Plaintiff denies any agreement to enlarge time, past the 45 day due process hearing guidelines.  Plaintiff felt that, by increasing the time from 45 days, per law to 16 months would cause her a huge financial burden, as a single parent with limited resources she could not financially withstand.   Her written and verbal, objections were ignored by all parties.

## **FINDINGS OF FACT**

1.  <u>Parent agrees and further states,</u>  That the child, known as A.D.-F. born on February 3, 2000, was a student at an elementary school in Naples, Florida from August 2005 until Christmas break in December 2008, but further states, that the school, is called "Seagate Elementary", which was the child's "home school" based on her residency. She also adds that Seagate Elementary, per their web page, had for the years mentioned, the **lowest** special education percentage, (**Seagate Elementary population of ESE, less gifted is 3%),** compared to the county, state, and national average of, special education student percentage (ESE) children.  The county, state, and national average of Special education students is 12-15%.  Seagate Elementary, was a prior "clustered school" for the gifted, and maintains their, large gifted population.  Petitioner believes, the schools personnel neglect to identify ESE, to keep their gifted status.

2.  <u>Parent agrees in part, but further states,</u> parent moved child to neighboring district, using McKay scholarship, per CCSD's guidance and due to CCSD's refusal to meet child's individual educational needs, refused to reevaluate, refused to monitor lack

of progress and try other interventions, or properly "place" child, based on her needs

as evidence by, child's inability to make data based progress, or benefit from

CCSD's ESE educational program.  CCSD modified child's curriculum for lack of

appropriate resources.

### The 2005-2006 School Year, (Kindergarten)

3. <u>Parent agrees in part, but further states,</u> child displayed frustration and "acting out

behaviors" as early as September 23, 2005.  Mother requested a meeting with

Kindergarten teacher, Ms. Soper and then, assistant principle Ms. Trout to address

teachers concerns related to the child not, following directions and child's'

"defiance" and lack of self-control.  Ms. Soper commented on child's willfulness

and disrespect of classroom rules.  Mother expressed and explained child's high

potential for miscommunication and lack of understanding of authority.  As early as

9/19/2005 Kindergarten, teacher also identified that child needs improvement in

learning basic academic skills, but **NO**; close monitoring, assessments, action,

interventions, or behavior evaluation was suggested, by school personnel. **Exhibit D,**

**E, P-548-572.**

4. <u>Parent disagrees,</u> and states; during Kindergarten, progress or lack of the same, was

reported to parent, visa "interim reports", on 9/19/2005, 11/22/2005, 2/16/2006 and

5/5/2006.  Report cards were sent home on 10/14/2005, 12/21/2005, 3/16/2006, and

6/02/2006.  This is a progress reporting period of 4 weeks, as early as 9/19/2005

teacher reported; child needed improvement in reading and math, documenting the

lack of academic progress, **Exhibit D.** The November 2005, interim report, which is with in 8 weeks of the start of Kindergarten, the child's weaknesses were more and the area's of "needs improvement" doubled and the teachers comments of the lack of academic progress was now up to seven (7) weakness. But, no conference was requested, no referral was initiated, no AIP/RtI was mentioned, no "child find" interventions were not used or even suggested, by school personnel.  **Child Find** process/provisions were ignored.  By the December 21, 2005 report card, **Exhibit G, P-557+558,** deemed child, needs improvement to be eligible for promotion and also addressed child's weaknesses in the basic phonemic awareness and phonological areas, to total at least the 4, which are consistent with a SLD and exceptionalities specifically the disability of Dyslexia.  Yet, no conference was called, no actions were taken by CCSD to initiate or implemented an academic interventional plan (RtI), per Child find, and under IDEA or ADA section 504.

5. <u>Parent strongly disagrees,</u> and states, Parent requested in parent comment section, of 12/2005 report card, "I am requesting that Annalyse be placed in a special reading class, if possible, so that she may get extra support" **see exhibit P-557+558.** Parent did not "demand a one-on-one tutor", as per the ALJ's inflammatory statement. Parent explained to, Ms Soper, that she struggled to read and comprehend herself and requested the child be placed in a "special reading class", because that is what the elementary school did for her when she was in elementary school.  Mother also requested a conference with teacher.  Mother received a copy of the 1/9/2006 AIP, in child's folder, mother would not sign due to lack of understanding and again, wrote a

comment at bottom, of Initial AIP, to address child's deficit. **see exhibit, H, P-559-562.** She was also advised verbally that there is no Kindergarten reading teacher. Mother then had a conference on January 16, 2006 with Ms. Soper and Ms. Heath, the curriculum specialist for Seagate Elementary.  She signed the AIP, as asked, but was not explained the "process" of AIP/RtI/the issue of IDEA or 504. Mother asked verbally, if the child could be evaluated for a learning disability, since she herself struggled with reading and comprehending.  Parent agrees, that in fact she requested the child be evaluated as was told by Ms. Heath, that they **DO NOT EVALUATE KINDERGARTENERS!** (After a parent has requested an evaluation for their child, especially a eligibility evaluation, the parent is to be given a Notice of her Procedural Safeguards), <u>W.B. v. Matula</u> (3rd Cir. 1995).  Mother was not given her procedural safeguards. Mother was not made aware of the laws, Federal or State that protected her child and was not referred to any resources that would explain the "process" of obtaining the information.  Mother was simply DENIED, her request for an evaluation. Parent is only guilty of, believing that CCSD personnel and trusting them to appropriately help her child, <u>Goleta Union Elementary Sch. Dist v. Andrew Ordway</u>, 248F.Supp.2d 936 (C.D. Cal. 2002).  IDEA '04 suggests schools collect data about a student's performance while using researched-based interventions. Even though RTI and other methods of data collection are expected to occur prior to the student being referred for special education services, a parent can request an evaluation for their child at any time during the data collection process. 34 C.F.R. § 300.307(a). "Meaningful and effective parental/family involvement is

critical to student progress and required by both NCLB and IDEA. It is vital that parents be informed and involved at each step in the process. Regardless of whether the parent or the teacher initiated a concern, parent involvement should be facilitated throughout the process. The district should communicate the information obtained from progress monitoring to the parent each time the data are analyzed to make instructional decisions and/or at regular intervals. Parents should be actively engaged in all the decisions regarding adjustments to interventions and related changes to a student's curriculum".

6. <u>Parent disagrees</u>, and further states with supportive clarification, that the AIP, was only initiated after mother identified, that the school was not meeting the child's academic needs, in her 12/19/2005 and again in her 1/9/2006 written requests.  An AIP, is seen as a pre-referral activity, now know as the early intervening services, through Response to Intervention (RtI) and can be utilizes prior to a referral for special education services, but does not replace or delay the evaluation process, under IDEA. {The most important parts of pre-referral services include services or programs that can be made available to the child as initial steps to improve performance including: close monitoring (watching), documenting the student's progress, and examining the instruction provided in the general education classroom. The child's progress needs to be monitored in a clear way so evidence of improvement can be tracked. Also, if the **instruction model** being used does not meet the needs of the child, the child will not progress.} 20 U.S.C. § 1400(c)(5)(F) 34 C.F.R. § 300.226(b) 34 C.F.R. § 300.226(c).  Implementing AIP/RtI does not override the other rights under IDEA, such as a parent's right to request a

25

comprehensive individual evaluation at any time. The basic elements of RtI are

required by the No Child Left Behind (NCLB) Act and the Individuals with

Disabilities Education Act (IDEA). **After a parent has requested an evaluation for**

**their child, the parent is given a Notice of Procedural Safeguards, 20 U.S.C. §**

**1400(c)(5)(F), 34 C.F.R. § 300.226(b), 34 C.F.R. § 300.226(c).** The parent was

denied any knowledge of the same.

Parent also submits and refers to FDOE's web site statements, found in

**"The Florida Department of Education, Statewide Response to**
**intervention (RtI) Implementation Plan, page 15 , 2008 states,**

**Academic Improvement Plan (AIP), is a Pre-referral activity. Pre-referral means**
**investigating and identifying the education or behavior needs of a child and giving**
**the necessary supports to that a child before he or she is referred for special education.**
**Pre-referral services are provided because the child is struggling and the parents and**
**teachers want to know why.  The supports can be given through interventions.**

**{The most important parts of pre-referral services include services or programs that**
**can be made available to the child as initial steps to improve performance including:**
**close monitoring (watching), documenting the student's progress, and examining the**
**instruction provided in the general education classroom.  The child's progress**
**needs to  be monitored in a clear way so evidence of  improvement can be tracked.}**

**\*Also, if the instruction model being used does not meet the needs of  the child, the child**
**will not  progress.**

And further shows proof that, per FDOE website that the AIP as the "method" used

was changed, because:

**{The traditional model of addressing student needs by conducting**
**pre-referral activities as required in the process of finding a student**
**eligible for special education is based on a "wait to fail" practice that**
**self-identifies students. The problem with this model is that once a**
**student is identified, typically the gap between student performance**
**and grade-level skill requirements is too great (more than two years)**
**to respond successfully (close the gap) based on the level of**
**intervention resources available in schools.}**

The child had a significant "gap" per her, July 2006 Independent Educational Evaluation (IEE), which did not decrease over the time (9/2005-12/2008) she was a (ESE) student at Seagate Elementary but, in fact the child's IQ, decreased as her gap increased.

7. <u>Parent disagrees and further states,</u> The AIP, of 1/16/2006 addressed the weakness the child had in reading, phonemic awareness and sight word recognition, but further states, these weaknesses are consistent with Dyslexia, a SLD and not solely a manifestation of ADHD. Parent states, that the interventions in small group were the same as in large group. They did not work, and the CCSD, had not data to support their interventions were working, in fact the child was slipping further and further behind.  How is the intervention of "rapid sight word recognition" going to help a child who is unable to recognize the word in the first place, going to help?  CCSD was teaching to the child's disability.  One can not teach a child how not to have a disability, her weakness are her exceptionalities, which are her disabilities. The child's next interim and report card showed more, even after the AIP, was initiated, weaknesses and problems identified as early as February 16, 2006.  Mother then received notice from principle, child would be retained.  The child did not progress and she did not benefit, from her education.  The CCSD, failed to use different interventions, failed to address child's needs, they failed to initiate a special education referral, they refused to evaluate, they failed to give the parent her procedural safeguards, they failed to comply with Child Find, IDEA, and ADA section 504, they failed to follow the process of said laws, therefore as a result the failed to provide the child FAPE.  An AIP is consistent with RTI in Florida, Response to Intervention is defined as the change in behavior or performance as a

function of an intervention. Response to Intervention is "data-based decision making"

applied to education. The essential components of RtI include:

• Multiple tiers of evidence-based instruction service delivery
• A problem-solving method designed to inform the development of interventions
• An integrated data collection/assessment system to inform decisions at each tier of service
delivery.

Children must be provided with effective interventions if they are not making adequate

progress and also with opportunities to accelerate their learning. The child made no progress

and fell further behind, as evidence by more problems added to the AIP and the intent of

affirmative letter, of retaining the child.

8.  Parent disagrees and states,  signing an initial AIP, is not a affirmation that a Parent has

been explained the process of child find or IDEA, or ADA section 504.  Parent was not given

her procedural safeguards, at this time. A parent's signature, is not informed consent" as far

as the parent knew, it was no more then an acknowledgment that she has been given a copy

of the AIP.  It does not relieve the School District of their, responsibility to follow the

process or relieve them of their neglect to initiate child find procedures in a timely fashion.

The ALJ, using the word "signing off" is an example, of her intentional adding of "district"

supported manipulation of the facts. Parent signed she received a copy, no more.

9.  Parent agrees and further states, the second AIP, used the same interventions that were not

working as evidence by, the child's lack of progress, her problems were worse and there

were more.  The CCSD's only "answer" was to retain the child, which the parent did not

agree to, the use of retention as an intervention, for the lack of CCSD's refusal to evaluate for

appropriate interventions. CCSD, continued to deny they had the obligation to evaluate the

child because she was in kindergarten.  The child had been slipping behind since day one and

had been on a AIP, for at least 6 weeks, which was proving not to help.  CCSD failed to initiate the next step, per the process of **child find** and appropriate evaluations.  .

10.  <u>Parent disagrees and further states,</u> CCSD failed to monitor and implement an appropriate AIP and failed to evaluate, when the AIP "referral activity" showed no progress after 6 weeks, February 2006, this lack of progress with the AIP, should have initiated a referral for evaluations and initiated the necessary Parental procedural safeguards distribution, under IDEA and ADA, Section 504. Mother only received a letter referring to retention.

11.  <u>Parent agrees in part and adds,</u>  This finding of fact, is a GROSS example of CCSD's refusal to comply with the state law and Federal laws, that protect the child.  That by CCSD's using their "opinion" to deny the child the protective rights to address her disability; they denied her FAPE, under IDEA and ADA section 504.  In, March 2006, Mother submitted, a copy of the Florida statues, per education law, to the school, related to appropriate evaluations of students, K-12, kindergarten child **are** protected. Still CCSD, refused to evaluate the child. Mother should have submitted her request in writing, with the law as a reference, to the Principle, but the parent was not made aware, of this requirement, by Ms. Heath or Ms. Soper.  She was not informed or aware of the laws under IDEA and ADA section 504, at this time.  Mother was not told by CCSD, that she needed to submit her request for an evaluation, in writing.  In April, 2006 the parent took the child to ( Dr. Dunkin) a pediatrician to discuss the child's educational and behavior issues, since CCSD was refusing to identify, evaluate, and implement an appropriate plan of interventional.  The child was now a <u>whole year behind</u>.

12. <u>Parent agrees and further states,</u> The child was now a year behind, CCSD wanted to

retain her, for lack of appropriate interventions.  Mother had submitted, in early May 2006,

Dr. Dunkin's written request to evaluate the child (full evaluation, not a screening) for

ADHD and SLD.  CCSD, flat out refused, to evaluate the child, referring back to the "60

day" time line.  But mother had been asking since January for the CCSD, to "help" the child

and in February 2006, to evaluate the child. Parent was not given her procedural safeguards

at this time of refusal, by Mr. Casellani, who she requested and evaluation from, per Dr.

Dunkin's written request, or by Mr. Laurence Ruble, head of PSY. Services, or by anyone

from CCSD.  She was just denied.

13. <u>Parent agrees and further states,</u> Dr. Dunkin stated, he could not diagnose child as

ADHD, but later on, after Dr. Mc Ginnies's evaluation, which showed SLD potential and

testing to support the diagnosis of the SLD, Dyslexia, in August 2006, CCSD forwarded to

Dr. Dunkin a formatted form to Label child, ADHD, with the diagnosis box already checked,

which he signed and thus "pigeon holed" child into ADHD/OHI.  They did not include the

Diagnosis of SLD, in their pre-checked form.  Even though the child's AIP, and private

evaluation (IEE), showed multiple dyslexia based weakness.  CCSD would agree to make

her eligible to ESE, special education services, under and only under the eligible of

ADHD/OHI.

14. <u>Parent agrees in part and further states,</u> please read Dr. Dunkin's written request for "full

evaluation" for ADHD and SLD, findings of fact emphasizes, ADHD and grossly minimizes

request to full SLD evaluation.  IDEA and ADA section 504, addresses appropriate

evaluations.  Therefore a full Academic evaluation by CCSD, was requested, not just the use

of a psychological evaluation, to diagnosis ADHD/OHI, <u>Amanda C. v. Clark Co Sch. Dist.</u>

<u>& Nevada Dept. of Ed, 267 F. 3d </u>(9th Cir. 2001) **See exhibit L, P-618.** This strongly

written decision cites and describes purposes of the IDEA; IEPs and procedural

safeguards. District's failure to provide parents with evaluations adversely affected

parents' ability to make decisions and damaged child; district failed to provide FAPE;

standard of review in two-tier system; credibility of witnesses.

15. <u>Parent agrees and further states,</u> She submitted her written request, due to school denying

her verbal requests, for a complete ADHD and SLD evaluation to the Principle, Mr. Brian

Castellani, of Seagate Elementary, as soon as receiving it, cost of visit to Pediatrician was

paid for by Petitioner at her own expense.  This was when the Petitioners actual financial

damages, started.  The punitive damages started back in September 19, 2005, when CCSD

refused to use the "child find" guidelines and process under IDEA and ADA section 504, to

identify the child.

16.  <u>Parent agrees in part and disagrees,</u>  Parent requested meeting with the Principle, Brian

Castellani, to address the issue, of denying the child the appropriate evaluation process, and

why her parental concerns and requests, had been denied since December 2005.  That she

was not happy, with the CCSD's "blowing her off" and that she was very concerned and

upset, that the schools answer was to retain the child. She did not agree to  the delay of an

evaluation until after the summer.  She explained that, as a parent her job is to help her child,

and that she struggled with reading when she was a child.  If she knew and could understand,

what the child needed, she would get the child what she needed over the summer.  She did

not want A.D.F., to slip further behind, if she could prevent another 3 months, of hardship,

for her child over the summer, she would.  Mr. Castellani refused to have the child evaluated

over the summer, and refereed the Parent to Mr. Larence Ruble, at the CCSD level.  But he

did, put in writing, his "written promises" to do a full evaluation, and to indicate the pre-

referral process.  But, now the parent understands that the AIP, was a pre-referral activity,

which was initiated in Jan 2006.  Parent now understands, that Mr. Castellani's written

document refers to a ADA section 504, plan for the issue of the CAST, team was recognized.

The CAST team referral, per ADA section 504 should have been initiated the (90 day) clock,

starts per parent identifying, back in December 2005,  and the (60 day) clock per IDEA, by a

"parent consent form" for evaluation.  At the latest, the clock should have been initiated in

February 2006, when the child was not making progress per the AIP.  If the process of IDEA

and ADA, section 504, was complied with by CCSD personnel, the child would have already

been appropriately evaluated, and the parent would have signed consent for the same and

32

would have received her procedural safeguards, under IDEA and section 504, back in

December 2005.  But, the CCSD failed to do any of theses actions.  They just delayed and

denied the child and the parent.  The principles rational is not consistent with the law, and

every day lost was a day the child slipped further behind.

17. Parent **strongly disagrees** and further states,  This finding of fact, was created by the

ALJ, no evidence exists and no testimony exists, to warrant the statement that the mother was

offered an evaluation, prior to the commencement of the Fall semester of school.  The **parent**

was requesting help, all year, and the CCSD was refusing and denying to do the same. Mr.

Ruble, stated over the phone, no meeting took place, the 60 day rule to the parent, and

expressed his hands were tied.  The Parent was doing everything in her power to get "timely"

help for her child, and was being denied the right to do so, by ALL at CCSD.  This is a

prime example of the ALJ adding untrue findings, to support her cause.  Why would the

parent deny the help (appropriate evaluations) when she was the only one who identified and

requesting the help, for her child? No consent was ever given to the parent to initiate the "60

day" rule. This case file, lacks the same.  Not written refusal, per IDEA exists and no

procedural safeguards were given, to the parent prior to August 2006, after the summer.  Dr.

Mack, saw the child, at the mothers expense, per the referral of Dr. Dunkin, since "he could

not diagnose the child as ADHD/OHI" but, she could not do an educational evaluation, she

could only do a psychological evaluation, to assess and diagnosis, the child as having ADHD

tendencies.  This was done, at mothers expense, and not covered by insurance, the cost to

parent increases, thus FAPE is denied. The statement the " <u>In response, Ms. D.-F. gave no</u>

<u>indication she wanted the evaluations conducted prior to August or September 2006,"</u> is

**UNTRUE.**  The evaluations should have been done, in a timely fashion, per child find and

IDEA and ADA section 504, by law.  Further more, what the parent wants" is not the issue,

what the law says and what the child needs to progress in the general curriculum under IDEA

and ADA section 504 is the issue." The parent herself has a learning disability, which the

CCSD was privy to as early as January 2006, how does she how what the child needs, she

herself struggled through school.  It was CCSD's responsibility to provide the provision of

FAPE.  The parent only wants her child to learn and is only trying to help her and  advocate,

without the instruction and knowledge to do so at this point.

18. <u>Parent agrees and further adds,</u> Parent was told, my CCSD, that Collier doesn't evaluate

kindergarten children," why would the parent want the child retained, in Kindergarten when

the CCSD stated they do not evaluate kindergarteners, this would have denied the child the

appropriate evaluations, to find why she could not learn another year!  Of course, the mother

refused to allow the child to be retained.  CCSD, would have just continued to do the same

thing that didn't work for this child, the first time to include an inappropriate AIP, and the

child would have been academically behind another year, to now total 2 years behind. The

child did not and could not meet the district standards, because CCSD failed to follow the

process of identifying, evaluating and reevaluating the child.  It's not the child's fault she

can't learn per their inappropriate interventions.  She has a disability; she is not able to access

an education, like her non-disables peers.  To punish the child for her disability, which is

most likely genetic based, is to discriminate against her, for the same. Mr. Castellani,

"placed" her with Ms. Richardson, who is a first grade "inclusion" teacher, who per her

verbal statements to mother" also has ADHD. This was a "misery loves company"

environment.  Ms. Richardson, displays the characteristics of a scattered, lack of focus,

creative teacher, but is not a certified reading specialist, is not a CALT, or a Certified

Academic Language Therapist. She has no training in Dyslexia, she was a dumping zone for

children who can not progress in the general curriculum." She requested and needed parental

volunteers, to meet her pupils/classes, basic needs.  The child was placed with

accommodations in Ms. Richardson's class.  Accommodations are used to address a child's

exceptionalities, based on ALL their disabilities.  This child had not been evaluated, for

anything to include a SLD, yet by CCSD, so mother agreed to the placement with the belief

that CCSD, per mothers verbal request, on February 2006, per Dr. Dunkins written request

on May 19,2006 and Mr. Castellani's written promise on May 26, 2006, **see attached**

**submitted exhibits, A, B,C** and understanding and consent, given to parent and signed on

September 24, 2007 would do a Full Educational evaluation to support or rule out the

diagnosis of a SLD.  IDEA and ADA section 504, clearly states ALL disabilities, are to be

identified and a IEP are to address ALL, disabilities.

19. <u>Parent disagrees and further stated,</u> she did not meet with Mr. Ruble, but was denied a

evaluation for her child, over the phone. He never agreed to allow the child, an evaluation

prior to September 2006.  This statement is a "made up offer" by the ALJ.

20. <u>Parent agrees in part and disagrees in part and further states,</u> That since CCSD, refused to

evaluate the child, prior to September 2006, and based on their consistent stance of retaining

the child in Kindergarten, parent initiated an appointment with a private psychologist to do a

comprehensive evaluation.  Dr. McGinnis, was located in Fort Myers, and agreed to do a Full

Comprehensive Psychological /educational evaluation, per Dr. Dunkin's written request and

Dr. Mack's referral.  This action was taken per referrals of professionals and due to CCSD's

refusal to do the same.  Mother paid out of pocket, for Mr. Dunkin, Mr. Mack, and Mr.

Mcginnis's professional services.  Mother is a single parent on a fixed income, works full

time and has another child who is a teenager, at this time. Dr. Mack expressed the importance

of a speedy evaluation, so that the parent could then hire a private tutor over the summer,

since she was told retention is not supported by the evidence to be an appropriate

intervention, and in fact will "hurt" the child.  Mother filed a "notice of intent" with Mr.

Castellani's boss, Dr. Kelly at the District level.  Mother was using the chain of command,

for lack of appropriate instruction.  IDEA and ADA, section 504, clearly states, procedural

safeguards are to be given to the parent upon request for an Evaluation. Parent was denied,

this right under IDEA and ADA section 504, for her child who exhibited and had a history of

the same to include all the characteristics, but not yet identified, due to the refusal of CCSD

to do the same and comply with the laws.

21. <u>Parent agrees and further states,</u> she was delayed and denied the appropriate evaluations

by all CCSD personnel.

22. <u>Parent disagrees and further states,</u> Dr. Mack, a certified Psychologist, only meet with the

child one time on June 5, 2006, where she diagnosed the child, per parent questioner with

ADD.  She did not DX child as ADHD, and prescribed medication to help child, stay on task.

ALJ excludes this issue, that the child was "medicated" with stimulant medications from July

2006 until August 2008, to control any inattentiveness caused by the ADD/ADHD.  The

child still after being medicated, on a daily bases, continued not to make progress, per

CCSD's interventions.

23. <u>Parent agrees,</u> she was referred to Dr. Mcginnis, as a licensed individual who could do a

complete, comprehensive educational evaluation.

24. <u>Parent disagrees and further states,</u> McGinnis, was paid a large sum, to provide and objective, comprehensive educational evaluation, but failed to do the same.  Dr. McGinnis spoke highly of Mr. Ruble, and failed to complete a Comprehensive full evaluation, in fact he left out 2 parts, of the evaluation, saying the child could not follow the task. But, failed to advise the parent that the lack of these tests, would not meet he District requirements for a diagnosis of SLD.

25. <u>Parent disagrees and further states,</u> Later when Dr. McGinnis was questioned by the parent in March of 2008, he stated "he intentionally didn't do the sub-tests, because it would have "hurt" the child's eligibility" Later on, Dr. McGinnis, stated on April 2008, to avoid a subpoena, to be a witness in Due process stated "That CCSD did not like the diagnosis of SLD, especially Seagate Elementary, and would have denied the child's eligibility in whole." Parent would have followed up with Dr. McGinnis to request, if necessary through the Medical board via a complaint) to finish the comprehensive evaluation, for which she paid out of pocket for and for which he was paid handsomely for, if she had been made aware of the same by CCSD, back in September 2006.  But, she wasn't advised of the same, so therefore she had no idea of the "loop hole" CCSD, would use to deny child had a SLD.

26. <u>Parent agrees and further states,</u> child has a high IQ, which supports her ability to learn.

27. <u>Parent disagrees, and states,</u> the reason the comprehensive evaluation was not complete was due to and based on Dr. McGinnis's relationship and knowledge of CCSD's history of denying children eligibility for IDEA, under the SLD diagnosis.

28. <u>Parent disagrees and further states,</u> McGinnis's testing and data support a "gap" of 32, double the amount the state was uses 15, to show a discrepancy: ***Discrepancy model:*** when there is a significant difference between a child's intellectual ability (often measured by an IQ test) and how that child performs academically (speaking, reading, writing, comprehension, math calculations and reasoning) 20 U.S.C. § 1414(b)(6). This large discrepancy model was still being used, under IDEA and under ADA section 504. It qualified the child as a child with a disability, under ADA section 504 and IDEA. The child then qualified for protection and the provision of FAPE, under both.

29. <u>Parent agrees and further states,</u> child's weaknesses in the areas of phonemic awareness and phonological ability, and her low scores of application of the same, are consistent with a SLD, to include Dyslexia and related disabilities, to include the subjects of reading, spelling writing, and math.

30. <u>Parent agrees and further states,</u> that the evaluation, specifically addresses, "a learning disorder looks increasingly apparent."

31. <u>Parent agrees and further states,</u> that CCSD has the responsibility to appropriately evaluate and reevaluate the child under IDEA and ADA section 504 for ALL disabilities. This evaluation clearly showed the potential for a SLD, the school was aware that the mother suffers form the same, but refused even after requesting consent to do an evaluation, never reevaluated the child, but simply "pigeon holed" her in to IDEA under a diagnosis of ADHD/OHI. They did not inform the parent that the evaluation, was inconsistent with a Comprehensive Educational Evaluation, due to lack of sub tests, and never continued the evaluation process to rule out or support the suspected diagnosis of SLD, or more then one disabilities, as is their legal responsibility.

32. <u>Parent disagrees and further states,</u> mother was never made aware, of the issue of the missing, tests and that any tests, or testing used by CCSD after the label of ADHD/ was subjective, to support the districts OHI label, only.

33. <u>Parent disagrees and further states,</u> It is CCSD's responsibility to evaluate and reevaluate for ALL disabilities. It is not the Parent's or the Independent Educational evaluator's, in fact If CCSD knew, that there were tests missing, then per Dr. Dunkin's written request, they were liable to do all appropriate Evaluations.

34. <u>Parent disagrees and further states,</u> Dr. Mack's role in the child's care was to address the Psychological issues, and prescribe medications for ADHD. That, the mother submitted a

written request, from Dr. Mack dated, July 2007, not July 2006, which was obtained, after

the child had a year of special education under OHI, in CCSD. Dr. Mack's written request to:

further evaluate the child was based, on the child's lack of educational progress, while on

ADHD medications. This written request was written to assess for a underlying LD of

Dyslexia. The child by this time had also had a private tutor, who specialized in ADHD and

was paid for my the mother. This request was presented to the IEP team, on September

2007, only after the child was retained in First grade and based on more then "focus" issues.

The child was now, 2 years behind, reading per "teacher observation" at the beginning of

first grade, after a full year of first grade, while child is medicated and getting services and

interventions for and only for her ADHD.

35. <u>Parent agrees and further states,</u> the tutor was hired, after child was evaluated by

Mcginnis, and used for the summer of 2006 and a full year, during 2006-2007. Child was

medicated, in special education under OHI, and was not making progress; therefore child was

retained in first grade. Parent paid out of pocket for tutor services, for more then 15 months.

CCSD never offered or suggested after school tutoring, during the first year of first grade.

CCSD never requested to reconvene the IEP team, to address child's lack of progress and

never request more evaluations or the idea of reevaluations; they let the child struggle and

fail, to meet her IEP goal. The IEP, was based on the child's OHI needs and lacked, present

levels, baselines, measurable goals, lacked data based, proof of progress and was reported on

by was of "teacher observation".  The child's cumulative file lacks any true objective

documentation or data, that the child made any progress.  Any progress was stated in the

fashion of immerging, not mastered, minimal frustration. No progress was or could be

measured, due to lack of measurable goals. Due to this Mother was unable to follow, such

subjective data based teacher self evaluation reporting.

36. Parent agrees and further states, parent submitted a copy of McGinnis's evaluation along

with a cover letter from McGinnis, opposition the child be retained, along with a letter from

the private Tutor, opposing retention due to the evidence, that it is in fact a negative

intervention.  She submitted these to Dr. Kelly, the then assistant Superintendent, of CCSD

and to Mr. Castellani, to prevent the child from being retained in Kindergarten.

37. Parent can not agree or disagree, for she is not aware of who they forwarded the

evaluation to, she was made aware, that the child would be "administratively" placed in first

grade.

38. Parent can not agree or disagree but further states, child should have been referred to

"MDT" when the AIP, was initiated back in January 9, 2006, per child find provisions and

mothers identification in the December 2005, report card. This timely, referral would have

been consistent with the laws, under child find, under IDEA and ADA section 504 no later

42

then February 19, 2006 when AIP, failed. Mother never meet with a "MDT", just Ms. Soper

and Ms. Susie Heath, at an informal parent requested conference.

39. <u>Parent disagrees and further states,</u> Ms. Cosgrove should have requested a meeting with

the parent to explain to her, that Dr. McGinnes's evaluation lacked sub-tests and therefore

was not a comprehensive educational evaluation and would deny the child, services and

direct instruction for the same.  In fact she withheld this information, and used the IEE, at the

expense of the mother and the child.  She also never considered or gave the parent any

information related to the laws, under IDEA of ADA section 504.  There was not informed

consent or explanation to the parent related to either.

40. <u>Parent disagrees and further states,</u> she now understands that a "test" should not be re-

given to a student, in a certain time frame, for there is a potential for the child to score higher.

But the parent must address the issue, that there is more then one test that can be given and

used to assess a child's present levels, baselines, IQ, processing, application. **Reevaluations**

**cannot be conducted more than once per year unless both the school and the parents agree,**

(34 C.F.R. § 300.303(b). Parent would have agreed if, she had known  Plus tests are given in

different formats, so if you give the child a written test and she can not read, she will

definitely score low. If you give the same test to the child, and you read it to her, because she

cant read, you will get a significantly higher score.  In fact, Ms. Cosgrove stated on the

record, she did not have the child read or write during any of her testing. Evaluations have to be provided in the language and format most likely to give accurate information about the child. This can include Braille, sign language, or any other foreign language 34 C.F.R. § 300.304(c)(1)(ii) Therefore she could not and did not assess the child's disabilities in this area. Her testing was all verbal and based on "her observation". So, Ms. Cosgrove's addendums, testing, and data were consistently "skewed" to make the child ineligible for SLD services under IDEA, therefore she focused only on supporting the ADHD/OHI disability and ignored the exceptionalities of the child's dyslexia. This is a child who has been deemed with a poor short term and long term memory deficit, but CCSD is using the defense she would remember the testing answers, this makes not sense. It was not appropriates, to withhold the evaluation process, for any reason. The Laws say, this is the schools responsibility to find and treat any and all disabilities, per IDEA and ADA section 504. Ms. Cosgrove should have and could have done, a similar battery of test, to complete the "full evaluation" process per requests. She choose not to, even after she had the parent sign a "consent" letting the parent believe she was going to do so and comply with the process of IDEA and ADA section 504.

41. Parent disagrees and further states, subjective informal observations yield not objective data. Ms. Cosgrove, performed a "in class room observation?" this is not evidence based and

44

it can only assess a child's inattentiveness.  There is no data to support, how many words the child can read, how many words the child can write, how many words the child can spell, if the child writes from left to right of right to left.  Maybe the child is inattentive because she doesn't understand the work, or she can't follow the instructions because the instructions lack "direct sequential" step by step, based on her needs.  They just deemed her inattentive and inability to focus, due to ADHD, she was medicated for ADHD, and had a depressed affect at best.  Teacher observation, no matter how many teachers, supporting each others "observations",  is no longer used as evaluation criteria, because it is so, subjective.  This finding of fact, is subjective, based on district testimony only and lacks evidence and data to support.

42. Parent agrees and further states, Mother signed consent, on September, 24, 2007, per her knowledge, for a 'full LD evaluation" and the child received a "addendum" per Ms. Cosgroves testimony.  This knowledge was only obtained by the parent in the due process hearing, which was 2.5 years, after mother was lead to believe the school, followed the process.

43. Parent disagrees and further states, McGinnis report lacked a comprehensive approach, therefore did not qualify as a full evaluation, per CCSD.

44. <u>Parent disagrees and further states,</u> Speech teacher is not a certified academic language therapist, (CALT) she does not have knowledge the aphasia that is a characteristic of Dyslexia and only performed a screening for the articulation aspect of speech.

45. <u>Parent agrees and further states,</u> Ms. Cosgrove stated child's listening skills are average for a first grader, this statement supports the issue, that the child is listening so "focus and inattentiveness" is not the problem, but then she states, could identify most upper and lower case. How is the work "most" measurable?  Child "did not know, most, but not all" how is this measurable.  Present levels and baselines must be numbers, they must be measurable, without measurable baselines and present levels, and measurable goals can not be written. This is not date, to base an IEP on, the child's IEP, from September 2006 to September 2007, lacks all requirements per IDEA.  The IEP, did not meet the child's needs, because there is no way to understand her needs based on most, or some, or a few.  There is NO data. The identifying that the child only knew 8 sight words id data, but then the issue of what the child should know, at this age is missing, to show a clear present level.  Then Ms. Cosgoves report states, per the ALJ, "the child did not use any strategies to try and figure out the word", how can the child use strategies she was never taught and read a word she does not know? These problems are her disability; she can't do it, because she was never given the appropriate interventions to figure out how to do it.  This is her exceptionality.  The school was teaching

46

to her disability, but because they never appropriately evaluated the child to find out what were her disabilities, they were punishing her for her disability. CCSD used Spalding phonics, as her remedial program, for 3.5 years. They used the same thing over and over again, for lack of appropriate evaluations and reevaluations. Then for lack of progress they modified her curriculum, and treated her as if she was mentally retarded and couldn't learn the strategies, they never taught her.

46. <u>Parent disagrees and further states,</u> Dr. Mcginnis's evaluation showed a above average intelligence, Ms. Cosgrove is saying 'at least within the average range" then states her academic deficit is based on ADHD, without do the appropriate evaluations, and based on her "observation" Mother never agreed to "dumb the child down" with modifications, mother asked for the CCSD, to give the child the support she needed, to get her to progress in the general curriculum"

47. <u>Parent agrees and further states,</u> the "MDT" made the child eligible for ESE only on their subjective observation and lack of appropriate evaluations, from reliable data based evidence, under OHI, for lack of following the process under IDEA and ADA section 504.

48. <u>Parent disagrees and further states,</u> mother could not disagree or agree to CCSD's determination of eligibility, because she was not made aware of her rights, or the guidelines of the process, or the Laws under IDEA or ADA section 504. She was not made aware, that

CCSD failed to appropriately evaluate the child. She was not made aware that McGinnes's evaluation lacked sub testing needed to appropriately identify the child's disabilities, she was not made aware, that the school would be using the same interventions and Spalding phonics, as they did in kindergarten, which didn't work. She was not made aware, that the resource room, teacher would not be using any scripted direct instructional program to help the child's need for remediation. The mother was new to special education and trusted the school to meet the child's needs. The mother was not aware, that it was her responsibility to in force the provision of FAPE. The mother was not explained that there is a "process" or outline, per IDEA and ADA, section 504, that the school must do, to insure FAPE. The mother didn't even know the definition of FAPE. The mother did know, that she had paid a large amount of money out her pocket, by this time to try and get the ball rolling and prevent a larger "academic deficit' for her child. The child had a 32+ point gap, which did not decrease, the discrepancy model, 20 U.S.C. § 1414(b)(6).

49. <u>Parent agrees.</u>

50. <u>Parent agrees.</u>

51. <u>Parent disagrees and further states,</u> The IEP, lacks understanding of what the present levels are, where the child should be, what level are her "non-disabled" peers at. How far, is she behind, it lacks baselines and exceptionalities. It lacks measurable goal. It lacks, a list of

interventions and how much will be used, by whom and where. It lacks appropriate objective

evaluation criteria, it lacks all the child's exceptionalities. The IEP, focuses on ADHD, and

accommodates the child, only for the effects of the same. The IEP, lacks assisted technology

as a related service. The IEP, lacked any ability for the parent to monitor the child's

progress. The focus of the IEP, was the child's lack of Focus, even though the child was

medicated for ADHD. The local private tutor, Ms. Marsha McGuinness, referred by Dr.

Mack continued to work with the child, for the during the summer of 2006 and the entire first

grade year, at the mothers expense of over $6,500.

52. <u>Parent agrees and further states,</u> this IEP, focused on accommodations, of a ADHD

student , not direct instruction, per IDEA. The IEP, was nothing more then a 504 plan,

labeled an IEP, so the district, could bill per the IEP Matrix score, and receive extra money,

from Federal Funding.

53. <u>Parent disagrees and further states,</u> the "multisensory approach method" used was

nothing more then the Spalding Phonics program used in Kindergarten. The child was still at

a Kindergarten level, apparently this program was not working for the child. CCSD, per the

Florida Center for Reading Research, FCRR, has many more available programs, that

address phonemic awareness and phonological problems, but the school refused to use, and

the parent was unable to tell if the child was making any progress. The parent did know that

the child continued to struggle to read at home, and refused to initiate nightly reading

sessions.  That all homework was diverted by the child, and the homework done was a battle.

Mother saw no decrease in the child's frustration related to school work.

54. <u>Parent agrees and further states,</u> child's IEP was not changed at all for a whole year, the

school did not request a conference, or a reevaluation meeting.  IEP process, of monitoring

the child's progress or lack of the same, was ignored and the team never suggested or tried

anything new or different to help the child meet her goal. The child, had good attendance,

continued on ADHD medication and was tutored at home weekly.  The child continued to be

a "non-reader" and at NO time did the school, explain that the parent had rights under federal

laws, to advocate for the provision of FAPE, for this child.  The Parent was given a "revised

copy of her Procedural Safeguards" at the IEP meeting, but was NEVER, explained that a

child with a IEP, is protected under IDEA and that IDEA is a Federal Law, that explains a

process or outline, the parent can follow.  When someone said, IDEA mother thought it was

"it meant that the special education department has a wonderful idea, to help the struggling

child." The Procedural Safeguards were not clarified to the parent, and in fact they were

minimized as a formality.  The Parent took responsibility, for not understanding the whole,

IEP paperwork, for she also has a disability with the comprehension of the written language.

It was very confusing, and her questions were not answered in a fashion, that she could

understand.  She is not a teacher and lacks the understanding of the "rules of the English"

language and learning process.  But she is a healthcare professional, who has mastered the

understanding of a Nursing care plan, with the use of proper assessments, evidence based

interventions, evaluation, and modification.  The CCSD, explained that the academic plan,

was not the same.  The parent trusted the IEP team, to help her child.

55. Parent disagrees and further states, Ms. Richardson, was an inclusion teacher with a full

classroom, she relied heavily of parent volunteers to help her with the basic, provisions, of a

"49%" population, of "special children.  There is not way, Ms. Becky Richardson, could

have physically supported the subjective statement that she "worked intensively" with the

child. The child was pulled out and placed in a "resource room" with Ms. Myers, the special

education teacher.  Ms. Myers, interventions no supportive objective data, to support what

she did with the child or what different interventions she tried, as far as the mother was told,

Ms. Myers, just reinforced Ms. Richardson's, remedial activities, of Spalding phonics.  The

child would cut and paste a picture in her daily journal, and try to write a couple of sentences.

This "student demonstration" of the child's unsuccessful attempts to spell was submitted by

the parent as evidence and shows no improvement over a 3.5 yr span. CCSD states, "a child

like this" is consistently inconsistent, this is another sign of Dyslexia, which was consistently

ignored, by the CCSD's staff.

56. <u>Parent disagrees and further states,</u> Ms. Richardson, never explained the process of IDEA

or that the child could have rights under ADA section 504, she failed to document the child's

exceptionalities, and failed to refer the child for the much needed appropriate evaluations and

reevaluations. Ms. Richardson, acknowledged the child was doing better, and that she

seemed "happy", but failed to comply with the provisions of IDEA. Ms. Jennifer Kincaid,

former Director of Reading for CCSD, stated in her testimony, that CCSD did not even have

the "full Spalding Phonics" program, therefore the teachers, were not Certified in it's use.

57. <u>Parent disagrees and further states,</u> Child failed to progress significantly, did not meet

her bench marks, or goals, which were not measurable anyway, and was retained in First

grade. The retention was due to the lack of progress, and inappropriate IEP, the lack of

reevaluations, the lack of referral from teachers, inclusive and special education. The lack of

trying to use other interventions, due to the lack of strict monitoring and revision.  The child

failed, because CCSD refused to follow the provisions and the process of IDEA and ADA,

section 504.  The CCSD, denied the child FAPE.  The IEP failed the child, because it was no

an INDIVIDUAL ACADEMIC PLAN, it was based on, the and only on, her exceptionalities

they deemed only ADHD, <u>Tereance D. and Wanda D. v. Sch. Dist. Philadelphia</u> (E.D. PA

2008**)** The child can not read, no matter how many times u redirect her to look at the page,

she doesn't understand.  No matter how close you move he to the board, she can't read the

words, and no matter how many times, you tell her to try harder, she can't meet the goal. The

CCSD blamed the child, for her lack of progress, if they had followed the process, and

identified each and all her disabilities, the child could have learned to read.

58. <u>Parent disagrees, and further states,</u> CCSD, knew per parent teacher conference, with

Ms. Richardson and Ms. Myer, on or around January 2007, that child was not making enough

progress to advance to 2nd grade.  Mother agreed, child was not making progress and was still

so far behind.  At this time, January 2007, neither teacher suggested or advised the parent

that per the process under IDEA, the IEP team should and could, reconvene to address the

lack of progress and the lack of the child meeting her goals, but no referral was made for

more evaluations or re-evaluations.  The CCSD, was happy and pleased, the mother agreed to

retain the child, but at no time, was the parent instructed on her rights, that she could have

asked for another evaluation in writing and that retention is a "red flag" for the need to

reevaluate. At no time was the Parent informed of her rights, to call an EIP meeting to

address summer school or the provision of ESY per IDEA.

59. <u>Parent agrees and further states,</u> Due to the child's medication being a "controlled

substance", Dr. Mack needed to assess child, yearly to continue prescribing stimulant

medication.  Per her evaluation, and based on the child's history of her inability to progress

in school, after a year of special education, 15 months of tutoring, medications, Dr. Mack,

concluded that, it was not just the child's ADHD, that was preventing her from learning, but

must be a Learning Disability.  Since the child had many exceptionalities, consistent with

Dyslexia, Dr. Mack's request was for the school to address ALL of the child's disabilities, so

that she could benefit from her education.  Dr. Mack informed the mother, that no medication

would or could make the child read, without the right program and apparently since the child

was still at such a low level of reading, spelling, and math the child's Dyslexia was the root

of the cause.  The child needed the appropriate reevaluations to identify the LD that was

holding her back.  Mother presented the written request, to evaluate the child, to the IEP team

at the IEP meeting. The Child's prior, IEP, lacked research based methodology and the goals

are not comprehensive, not specific and were not measurable, Shannon Carter v. Florence

County Sch. Dist. IV. (SC 1990) and  Gerstmyer v. Howard Co. Schools (MD 1994).

60. Parent disagrees and further states, Mother presented Dr. Mack's written request for a

Learning Disability Evaluation, to the IEP team members, at the yearly IEP meeting, on

September 24, 2007.  This "letter" was presented to the IEP team, as a written request to

evaluate for a LD.  The IEP team, per  34 CFR 300.306 may determine that a child has a

specific learning disability, as defined in 34 CFR 300.8(c)(10), if:

'The child does not achieve adequately for the child's age or to meet State-approved

grade-level standards in one or more of the following areas, when provided with learning

experiences and instruction appropriate for the child's age or State-approved grade–level standards.

    a.  Oral expression.

    b.  Listening comprehension.

    c.  Written expression.

    d.  Basic reading skills.

    e.  Reading fluency skills.

    f.  Reading comprehension.

    g.  Mathematics calculation.

    h.  Mathematics problem solving.

61. <u>Parent disagrees and further states.</u> CCSD never requested a reevaluation meeting. On September 24, 2007 mother used the yearly IEP meeting to request the child be evaluated for a Learning Disability and presented Dr. Mack's letter to team as her written request for a Full Learning Disability Evaluation.  Mother also addressed, with the team, that the child has been in special education for a year, she has had a private tutor for 15 months, who is using ADHD strategies, she has been medicated daily since July, 2006 for ADHD, that the mother only agreed to retain the child for lack of interventions that worked.  Mother could see child was not any closer to closing the "gap" that Mr. McGinnis and Ms. Heath spoke of. Child was not making progress and slipping further behind. Mother wanted and requested a LD to support the diagnosis of

Dyslexia or to Rule Dyslexia out. It was clearly, not the diagnosis of ADHD and its

affects on the child that were holding her back.  The child can not read. The mother

agreed to retain the child in first grade, only **to decrease the variables**, of the child's

educational environment, she agreed to retain her if and only if, the child had the same

teacher, the child would have the same environment, the child would have the same

curriculum and content, there would be less variables, so that the child's true problems,

could be addressed. If the child's real problem was Dyslexia, which is genetic and

covered under IDEA and ADA section 504, then the child qualifies and would be

serviced for her SLD, the school needs to find the real problem.  This was a lack of child

find compliance, by the school.

62. Parent disagrees and further states, The September 24, meeting was not a known

reevaluation meeting, mother made "The annual IEP meeting" a re-evaluation meeting

because she would not agree to create a new IEP,  without the results, of the requested

Learning Disability evaluation data, in the new IEP.  An IEP without the child's true

exceptionalities and true objective data based evidence, would not meet the child's

needs, and without necessary data, the child would not and could not move forward and

benefit and progress in school.

56

63. <u>Parent strongly disagrees and further states,</u> that the ALJ's word of "<u>exhaustive review</u>" would have been based on CCSD's "subjective teacher observation" and that per law, she refers to, **§300.109 Full educational opportunity goal (FEOG)**. The State must have in effect policies and procedures to demonstrate that the State has established a goal of providing full educational opportunity to all children with disabilities, aged birth through 21, and a detailed timetable for accomplishing that goal. (Authority: 20 U.S.C. 1412(a)(2)) and **§300.110 Program options**, The State must ensure that each public agency takes steps to ensure that its children with disabilities have available to them the variety of educational programs and services available to nondisabled children in the area served by the agency, including art, music, industrial arts, consumer and homemaking education, and vocational education. (Authority: 20 U.S.C. 1412(a)(2), 1413(a)(1)), the IEP team didn't know that the parent would be asking for a comprehensive LD evaluation, they thought it was a IEP meeting, therefore the Parent presented Dr. Mack's letter at the meeting and would not have given the school any warning of her intent to use the mandatory "yearly" meeting as a request to further evaluate the child. The school didn't exhaust anything, they only used the services, they had, and refused to comply with the mandatory, objective data based evaluation criteria.

CCSD allowed the child, from day one to flounder and slip behind.  Mother refused to

allow another year, of an IEP, that was not "an INDIVIDUALLIZED educational plan."

64. <u>Parent disagrees and further states,</u> the mother addressed her child's issues with the

team, and that the child's issues where not being addressed, to include: the child writes,

from right to left, the child can not tell time, the child doesn't understand space and

distance, the child misuses words, or due to the inability to find the right word, uses

other words, the child struggles so hard to read, she can not understand the meaning of a

sentence or the meaning of a book, the child lacks comprehension,  the child cant

understand and differentiate the different sound of vowels, the child, repeatedly says

nimple, for nipple. The child has a speech, communication, and language based

problem.  The child misuses letters, B's for D's or visa versa is the worst, but the is the

miss use of q for g, and h for t, not just in writing but in reading. This is not ADHD,

these exceptionalities are more consistent with Dyslexia, and the child needs the right

interventions to fix the problems.  <u>Terance D. and Wanda D. v. Sch. Dist. Philadelphia</u>

(E.D. PA 2008).  The parent stated "<u>the child is better in math then in reading</u>", but

never stated, "the child has been cured of her math deficit or lets ignore the child's math

needs" she never agreed to remove the goal of the child's math problems, from her IEP.

This statement from the ALJ's is a direct example of her intent to validate CCSD's

removal of a problem, from the child's IEP, without valid data based progress and proof, the child's math goal in her 2006 IEP, was never meet. Child did not have private tutoring at, parent expense, for summer 2007.  CCSD, did not consider or suggest in child's IEP and parent did not have the funds to continue the private tutor for ADHD, she had been paying for, the prior 5 months.  If the child was making "progress" per District statements, and the child had an IEP, from 2006 then the IEP team failed to consider the provision and refused to offered ESY services, over the summer. CCSD used retention and only retention, as an intervention. <u>Reusch v. Fountain</u> (MD) and <u>Daniel Lawyer v. Chesterfield Sch. Bd</u> (E.D. VA 1993).

65. <u>Parent strongly disagrees and further states,</u> Mother requested LD evaluation, not "process testing" this Finding of fact, is not true or fact, **it is an example of the Districts using the parents, disability against her and the ALJ, supporting their discriminatory action to base her like and same,  finding of fact**.  The mother is not a teacher and doesn't know what "process testing" is.  Mother submitted Dr Mack's letter and voiced her request for a Full Educational (learning disability) Evaluation, she was not informed that CCSD, was denying her request and doing "A process test", no such document or written clarification, exists.  <u>The parent further states</u>: as per IDEA, The screening of a student by a teacher or specialist to determine appropriate instructional

strategies for curriculum implementation shall not be considered to be an evaluation [34 CFR 300.302] [20 U.S.C. 1414(a)(1)(E)].  Mother didn't know the difference, but was very clear on her concerns, the data, and the student's demonstration, to back up her concerns. Mother thought, for lack of clarification, by the IEP team, that a diagnosis would get the child the scientifically proven, evidence based, appropriate  interventions to help the child benefit for her education, <u>T. R. v. Kingwood Township (NJ) (</u>3rd Cir. 2000).  CCSD failed to appropriately identify and appropriately intervene on the child's exceptionalities, related to her LD, of Dyslexia, which was, denying her FAPE. Cosgrove's, "process testing" was done in a auditory fashion, she in fact stated, she did not see the child write anything and did not review the child's work samples.  CCSD, tested the child in a fashion, which would yield the results, they wanted, which was to deny the child had a underlying LD, their method of "testing" is not consistent with IDEA provisions, which states, (Each public agency must ensure that assessments and other evaluation materials used to assess a child under Part 300 are provided and administered in the child's native language or other mode of communication and in the form most likely to **yield accurate information** on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to provide or administer, <u>Tereance D. and Wanda D. v. Sch. Dist. Philadelphia (</u>E.D. PA

2008), [34 CFR 300.304(c)(1)(ii)] [20 U.S.C. 1414(b)(3)(A)(ii)]. Petitioner requested a LD evaluation and the members of the IEP team, are CCSD employees and work at Seagate Elementary. Florida doesn't recognize Dyslexia, per Mr. Casellani's statements and Seagate, has the lowest percent of ESE students. The IDEA 2004, is designed to ensure that children with disabilities are taught by **highly qualified teachers** and receive **research based instruction**. IDEA 2004, also makes the District requirements for personnel training, IEP's, and scientifically based instruction. The CCSD lacked the appropriate resources, the teachers lack the qualified status and knowledge, and the district had no intent, for lack of resources, of identify the child's Dyslexia/SLD diagnosis. They deliberately, refusal to perform the requested evaluation, per child's needs.

66. Parent disagrees and further states, Mother did not willing sign an IEP, that day for there was no IEP made, mother found "old goals including math, unsuccessful" and refused to actively participate in the IEP meeting until after evaluation results and new data, could be used. If the team dated the IEP, on that day, prior to re-evaluation data, the parent was not aware, the consent to re-evaluate child was signed on that day Sept. 24, 2007 and the parent sign that she attended the meeting, but in no way was she agreeing to sign an ineffective IEP for her child, JP v. School Board of Hanover County

VA (E.D. VA 2008).  Mother was lead to believe that the consent she signed was consent

to do a LD evaluation, as per her request.  Clearly the signed "consent" lacks the

requirements of "informed consent" and the schools responsibility to give "written

notice to the parent of their refusal" to perform a LD evaluation as per, parents belief of

the same, per her many requests. Community Consolidated Sch. Dist. #93 v. John F.

(IL) (N.D. IL 2000) was being denied.  "To make wise decisions about your child's

special education program, you need accurate information about the child's disability,

strengths, weaknesses, and needs. This information is available from tests and

evaluations of your child. "A comprehensive evaluation of the child will give you a

roadmap in planning for the future. The evaluation should identify your child's problems

and include a plan to address these problems".

67. Parent disagrees and further states, Apparently the parents had no voice, for her

requests were ignored, manipulated, changed, and misunderstood to support CCSD

intentional actions of denying the parents requests, and the child's needs and rights,

under IDEA. (d) Parent disagreed with the single diagnosis of ADHD/OHI and was

requesting more evaluations to address is child had a LD.

68. Parent disagrees and further states, Child's IEP for 2006 and 2007, does not identify

one on one teacher support.  The parent "volunteer", that was working with the child in

the general education/inclusive teacher environment, later stated to the parent in 2009, that she clearly told Ms. Richardson, that the child was Dyslexic. Ms. Richardson, should have at this time referred the child for, more evaluations, but she didn't.

69. <u>Parent disagrees and further states,</u> the child's yearly IEP, should be dated after the October 2007, LD/Process testing results. CCSD removed the IEP goal related to math and ignored that the child, never meeting the goal, without parent's consent or written notice. This is another example of this ALJ, manipulating this case history to protect and Covent CCSD's actions, <u>T. H. v. Palatine,</u> (N.D. IL 1999).

70. <u>Parent strongly disagrees and further states,</u> How can an IEP, made by CCSD based on the child being retained, no ESY, no related services and without a LS evaluation per the child's "retention status" without Appropriate evaluations, be appropriate? This IEP, was in bad faith, falsely created and based on "teacher observation" and made prior to the evaluation date, of October 2007, per parent and MD's request.

71. <u>Parent disagrees and further states,</u> That CCSD's lack of measurable goal writing was help liable and addressed in an Exhibit, as to the 100% non compliance of the same, per Dr. Sartorio's Deposition, and the Lack of the same is well documented in all of the child's IEP's from day one. All IEP's from CCSD lack compliance with the laws and provisions under IDEA. None of the child's IEP's have present levels, baselines or

measurable goals.  This is a <u>bazaar statement</u> and may be due to the ALJ's lack of

knowledge as to what a measurable goal is, but is clearly addressed, in the transcripts

and in the written IEPS.  How can a IEP, meet the child's needs, based on old

information prior to October 2007, <u>Shannon Carter v. Florence County Sch. Dist. IV.</u>

(SC 1990)  and  <u>Bd. of Ed of Kanawha WV v. Michael M.</u> (W VA 2000).

72. <u>Parent agrees in part and disagrees in part to further state,</u>  The IEP team continued

to deny the child's multiple and obvious exceptionalities, related to the child's LD of

Dyslexia, <u>Evans v. Rhinebeck Central School Dist.</u> (S.D. NY 1996).  The statement

that the child was now, after one year of and IEP, resource room, accommodations, in an

inclusive class, with so called "one-on-one tutoring", shows, the child made no progress

and any "true first grade level" was based on and only on subjective data from her

teachers..  The child's IEP team refused to reconvene  for an IEP meeting prior to the

summer  of retention, 2007 or to address her lack of progress, while receiving special

education services, or her lack of mastering the goals, and still being "at a beginning

first-grade level", <u>Daniel Lawyer v. Chesterfield Sch. Bd</u> (E.D. VA 1993) and

<u>Cleveland Heights-University Heights v. Sommer Boss</u> (6th Cir. 1998).

73. <u>Parent disagree and further states,</u> that the targeted weaknesses are kindergarten level

dyslexia based issues, that the child never mastered.  That all of the child's IEP's , lack"

a level of commitment of any services," as per IDEA and IEP provisions and guidelines. That this "increase of intensity" was not documented on a new IEP, and therefore was not offered or provided, as per IDEA. That any "insanity" of intervention, was with the same intervention used since 2005 and that the school "Seagate Elementary", lacks any qualified/certified teachers in the area of LD, due to there "gifted school status" Also if a child can not understand and read fluently at a basic level, due to the lack of phonemic awareness and phonological understanding the issue of "comprehension" of the same is, futile and frustrating to the child.

74. Parent disagree and further states, The Parent now understand, that pursuant to IDEA, the proper process to include the related service of "counseling services" would have been to 1) Documented data of the need. 2) Request a re-evaluation meeting, 3) Obtain written consent for a behavioral evaluation, 4). Provide appropriate evaluations, 5) call an IEP meeting, to discuss the data obtained in the evaluation process  6).  Revise the IEP to include a behavioral interventional plan, 7) Include a measurable goal in the child's IEP that will show data driven progress. CCSD' failed to initiate a behavior evaluation as early as 2005, and child's frustration was ignored and minimized by CCSD, during the entire, IEP process.  The child's IEP's lack a "behavior interventional plan" BIP, lacks consent for a behavioral evaluation, and lacks a behavioral goal. In fact

65

one of the child's strengths is her "very social" personality. The parent's needs were

clearly the need for informed consent and parent education to exercise her procedural

safeguards affectively.  All and any emotional issues related to the child's behavior were

based on the child's frustration, lack of interest, and shutting down defense mechanisms,

related to the IEP's lack of appropriate evaluations and refusal to implement appropriate

interventions, to address the same. The child was refused the related services of

"counseling". The parent lacked the "knowledgeable" to appropriately advocate for the

child, related to the same, Cedar Rapids v. Garret (8th Cir. 1998) and _Weast v._

_Schaffer_, the U. S. Court of Appeals for  the Fourth Circuit) and A.K., a minor by his

Parents and Next Friends J.K. and E.S., v. Alexandria City School Bd. (4th Cir.

2007) This issue, lacks the requirement of a formal written offer that creates "a clear

record of the educational placement and other services offered to the parents."

75. Parent disagrees and further states, If Mother signed anything it was that "she

attended the IEP", meeting that she made a re-evaluation meeting to request a SLD,

evaluation to meet her child's Dyslexia based exceptionalities.  She did not willing agree

to an IEP, void of the appropriate interventions to meet the needs of her child, until the

results of the requested LD evaluation criteria were available.

76. <u>Parent agrees in part but further states,</u> to receive a pamphlet of her "procedural safeguards" that outline your rights to "due Process" and refused an explanation as to the District's procedural responsibilities and the process they are required to take, are two different things.  The District knew the parent has a disability and used this knowledge to confuse and intimidate the parents, related to the proper "process".

77. <u>Parent agrees in part but further adds,</u> Parent is a single parent with limited, resources. She was given a copy of a letter, related to Mckay scholarship, but was not given a detailed explanation to understand that it could be used in the "public education environment" or that IDEA outlined the issue of "placement", <u>Shannon Carter v. Florence County Sch. Dist. IV.</u> (SC 1990) The school did not offer to explain the entire provisions of the McKay scholarship and therefore, she thought it was only related to a "private school placement".  The Plaintiff is a single parent, with limited income.  She works full time, 12 hr shifts, and must rely on after school services.  She at this point had to work 4, (four) , 12 twelve hour shifts a week, a 44 hr work week, to meet her child's extra financial educational demands to include:  the private tutor costs, the doctors bills, the prescription costs, and all the "child's' evaluation costs.  By September 2007, the parent had spent an extra <u>$ 12,000, twelve thousand dollars,</u> in her quest to find the appropriate diagnosis, and in her attempt to obtain FAPE, for her child, <u>T. H. v.</u>

Palatine, (N.D. IL 1999).  Seagate Elementary was the child's residential/home school, and the parent believed they should be meeting her needs. The IEP team, or anyone at the CCSD level, never addressed pr explained the issue of "Placement", per IDEA.  The school was stating, "that the child was making progress", This "finding of Fact" rational makes no sense.

78. Parent agrees and further states,  If the re-evaluation, of a LD evaluation was to take place in October 2007, why would the parent had, agreed to sign a new IEP, with the same goal, that were not meet in the prior year, after the child was retained for the same? This is an example, of the IEP team ignoring the mother's requests and refusing to allow her to be an "equal participant" in the IEP process.

79. Parent disagree's and further states, The child displays aphasia and lack's the ability to distinguish the different sounds of vowels, and may be due to her added ,Milk allergy related chronic ear infections, as an infant.  Speech and language, should have been utilized under as a related Service, to assist the child, to benefit. Ms. McCaughna, is a speech pathologist, not a Certified Academic Language Therapist, for if she was, she would have recognized the language based deficits of this Dyslexic child.  This is an example of CCSD's lack of qualified evaluators.

80. _Parent disagrees and further states,_ the language pathologist, denied the child had a expressive language weakness, when all other evaluations support the diagnosis of the same.

81. _Parent disagrees and further states,_ Ms. Cosgroves LD evaluation, was not a LD evaluation, but a "process test" administer verbally, to inflate the scores. That the "CTOPP" is a test that Certified Dyslexia evaluators use, and one must be Certified in the administering and interpretation of the same. If Ms. Cosgrove had administer the test, in a fashion, that would have delivered the "most accurate scores/data" per IDEA, guidelines, the child's ability and present levels, would have been severely deficient and consistent with the child's IEE's. The CCSD, during the hearing, consistently repeated, and per their testimony, "the child is consistently inconsistent"

82. _Parent disagrees and further states,_ The IEP team members, manipulated and falsely documented the Doctors and the Parents requests. They ignored the child's exceptionalities and the issue of her lack of progress, to the point of her retention.

83. _Parent disagrees and further states,_ CCSD had a vested interest in manipulating the tested technique and the interpretation of the results, to deny the child's LD diagnosis. The interpreters conclusion is vague and subjective.

84.  Parent agrees and further states, the child demonstrates weaknesses in all, area which is a characteristic and supports that the child has a LD, specifically the duel diagnosis of the disability of Dyslexia.  All testing, void of Ms. Cosgroves's scores show a significant consistent deficit in these areas.

85. Parent disagrees and further states, child is unable to "master skill" and is severely deficit in this area. Petitioner disagrees with this testing's outcome.

86. Parent agrees in part and disagrees in part to further add,  If the child is weak in the building blocks of Phonological awareness, and is unable to master this basic skill, then of coarse she is not going to be able to build her phonological memory and it is impossible to pass a rapid naming of the same.  These are the basic building blocks of reading and without remediation with the right intervention; the child will never progress and will forever be illiterate.

87. Parent refers back to finding of fact,  # 86

88. Parent disagrees and further states,  That CCSD never had any "concerns" about the child's needs and that the child was "ripe" (9/2007) to have perform a complete Comprehensive Educational ( LD) Evaluation on the child, per parents request, Doctors noted request, and pursuant to the lack of progress and her retention status.  CCSD again refused to appropriately evaluate the child for ALL disability related educational

70