# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

TERRY L. DUNN-FISCHER,
Individually, as the parent of A.D.-F

Plaintiff,

v.                                        Case No. 2:10-cv-00512-JES-SPC

SCHOOL BOARD OF COLLIER COUNTY,
FLORIDA,

**THIRD AMENDED
COMPLAINT/APPEAL OF
ADMINISTATIVE DECISIONS**

**JURY DEMAND**

Defendants,

_____/

## THIRD AMENDED COMPLAINT

COMES NOW the Plaintiff, Terry Dunn-Fischer, (T.D.-F.) individually, as the parent

of A.D.-F., a child with multiple disabilities, in *pro se* form, and files this Third Amended

Complaint for declaratory, reimbursement, compensatory and monetary relief, including

actual and punitive damages and attorneys' fees and court costs, to redress defendants'

violations of plaintiff's federally protected rights and state common law claims. She

adjoins her Complaint as an Appeal of a State Level Administrative Hearings outcome,

with attached rulings under Case No. 09-1050 E for the intersecting violations of the

IDEA, which created a denial of FAPE under the IDEA and the deprivation of her rights

to the provisions and protections secured under Section 504, of the Rehabilitation Act, for

1

the denial of FAPE, consistent with the protection from discrimination and equal access under the ADA.

Plaintiff files this Complaint as a person with a disability under the ADA and as an aggrieved parent, under the rights granted by and through this District Courts procedural process to amend her original Complaint under 28 U.S.C. 1654. She has met the "state" administrative exhaustion requirements for all 20 U.S.C 1400 et seq. claims. She has also met the exhaustion requirement for the intersecting IDEA and 504 claims time period of (2006-2009) in the administrative "state" realm. The IDEA arose from Federal law holding that; the deprivation of a free public education to disabled children constitutes a deprivation of due process under (29 U.S.C. 794) Section 504 of the Rehabilitation Act of 1973.

She further states that her separate (2005-2006) "kindergarten" claims are not subject to the administrative exhaustion requirements, for they can stand alone as they are separate and distinct Federal laws in place at all times relevant, from protection of derivational acts and discrimination from "actors and agencies under color of state law," independent of the IDEA stricture.

This court has granted the Plaintiff the procedural due process right to clarify and assert her individual and independent claims for relief under; (1) 20 U.S.C. 1400-1415 et seq. The Individual Disability Educational ACT (IDEA), (2) 29 U.S.C. 794 et seq. Section 504 of the Rehabilitation Act of 1973 (Section 504) including 45 C.F.R. 84 et seq. All Constitutional and Civil Rights violations of protection and liberties to include the; (3) Fifth Amendment, (4) Fourteenth Amendment, (5) Due process of Law Rights and The Equal protection Clause, (6) 42 U.C.S § 2000 et seq.(Title II) denied access and

accommodations, (7) 42 USC 12101 and 12131-12134 under Title II Americans With

Disabilities Act of 1990 (ADA) (28 CFR 35.107), for denial to equal access of

participation and benefit of services and programs. (8) 42 U.S.C. 1985(3) and

(9) 42 U.S.C § 1983 under color of Law, for party injured in an action at law, suit in

equity, or other proper proceeding for redress, and (10) 42 U.S.C. 1983 claims for

deprivation of her Civil rights and protections under (10) 28 U.S.C.A. § 1343(3), and (11)

42 U.S.C. 1988 to include all court associated costs and attorney fees. to access relief of

her Federal and State Protected Rights, and for (12) All consistent State Statues violations

under said Federal laws, independent of the IDEA "umbrella strictures," as consistent

with the appropriate relief due her, and alleges as follows:

## PARTIES

1.    The plaintiff, T.D.-F., is an individual, sui juris, and is an "individual with a

disability" as defined under 42 U.S.C. 12102(2) who suffers from a leaning disability and

is the parent of the child (A.D.-F.) an "individual with a disability" as defined under 42

U.S.C. 12102(2) who suffers from multiple learning disabilities. T.D.-F., and A.D.-F.,

primary residence was located in Collier County, Florida at all times relevant (from July

2003 to September 2009) and A.D.-F., was a Collier County Public School (CCPS)

student, in attendance for 40 months, during the time she and her mother were deprived

of their Constitutional rights under (42 U.S.C. 1983). T.D.-F., is the natural mother and

the single parent of A.D.-F., a minor, *see* Winkelman v. Parma City Sch. Dist., 550 U.S.

516, 535 (2007), finding that parents have a right to represent their own interest and a

basis for representing their children in court, due to parental interest in the education of

children.

2.     The defendants, SCHOOL BOARD OF COLLIER COUNTY, FLORIDA ("CCSB")

is a body corporate and <u>governmental agency</u> duly empowered by the Constitution and

Statutes of the State of Florida to administer, manage, and operate the Collier County

Public Schools ("CCPS") within the Collier County School District ("CCSD"), Collier

County, Florida. CCSB as a Local government agency and public entity are accountable

for violations under 29 U.S.C. 794, 42 U.S.C. § 12101 and 12131-12134, acting "under

color of state law" 42 U.S.C. 1983, they receive Federal financial assistance as defined

under 20 U.S.C. §1400 <u>et seq</u>, and accountable for their employees actions under color of

state law, 42 U.S.C. 1983.

## JURISDICTION AND VENUE

3.     The court has jurisdiction of the action under Original Jurisdiction (28 U.S.C.

1251), and (28 U.S.C 1331, 1332, 1343); (28 U.S.C. 2201, 2202) and enforcement under

42 U.S.C. § 12188(a)(1) for damages and relief under (42 U.S.C. 1983); (42 U.S.C.

1988), 42 U.S.C. § 1985(3), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C.

794), the ADA (42 U.S.C. 794); and the  IDEA, (20 U.S.C. 1400-1415  et. seq.) under

Due Process and the Equal Protection Clauses of the United States Constitution, of all

Federal claims.

4. Supplemental jurisdiction of plaintiff's state common law claims under 28 U.S.C. §

1367.

5.     Jurisdiction is conferred for ongoing causative damages for violations under; Section

504, the ADA, Constitutional and civil actions under the equal protection clauses, under

1983 and  1985, and 1988 during the Due process phase, which lasted until July 2010, a

total of 17 months, consistent with diversity of citizenship.

6.    Additionally, this Court has pendant Jurisdiction to adjudicate any state law claims which arise out of the same facts as the federal claims asserted herein (28 U.S.C. § 1367).

7.    Jurisdiction for this action lies pursuant to Section 26.012(2)(a) of the Florida Statutes (1997).

8.    Jurisdiction for this action lies pursuant to Section 48.193(1)(a)(b) of the Florida Statues 1997 in that the defendants reside in the state and carry on business within the state.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)(2)(3) and (c) (e) in that the claim arose in and Defendants and Plaintiff resided in this District, when the acts occurred.

10.    Venue for this action vests pursuant to (28 U.S.C. 1391 and 1392) in the United States District Court of the Middle District of Florida, Fort Myers Division and pursuant to Section 47.011 of the Florida Statues (1997) in that the defendants reside and conduct business in Collier County, Florida.

## REQUEST FOR ACCOMMODATIONS

11.    Plaintiff, T.D.-F., is an "individual with a disability" as defined under 42 U.S.C. 12102(2) who suffers from a leaning disability, which requires extra time and written clarification as an accommodation, due to her disability, to process information necessary to  adequately access this courts procedural process under the ADA Title II.   Plaintiff refers to her rights and this courts obligations under the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101-12213), the provision of accommodations to individuals with disabilities, Local Rule 2.540.  Plaintiff continues to make written requests for the same and further states the rule Subdivision (a), Duties of Court, recognizes the court

system's obligation to provide accommodations to qualified persons with disabilities. This subdivision provides that a qualified individual with a disability will be provided, at the court's expense, with accommodations, reasonable modifications to court rules and practices, and the provision of auxiliary aids or services. Plaintiff requests protection from discriminating acts under 42 U.S.C. 12102(2) to include defendants attorney(s).

## ALLEGATIONS OF DENIAL OF A FREE APPROPRIATE PUBLIC EDUCATION (FAPE)

12.    Plaintiff incorporates by reference the allegations contained in paragraph 1 through 11 of Plaintiffs' Complaint as if rewritten herein.

13.    CCSD is a Federally Funded state agency responsible for its employee's actions to provide every CCSD public student their Constitutional right to the property of a Free Public Education.

14.    If a student has a disability as defined under Section 504 and the ADA, the school district, "CCSD" must provide the child and parents the opportunity of equal access of the provision of a Free Appropriate Public Education (FAPE), as assured by the Equal Protection Clause under the 14th Amendment of the Constitution of the United States.

15.    Due Process of Law is a right under the Constitution; to a fair unbiased hearing to be heard and a right to a jury trial, for federal claims associated with the deprivation of any person's Constitutional right and Civil liberty.

16.    When Congress created the IDEA, the theory was that education in America was to be free to the citizens of the USA and when a child has a disability that prevents them from the same benefit as adequately as their non disabled peers, under Section 504, then the education must be tailored to meet their individual needs, to allow them access to a

beneficial education, one that enables them to obtain life, liberty, and property, thus the theory of FAPE was born.

17.    When Congress created and implemented the IDEA, with the protections of and under the theory of FAPE, the label of FREE suggests and implies that, the IDEA process is to be free and that the benefit of and protection of it's procedures process are to be free also, which includes parents protected rights to the access and ability to be an equal participant, to  enforce, exercise, and apply their procedural safeguards rights at all times and if necessary, do to a districts refusal to comply and for violating actions, to ensure that their child is not being denied the procedural process necessary to obtain a beneficial education, through the IEP process.  If the has knowledge that their child is being denied their protected rights, they have the right to file a due process action for the injury and damages, related to the same, at no cost to them.

18.    Plaintiff (T.D.-F.) was force to file a due process hearing request in February 2009, after multiple years (40 months) of Collier County School District and their employees continues intentional refusals and depriving actions of compliance which caused extensive everlasting educational, emotional, financial injury to T.D.-F and A.D.-F., **see attachments as Exhibit A, B and C,** state level file with exhibits and transcripts have been move up with this Complaint.

19.    The IDEA is the only law that requires a parent to exhaust their claims, at the administrative state level, as a state level remedy for violations consistent with the denial of FAPE, prior to moving forward in a Federal Court under all adjoined and related deprivation of Civil Rights claims.  The IDEA is not to be used as a "safe harbor" to protect a "State Agency and its employees" who are actors under Color of state Law"

from liability and damages under Section 504, the ADA or any other relevant

Constitutional derivational claims, consistent with 42 U.S.C. 1983 and 1985. .

20.     CCSD at all times relevant and for 48 months, refused to; identify A.D.-F's

disabilities under (child find) and to provide appropriate child based needed individual

educational evaluations and reevaluations, at no cost to the parent, to meet the substantive

and procedural mandatory procedural process consistent with their legal obligation to

ensure her child (A.D.-F) was provided her constitutional right to the opportunity to equal

access of a **Free Appropriate Public Education "FAPE"** and deprived T.D.-F's, her

rights to access the procedural safeguard process adequately to enabling her to exercise

and enforce her due process rights at a meaningful time and in a meaningful way, for

their denial of FAPE, while a Collier County public school student, which caused injury

and damages, while they resided in Naples, Florida.   The provision of a FAPE is a

Constitutional right of all children with disabilities and their parents in the United States

that is guaranteed and protected under the <u>Rehabilitation Act of 1973</u> and the <u>Individuals</u>

<u>with Disabilities Education Act</u> (IDEA).

21.     Under Section 504, FAPE is defined as "the provision of regular or special

education and related aids and services that are designed to meet individual needs of

handicapped persons as well as the needs of non-handicapped persons are met and based

on adherence to procedural safeguards outlined in the law."

22.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794(a), ("Section

504") is a powerful federal antidiscrimination statute, modeled after the Civil Rights Act

and sharing its language.

23.     Section 504 bans discrimination on the basis of disability in programs and activities

receiving federal funds. The subsequent passage of the Americans with Disabilities Act

("ADA"), 42 U.S.C. Section 12101, extended many of the protections of Section 504 to

the private sector providing public access. Congress has made clear that those protected

under the two statutes are the same.

24.     Procedurally, Section 504-eligible students are entitled to evaluation; written and

enforceable service plans developed in conjunction with their parents; access to a due

process system, including an impartial due process hearing, to challenge or enforce their

plans, essentially the same due process hearing procedures as those available for IDEA

claims, access to the federal courts, and access to the federal complaint system through

OCR. Remedies for failure to provide or deliver adequate Service Plans include

prospective relief, compensatory education, parental reimbursement, attorneys' fees,

expert witness costs, and, in appropriate cases, money damages, see <u>A.W. v. Jersey City</u>

<u>Public Schools, 486 F. 3d 791, 804</u> (3d Cir. 2007). "The remedies for violations of

Section 504 include compensatory damages and injunctive relief."

25.     Punitive damages are also available as vindication for depriving actions that caused

injury under 42 U.S.C 1983 and all money damages are available for intentional,

violation of the Rehabilitation Act. Section 504 is the Section of the Rehabilitation Act of

1973 that protects the civil and constitutional rights of persons with disabilities.  Any

recipient both public and private that receives or benefits from Federal financial

assistance must comply with the requirements of Section 504.  The school district must

provide a free appropriate public education to each qualified disabled person and protect

them from discriminating acts under the ADA.

26.     Under the IDEA, FAPE is defined as an educational program that is individualized to a specific child, designed to meet that child's unique needs, provides access to the general curriculum, meets the grade-level standards established by the state, and from which the child receives educational benefit. The United States Department of Education issues regulations that define and governs the provision of FAPE.

27.     To provide FAPE to a child with a disability, schools must provide students with an education, including specialized instruction and related services that prepares the child for further education, employment, and independent living.

28.     An initial referral to identify a disability is usually NOT solely an IDEA matter. Special Educators may advise or assist the 504 committee or coordinator, but a full 504 consideration should take place before referring the matter for special education.

29.     The Consideration of FAPE under Section 504 should remain separate and distinct from the realm of special education because it is inappropriate to implement IDEA procedures until it becomes evident that the student has a need that exceeds reasonable accommodation. Thus, until it is suspected that specialized instruction is required, it is inappropriate to bring students under the auspices of special education.

## ALLEGATIONS OF DENIAL OF TIMELY DUE PROCESS HEARING TIME LINE

30.     Plaintiff incorporates by reference the allegations contained in paragraph 12 through 29 of Plaintiffs' Complaint as if rewritten herein.

31.     Once a parent files a hearing under the IDEA, a district has thirty days to try to settle the hearing through a "resolution meeting" before it can commence. After thirty days, the hearing officer has another forty-five (45) days during which to issue a decision

and courts regularly rule that the failure to receive special or regular education constitutes irreparable harm, and thus education delayed is education denied. *See, e.g.*, Cosgrove *ex rel.* Cosgrove v. Bd. of Educ., 175 F. Supp. 2d 375, 392- 94 (N.D.N.Y. 2001); Borough of Palmyra, Bd. of Educ. v. F.C. *ex rel.* R.C., 2 F. Supp. 2d 637, 645 (D.N.J. 1998) (holding that the loss of an appropriate education "would constitute irreparable harm");

32.    DOAH'S hearing officers, displayed deliberate indifference to the Plaintiff's rights to a timely hearing decision and voiced their reckless disregard for plaintiff's financial limitations and prolonged their rulings unnecessarily.

33.    DOAH'S hearing officers, intentionally tolled time and Holifield further delayed the ruling and injured the Plaintiff with additional attorney fees, by calling a telephone conference as late as April 2010, to clarify if she was being paid to rule under Section 504, citing *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995), **see exhibits P.**

## ALLEGATIONS OF INAPPROPRIATE APPLICATION OF STATUTE OF LIMITATIONS

34.    Plaintiff incorporates by reference the allegations contained in paragraph 30 through 33 of Plaintiffs' Complaint as if rewritten herein.

35.    In 2004, the IDEA was amended to require a party who files a due process complaint to do so within two years of when the party *knew or should have known* of the alleged violation, or within such timeframe as a state allows.   At this time, two tolling provisions have been adopted in the "Exceptions to the Timeline" provision, which reads, in relevant part:

   A. The timeline shall not apply to a parent if the parent was prevented from requesting the hearing due to:

(i) Specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

(ii) The local educational agency withholding of information from the parent that was required under this part to be provided to the parent under this part, *See* § 1415(f)(3)(D).

36.    The state of Florida has a two (2) year statue of limitations for injury claims.

37.    Most of the IDEA'S rights are considered to be a "floor"; states may adopt greater rights for parents but may not reduce parent rights below those afforded by the IDEA, 20 U.S.C. § 1407(a).   Florida is a 4 year statute state and the time line of this cases violations, is and should be consistent with the state regulations in affect when A.D.-F., the (child) was a CCSD student, which must be based on the IDEA 1997 and her Section 504 claims, had no applicable Statute of Limitations.

38.    This cases, hearing officer's agenda was to attempted to shorten the limitations period and showed deliberate indifference to this individual cases evidentiary history and record, which provides merit to the "consistent lack of any written notice or written notice of refusal" evidence provided to the parent from CCSD of their intent to deprive her and her child their Constitutional and Civil rights and liberties of the IDEA process consistent with the provision of  Notice imperative of due process of Law and the protection clause, under the 14th Amendment of the Constitution.

39.    As a result, in this case the hearing officer abused her discretion when she applied and attempted to reduce the incongruent statute of limitations, she applied an unjust and inequitable provision as an agenda to deny the parent the ability to obtain equal access of due process under a federal statute, because the state agency had a significant financial interest in withholding imperative knowledge which limited the parents' abilities to

redress their violations. Her attempt to shorten the limitations periods under Section 504 and the ADA, protected the district and the states agency FDOE, for their refusal to provide the opportunity to equal access of a FAPE, with little risk of a parent challenge.

40.    The fact that the IDEA require parents to be notified in written notice fashion, affords them the ability to request the remedy that compensatory education and costs renders, the application of the two year limitation period was egregious.

## ALLEGATIONS OF DEPRIVATION OF WRITTEN NOTICE
## AND PROCEDRUAL SAFEGUARDS

41.    Plaintiff incorporates by reference the allegations contained in paragraph 34 through 40 of Plaintiffs' Complaint as if rewritten herein.

42.    The IDEA requires that districts and public agencies distribute very specific notices to parents as part of the special education process. Prior Written Notice must be provided whenever the district "refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child, 20 U.S.C. § 1415(b)(3)(B), which  must contain, at a minimum:

   (a) a description of the action proposed or refused by the agency;

   (b) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

   (c) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

   (d) sources for parents to contact, to obtain assistance in understanding the provisions of 20 U.S.C. § 1415;

(e) a description of other options considered by the IEP Team and the reason why those options were rejected; and

(f) a description of the factors that are relevant to the agency's proposal or refusal.

43.     Prior Written Notice must be "written in an easily understandable manner," defined as "understandable to the general public, 34 C.F.R. § 300.503(c) (2011).

44.     Prior Written Notice is "one of the most important rights that parents have under the IDEA, 20 U.S.C. § 1415(c)(1)(A).

45.     Although these protections are significant, in practice they do not serve to protect and inform the rights of families and young people without financial resources and thus their enforcement is limited, the provision of FAPE is to be free, if a parent must hire the services of other professional to include attorney and spend their time and money to enforce their due process Rights and their child's Rights to a FAPE, for the deprivation of the same, then they were denied a FAPE.

46.     Despite all attempts at promoting self-advocacy, T.D.-F., in reality was clearly unable to access the much needed more intensive support, over the 48 month period, even the much-vaunted technical assistance parent/student advocates dispense, can prove to be ineffectual if the client is unable to translate the advice and coaching into effective advocacy.

47.     The IDEA requires that school districts ensure that the information in the notices and safeguards is accessible to all parents, to include parents with limited literacy and or (parents with learning disabilities) and those who may have other communication deficits, 20 U.S.C. § 1415(d); 34 C.F.R. § 300.507.

## DENIAL OF OPPORTUNITY TO EQUAL ACCESS TO A FREE
## PUBLIC EDUCATION

48.   Plaintiff incorporates by reference the allegations contained in paragraph 41

through 47 of Plaintiffs' Complaint as if rewritten herein.

49.   Most federal education legislation is enacted under the "spending clause" of the

Constitution, which gives Congress the authority to tax and spend for the general welfare.

50.   Once the state of Florida decides to provide an education to its children, as every

state has, the provision of such education must be consistent with other federally

guaranteed constitutional rights, such as the Fourteenth Amendment's right to equal

protection under the law and the First Amendment's right to the free exercise of, and the

non establishment of, religion thus, any treatment of education and constitutional rights

must begin with the **Fourteenth Amendment**, which guarantees every citizen equal

protection under the law.

## ALLEGATIONS OF DEPRIVATION UNDER COLOR OF LAW

51.   Plaintiff incorporates by reference the allegations contained in paragraph 48

through 50 of Plaintiffs' Complaint as if rewritten herein.

52.    T.D.-F claims multiple violations under the IDEA and Section 504, by multiple

actors of CCSD "under color of state law" who's actions reached beyond the bounds of

lawful authority, but in such a manner that the unlawful acts were done while the official

was purporting or pretending to act in the performance of their official duties.

53.   Every CCSD employee, who had educational contact and personal knowledge of

A.D.-F., during her 40 month placement at Seagate Elementary had access to the

knowledge, that A.D.-F.; was continuously refused and denied the opportunity of equal

access to the IDEA procedural process to include but not limited to; the identification

15

process, appropriate comprehensive evaluations, reevaluations, objective data collection, monitoring processes, written notice, and the benefit of an education, but failed to inform the parent of the same.

54.    The CCSD'S representatives at A.D.-F, IEP table formed an "agenda" that was not to ensure the provision of the mandated procedural process, but to deprive A.D.-F and T.D.-F their procedural safeguarded rights to a FAPE and withhold the said knowledge to prevent an action under due process of law, thus the IEP team was most likely formed as a  "Denial Team" of state actors, who agenda was to willfully participated to continuously refuse to refer A.D.-F for services, they had knowledge of her educational failures and intentionally deprived  her of her rights to appropriate educational services in light of the child's floundering  academic progress, the " Denial Team" members were individual persons working  "under color of state law" for and conspiring with the state agency, 42 U.S.C. 1985(3) and 1983

55.    The "Denial Team" had an agenda and performed individual actions "under color of law" when they exercised their "power possessed by virtue of state law and was made possible only because the wrongdoers were clothed with the authority of state law"  they were the professional responsible and obligated to insure that the child's needs were met through the IDEA process.

56.    The above state actors are being individually identified for they were CCSD employees from 2005-2009 to include; Susan Soper, Susie Heath, Brian Castellani, Laurence Ruble, Julie Cosgrove, Becky Richardson, Mary Myers, Elizabeth McBride, Victoria Sartorio, Ed Schriber, Ann Riggs, and Margerit Freno, who formed a team at the IEP table, to create a greater force who conspired together for the purpose of; directly

depriving the child the IDEA process and T.D.-F her parental written notice for equal

access to the imperative knowledge, which deprived her of her equal protection of the

law, equal privileges and immunities under the law. They also bullied and deprived her

of her rights to be an equal IEP team member.

57.    Seagate Elementary Schools principle, Mr. Castellani and T.D.-F discussed the

issue of indentifying A.D.-F disabilities at the May 2006 meeting.

58.    Mr. Castellani expressed that because of his own hearing disability he didn't like to

"LABEL" a child with a disability and that a disability LABEL would not get her child

any more services. He deliberately refused to initiate the Identification Evaluation

Process under child find, because he "hid" his own disability as a child, he was motivated

in his actions by an "invidious animus" against the disabled, and thus displayed deliberate

indifference to the child's constitutional rights and also failed to adequately supervise his

Seagate Elementary staff obligations to refer the child for a disability evaluation under

the child find mandates, he is accountable and liable as a direct and supervisory actor

under color of law, 42 U.S.C. 1985(3) and section 1983.

59.    The "Denial Team" members as a group denied the parent equal access to due

process and bullied T.D.-F., into agreement of every IEP that was void of appropriate

comprehensive objective evaluation criteria and further failed to give her "written notice

of refusal" to identify her child's SLD and refused to provide her clear written notice of

the appropriate procedural steps, under the IDEA process to obtain an IEE, at public

expense, 42 U.S.C. Sections; 1983, 1985, 1988.

60.    The IEP Team (Denial Team), "misused their power, possessed by virtue of state

law and made possible only because the wrongdoer was clothed with the authority of

state law, for actions taken `under color of' state law," <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941), 42 U.S.C. 1983.

61.    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress under, 42 U.S.C. S 1983 (1988).

62.    Laurence Ruble, was a key player of the CCSD'S "denial team" for he was acting as the Section 504 Coordinator and the state agencies official; Head of the Psychological Services Department under color of law and responsible for all evaluations, under the IDEA.

<u>**GENERAL ALLEGATIONS**</u>

63.    Plaintiff incorporates by reference the allegations contained in paragraph 51 through 62 of Plaintiffs' Complaint as if rewritten herein.

64.    A school district who denies a student the right to the provisions of "child find" under the IDEA and Section 504 during kindergarten is:  A school district who intentionally refused to evaluate a child with a "suspected disability' and uses the "wait to fail model" to obtain the "educational gap" which makes the child eligible under the IDEA to receive funding' is a state agency who supports and condones its employees actions to deliberately delay, deny, and ignores with reckless disregard and deliberate indifference the child's constitutional right to the property of an education and the parents rights to due process of law; in an effort to obtain additional federal funding, at the parent

18

and child expense, is a school district who caused injury and damages, under 42 U.S.C. 1983 and 1985.

65.    A.D.-F has an educational record and history of deprivation clearly consistent with the above "wait to make fail" actions, which gives merit and clarification of what and why CCSD deprived A.D.-F's equal access in her kindergarten year and why the parent's requests for an evaluation were ignored and refused.  Seagate Elementary schools employees actions and lack of appropriate actions is the foundation of the child's educational discrepancy, educational deficits, behavioral and emotional issues, which produced an ongoing life limiting causative injury, for which she will be forever damaged

66.    A state agencies who deprives a child and her parent the "properly right to a free public education", by intentionally withholding non-funded early interventional services, is a school district who creates an educational injury to obtain additional monies from a federally funded program, is one who commits extortion and fraud from the tax payers of the USA.


67.    T.D.-F refers to the FCRR, a resource used by CCSD states: **According to the Florida Center for Reading Research www.fcrr.org Technical Reports Dyslexia Technical Assistance Paper- States:**

**"Schools can identify children with reading disorders in preschool or kindergarten. Serious reading difficulties are preventable with the right kind of intensive instruction provided early in a child's development. That window of opportunity closes early. After first grade, a student can still improve. However, those who do not receive early powerful interventions will always perform poorly on phonemic decoding, reading fluency and spelling. They will never be able to close the gap",**

68.    At all times relevant T.D.-F and A.D.-F., had and continue to have Fourteenth Amendment Rights, Guaranteed Privileges and Immunities of Citizenship, under Due

Process and the Equal Protection clause, because Section (1) provides that "all persons born in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

69.    The Collier County School Board is a public "state agency" receiving state and federal funding for education, who is responsible and liable for their employees actions under color of state law, consistent with the Fifth and Fourteen Amendments under United States of America Constitutional Laws and liable for the deprivation of all and any violations of life, liberty or property and Civil Rights protection under due process of law.

70.    The Plaintiff, T.D.-F, filed her Original Appeal/Complaint of the administrative rulings, with a request for accommodations under the ADA, in this District Court (Doc. #1) on August 23, 2010, within the 90 referred time, in pro se form.

71.    T.D.-F filed her original due process hearing request in February 2009 and received her final ruling in June 2010, a 17 months due process hearing time frame.

72.    T.D.-F filed for a due process hearing in her individual and child's behalf as a parent aggrieved, claiming multiple violations for many years, under: (1) IDEA (20 U.S.C. 1400-1415 *et. seq*) and separate violations under (2) Section 504 of the Rehabilitation Act 1973 (29 U.S.C. 794), (3) her civil rights under Title II of the ADA (42 U.S.C. 12101-12165 *et seq*.), (4) all related State Statutes, (5) Constitutional and Civil Rights to include actions under color of law (42 U.S.C. 1983) claims, (6) equal

protection clauses of 1983 claims, (7) for violations of her Federally protected Rights

under the Fourteenth Amendment's for procedural and substantive due process of law,

(8) and requested attorney fees under (42 U.S.C. 1988), she has meet the exhaustion

requirements of her administrative remedies under all, **see attachment as Exhibit D.**

73.    The defendant's Collier County School Board and its employees receive state and

federal funding for education, they are liable under color of law, for the deprivation of a

students Constitutional and civil rights and for the causative damages under Section 504,

the ADA, 1985, due process of law protection and all other referred as above laws, both

Federal and State, under 42 U.S.C.1983.

74.    Because the State has a responsibility to supervise and "directs and or controls" the

defendants' actions, "the State can be held responsible for a private party's decisions."

see Payton v. Rush-Presbyterian-St.Luke's Medical Center, 184 F .3d623, 628 (7th

Cir.1999).

75.    CCSB and its employees are accountable for substantive and procedural process

violations under the IDEA, and liable for damages which resulted in the denial of FAPE,

for 48 months.

76.    The CCSB/CCSD "The District" is a "public entity" under Title II of the ADA,

which includes "any state or local government" and "any department, agency, special

purpose district, or instrumentality of a state or states local government", and subject to

obligations of the same.

77.    Section 504 of the Rehabilitation Act of 1973 protects a qualified individual with a

disability from discrimination in the provision of any benefit or service provided under

any program or activity receiving funds from the Department of Health and Human

Services and discriminatory actions prohibited under this authority which includes:
Denying a qualified individual with a disability an aid, benefit or service that is provided
to others.

78.     The CCSD is an agency of the state, and its employees were acting under "color of
law" when they exercised their "power possessed by virtue of state law" and made
possible only because they were clothed with the authority of the state, when they refused
to refer A.D.-F for a disability evaluation, 42. U.S.C 1983 and as a "group" withheld the
knowledge of due process of law, and a disables child's right Constitutional right and
protection to a FAPE under Section 504, 42 U.S.C. 1985(3) and protection from
discrimination acts under the ADA.

79.     CCSD refused to identify and evaluate A.D.-F., for a disability, at the parents
multiple requests and in light of the presents of multiple red flags, under Section 504 and
the ADA, they displayed "deliberate indifference" and "reckless disregard" of A.D-.F's
and T.D-F's constitutional and civil rights, of equal protection and the right to a FAPE
during the 2005-2006 Kindergarten school year, which caused damages, 42 U.S.C 1983.

80.     T.D.-F., voiced her concerns to CCSD employees as early as September 2005 and
placed her concerns in writing in December 2005, that she suspected her child may have
a disability.

81.     A.D.-F, had a CCSD record and a history, of not meeting the sunshine standards, in
the general education classroom, as early as October 2005, which continued to be
reported to the parent, by and through CCSD documented progress reports and report
cards, every 6 weeks which clearly showed that every day she attended the CCSD school,
she was slipped further and further behind her non disabled peers,

82.     The Office of Civil Rights (OCR) enforces Section 504 of the Rehabilitation Act of 1973 (Section 504), a Federal law designed to protect the rights of individuals with disabilities in programs and activities that receive Federal financial assistance from the U.S. Department of Education. Recipients of this Federal financial assistance include public school districts, other state and local educational agencies, and institutions of higher education.

83.     OCR also enforces Title II of the Americans with Disabilities Act of 1990, which prohibits discrimination against individuals with disabilities in state and local government services, programs, and activities (including public schools), regardless of whether they receive Federal financial assistance.

84.     Because Title II of the ADA essentially extends the antidiscrimination prohibition embodied in Section 504 to all actions of State and local governments, the standards adopted in Title II are generally the same as those required under Section 504. *See* 28 C.F.R. § 35.103(a). Title II and its implementing regulations do not establish a lesser standard of protection than Section 504.

85.     Section 504 and the ADA define disability as (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1).

86.     Under the ADA Congress directed that the definition of disability shall be construed broadly and that the determination of whether an individual has a disability should not demand extensive analysis. 42 U.S.C. § 12102 and that the "regarded as" prong of the disability definition, if an individual can establish that he or she has been

subjected to an act prohibited by Title II or Section 504, to include being denied equal access to educational programs because of an actual or perceived physical or mental impairment, then he or she is entitled to protection under these laws.

87.     In this case, application of these rules should include but not limit the shift of the inquiry away from the question whether a student had a disability in kindergarten (and thus is protected by the ADA and Section 504), but also include the school district's deprivation of actions and obligations to ensure equal educational opportunities to A.D.-F and her parent T.D.-F., because an impairment need not prevent or severely or significantly restrict a major life activity to be considered substantially limiting.

88.     An evaluation under "child find" is initiated to determine if a child has a disability and schools are required to locate, identify and evaluate all children with disabilities from birth through age 21 and after identifying children who may need services, all necessary evaluations must be completed on these children, at no cost to parents.

89.     CCSD refused to comply with the child find mandates under Section 504 which denied A.D.-F., equal access to receive and obtain the appropriate early interventional services necessary for her disabilities.

90.     CCSD employees at Seagate elementary refused to initiate the "child find" mandates to identify A.D.-Fs adverse behaviors to the educational setting as early as September 2005, as a sign of an underlying disability, for probable cause to the rights to an evaluation, under Section 504 while in kindergarten, denied her the right to the determination process of a disability, under 42 U.S.C 1983.

91.     To be eligible for services and protection against discrimination on the basis of a disability under Section 504 and the ADA, a student must have a record or history of a

disability, or be perceived as having a disability, a student must be determined as a result of an evaluation, to have a physical or mental Impairment that substantially limits one or more life activities.

92.     Office of Civil Rights recognized ADHD and Dyslexia as disabilities, under the protection of Section 504 and the ADA.

93.     Section 504 requires that CCSD and its acting agents to identify children who may be eligible for identification under Section 504.  Districts do not have the luxury under Section 504 of sitting back and waiting for qualified children or their parents to step forward and identify themselves because Section 504 duty to identify is an affirmative mandate of schools to search for "eligible children"

94.     CCSD teachers at Seagate Elementary are to be trained and were responsible to recognize the suspicion of a disability, refer a child for evaluations who is suspected of having a disability and know what determines eligibility for Section 504 protection and accommodations; they refused to follow this section 504 procedural process.

95.     A.D.-F., did not benefit from an education during the kindergarten year, in fact the child obtained a severe discrepancy from her educational setting and was educationally deprived solely based on CCSD and its employees deliberate indifference and reckless disregard for the child's underlying disability, as evidence by her academic failure and negative emotional manifestations during the Kindergarten school year, as documented by her CCSD educational history and record.

96.     A.D.-F was never able to recoup her educational deprivation and CCSD failed to remediate her educational loss (she continuously failed to meet the sunshine standards)

because they continued to depriver her of the problem solving based procedural process guaranteed under the IDEA, during the 40 months she was a CCSD student.

97.    CCSD can not use the good faith defense or immunity from liability of discrimination, for their actions were  intentional and they displayed deliberate indifference and reckless disregard, in light of the child's history and record of academic failure clearly noted in December 2005 and her clear likeliness of an underlying disabilities, because T.D.-F's made a parental requests to evaluate her child, which were denied, delayed and ignored, in an attempt to hold themselves immune from liability of their obligation of the provision of a FAPE to a child with a disability, under the IDEA, Section 504, the ADA, and 42 U.S.C. 1983.

98.    CCSD deprived A.D.-F., of 48 months of equal access to an appropriate beneficial education, through their actions; they are liable for 48 months of injury consistent with compensatory educational cost for damages, and punitive damages, while a CCSD resident under Section 504 and plaintiff's rights to relief under, 42 U.S.C. 1983.

99.    The United States Department of Education has defined disability harassment as "intimidation or abusive behavior based on disability that creates a hostile environment." U.S. Dep't of Educ., issued a Reminder of Responsibility in July 25, 2000, under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act. Students with a disability and their parents whether the disability is visible or non-visible, are subject to increased bullying that is often directed at the disability. The IDEA incorporates an anti bulling provision and the 14th Amendment to the Constitutions protects parents from the same.

26

100.    CCSD deprived T.D.-F., the right to protections from being bullied by the IEP

members, to agree to and only to their provisions of assessments, knowledge, disability

identifications and services, during the IEP process, as evidence by the court reporters

IEP transcript of September 2008 and October 2008, which clearly provides objective

best true evidence and merit to the CCSD'S attempt to and actions of bulling and steam

rolling the parent into agreement of their self created IEP'S and the IEP team members,

refusal to allow T.D.-F, equal access to the IEP process as an equal IEP member, **see**

**attached partial attachment in last complaints** and refers back to entire IEP transcript

submitted in total as it should be attached to the state level hearing complete file.

## KINDERGARTEN YEAR SECTION 504 and ADA ALLEGATIONS
### August 2005-August 2006

101.    Plaintiff incorporates by reference the allegations contained in paragraph 63

through 100 of Plaintiffs' Complaint as if rewritten herein.

102.    A.D.-F was born on February 3, 2000 and is the minor child of T.D.-F., her

natural mother, who has sole responsibility and custody.

103.    A.D.-F was a Collier County Elementary Public School District student from

August 8, 2005 to December 21, 2008 for 40 months, but resided in the CCSD fro 48

months.

104.    T.D.-F owned a home in Collier County from July 2003 till March 2011, which

was their primary residence, and paid property taxes for 8 years.

105.    A.D.-F attended and or was enrolled as a student in her residential "neighborhood

school", Seagate Elementary, a Collier County Public School, which had a less then 4%

exceptional student Education (ESE) population and was known for its "gifted school" status and provided the services of a *Challenge Program*" for 40 months.

106.    A.D.F., displayed behavioral problems, in the general educational setting, as early as September 2005.

107.    T.D.F, requested and attended a meeting for the identified "behavior problems" her child was exhibiting, with the Vice principle, (Ms. Trout) and the child's kindergarten teacher (Ms. Soper), as early as September 2005, related to identified behavioral problems.

108.    CCSD failed to initiate any pre-referral activities, behavioral assessments or interventions, in September 2005.

109.    The September 2006 meeting only produced A.D.-F as being identified and labeled by CCSD as "no more then a defiant child with behavioral problems", likely due to "Poor Parenting" thus CCSD failed to initiate any behavioral evaluations (consistent with Section 504), which started their perception of and the "parent blame game."

110.    A.D.-F passed her hearing and vision screening, in early October 2005.

111.    A.D.-F., displayed education deficits, in reading, spelling, and math as early as October 2005 and continued to "act out" in class and she was identified as not making educational progress in the general curriculum.

112.    Kindergarten in the state of Florida is mandatory.

113.    Kindergarteners have federally protected Rights and liberties under the 1st, 5th and 14th Amendments to the Constitution of the United States to have the opportunity of equal assess to "the property of a free public education" and to be free from discrimination as adequately as their non-disabled peers.

114.    Public schools must provide protection from discrimination for public school Kindergarten students, who have a history and or a record of a potential disability, under Section 504, because public schools receive federal funds to provide a free public education.

115.    Public schools, because they are federally funded, must not ignore a kindergarten age child's disability, for they are responsible and liable to insure the protection of the provision of a FAPE under Section 504.

116.    Public schools must provide children and their parents protection from discrimination under the ADA because they are a public Agency.

117.    Kindergarten students are entitled to all rights and protections of the opportunity to have their disabilities identified in the public school setting.

118.    Kindergarten students are entitled to the right to be provided a 504 educational plan, if necessary to enable them the opportunity to access the general curriculum related to their disabilities' manifestations to include any; educational deficits, emotional problems and physical limitations, for the protection necessary to provide them the opportunity to equal access to an education as adequately as their non-disabled peers.

119.    Section 504 Educational plans can include special educational and related services if necessary to give a disabled child equal access to programs under Section 504 and the ADA, 42 U.S.C 12101, 12131-12134.

120.    The Section 504 "child find" mandates the identification process and Section 504 Educational plans which can include **services necessary for the opportunity of equal access are not funded.**

121.    Qualification of a disability under Section 504 would not produce funds to a school district for the child's related identified equal access needs for services.

122.    A school district receives NO financial benefit, for initiating the evaluation process under section 504, if the child does not meet eligibility under the IDEA and needs the provision of a Section 504 Educational Plan that includes related services, to have equal access as adequately as their non disabled peers.

123.    The IDEA eligibility label does produce extra federal funding to a school district.

124.    The IDEA does provide funding to a school district, for the implementation of the pre-referral activities of appropriate interventions, under the Response to Intervention (RTI) model.

125.    An IEP under the IDEA, which produces funding, is created in contract form to document and support school districts requests for extra federal funding, which is known in Florida as a "Matrix" number.

126.    A disabled child who does NOT meet the states eligibility criteria, under the "discrepancy model" consistent with the IDEA, must not be denied non exhausting services which are necessary for her to have equal access to the general curriculum as adequately as her non disabled peers and under Section 504 and the ADA she is guaranteed protection from discrimination to obtain these services, but her rights and protections to a FAPE under Section 504, comes with not financial backing or support to the school district.

127.    A school district that identifies a child, as a child with a disability, to "early" and prior to meeting the "discrepancy model or state regulated educational gap" is a district

that is liable to provide the appropriate educational and or behavioral plans and services, without the benefit of funding.

128.    CCSB is the school district that intentionally refused to evaluate A.D.-F, " the child" with a "suspected disability' and used the Academic Improvement Plan (AIP) known as the "wait to fail model to obtain the state required educational gap" which made the child eligible under the IDEA to receive funding, is a state agency who supports and condones its employees actions to deliberately delay, deny, and ignores with reckless disregard and deliberate indifference the child's constitutional right to the property of an education and the parents rights to due process of law, in an effort to obtain additional federal funding, at the parent and child expense, is a school district who caused injury and damages, under 42 U.S.C. 1983 and 1985.

129.    A.D.-F's educational history and student academic records are clearly consistent with the above actions CCSD took against A.D.-F in her kindergarten year which caused and is the foundation of her educational discrepancy, educational deficits, emotional and identified behavioral problems, which produced an ongoing life limiting causative injury, which suffered and she will be forever damaged.

130.    A.D.-F., was denied her Constitutional Right to the property of a "free public education" as a kindergarten student while enrolled at Seagate elementary during the 2005-2006 year, as evidence by her inability to make educational progress and her need to be retained in kindergarten in May 2006, as documented by the CCSD.

131.    CCSD violated the "child find mandates" of Section 504, when they intentionally denied, delayed, ignored and avoided the procedural process necessary to identify the child's disabilities as an attempt to deprive her of protection from discrimination, during

the Kindergarten year, which denied her equal access to the property of an education under federal and state law.

132.   T.D.-F., was denied the right to have A.D.-F., made eligible for services under a comprehensive evaluation to include an "assistive technology" evaluation and CCSD refused to take actions necessary to seek out and find, under the child find mandates "all children with disabilities" to insure that appropriate early interventions were initiated.

133.   A.D.-F was denied equal access to the right to a FAPE under Section 504 and T.D.-F., was unable to address their deliberate indifference through the procedural safeguards process or the state complaint process, or the OCR complaint process do to lack of all knowledge related to the same, under Section 504 and the IDEA.

135.   T.D.-F., was notified by CCSD via progress reports and report cards, that A.D.-F., was identified as not making the sunshine standards, as adequately as her peers in October 2005 and at risk for retention, in Kindergarten, by November 2005 and would most likely be retained by her December 2005 report card.

136.   T.D.F demanded a parent teacher conference with Ms. Soper, on A.D.F'S, December 2005 report card, because they failed to respond to her requests, **Exhibit (D)**

137.   T.D.-F., was denied all knowledge of the Federal and State regulations promulgated to enforce Section 504 which requires that all children with disabilities, as defined by Section 504 and the ADA, be provided with free, appropriate public education as interpreted by the Section 504 regulations, 34 C.F.R. § 104.33(a) and that entitlement does not hinge on IDEA eligibility, during the Kindergarten year.

138.   T.D.-F., believed the child may have a disability and in December 2005, requested A.D.-F., be placed in a "special reading class", not referred to special

32

education, but her requests were denied, by the Seagate Staff, stating "kindergarteners" do not get extra reading instruction, by the reading teacher."

139.    T.D.F'S, child was denied these services, by CCSB employees in December 2005, because she was a kindergartener.

140.    Seagate Elementary staffs procedure policy and statement that "we do not evaluate kindergarteners" is a violation of the child find provisions under the IDEA and Section 504 which consequently violated the ADA.

141.    T.D.F had a meeting with Ms. Soper and Ms. Susie Heath (elementary curriculum resource) to address her child educational deficits and their identification that A.D.-F would be retained, in January 2006.

142.    CCSD employees did not refer A.D.-F., to the "CAST" Team at Seagate Elementary school, a (Collaborative Academic Support Team) while a kindergarten student.

143.    An appropriate referral to CAST team would include students who are not making typical progress despite interventions or those having serious academic, social and emotional, behavioral, health or attendance concerns. CAST is part of an action to document process and monitoring students response to interventions, but is also for students who do not respond to interventions and who may need increased levels of support (RTI) or the Multidisciplinary Team "MDT" approach under Section 504, the child was denied this referral from December 2005 to August 2006, while a Kindergarten student.

144.    Ms. Soper and Ms. Heath did not refer A.D.F. for evaluations under the "child find" of Section 504 or the IDEA as mandated to seek out and find all children with disabilities, in January 2006.

145.    Ms. Soper and Ms. Heath did not provide T.D.-F her CCSD procedural safeguards under the IDEA, or her parental rights under Section 504, or refer her to CCSD'S Special Program and Procedural Manual (SP&P), at the January 2006 meeting and never mentioned the idea of FAPE through out the child's 40 month attendance at Seagate Elementary.

146.    Ms. Soper and Ms. Heath failed to advise T.D.-F of any mandated Federal or State law, necessary to clarify their legal obligation to initiate the "child find" referral process for evaluations or of the procedural process to seek out and find all children with a disability, during the January 2006 and at every parent teacher meeting after that date.

147.    Ms. Soper and Ms. Heath did not provide T.D.-F any "Written Notice of refusal" to apply the mandated "child find" assessment provisions under Section 504, consistent with a child suspected of having a disability.

148.    CCSD'S employees collaborated in an agenda fashion to withheld imperative knowledge of Section 504 and the ADA during the kindergarten year and T.D.-F was denied her constitutional due process rights under Section 504 and was deprived of the opportunity to have her concerns be heard at a meaningful time and in a meaningful manner, during the 2005-2006 period.

149.    Ms. Soper and Ms. Heath, referred to the child's behavior and lack of educational progress as a condition, based solely on immaturity due to her kindergarten age.

34

150.    Ms. Soper and Ms. Heath were informed by T.D.-F, in January 2006, that she also struggled to read and spell in elementary school and was placed in a special reading class and still struggles to understand unfamiliar concepts.

151.    Dyslexia is a recognized and qualifying disability under Section 504 and the ADA; which is largely hereditary and linked to a number of identified genes.

152.    The CCSD employees at Seagate Elementary denied T.D.-F equal assess to the knowledge of her own individual Constitutional and civil rights of due process of law and her rights under the equal protection clause, as a parent of a child with a disability and as an individual person identified as having a disability under Section 504 and the ADA, when they deprived her of her Section 504 procedural safeguards.

153.    The CCSD employees at Seagate Elementary denied T.D.F the ability to exercise and enforce her civil rights protection, to file a complaint with OCR, in a timely fashion during the kindergarten year, when they refused to inform her of her Constitutional rights to due process of Law and ability of the same.

154.    Ms. Soper and Ms. Heath failed to refer the parent to the procedural process to identify her child as "an individual with a disability" or a child with a disability, attending a public school, and withheld the knowledge of her child as having rights to Federal laws of protection, mandated for a child with a disability, under Section 504, or the ADA, at the January 2006 meeting.

155.    CCSD staff deprived T.D.-F., and A.D.-F. of their "property right to education" without due process of law, under the Fourteenth Amendment, by withholding all written notice of this information, upon parental request to evaluate and CCSD refusal to do the

same, in December 2005, January 2006, February, 2006, March 2006 and again in May 2006.

156.    CCSD refused to initiate the "child find" provisions in 2005-2006, under Section 504 based on A.D.-F's **AGE** as a Kindergartener.

157.    Unfair treatment and depriving treatment based on age and class is discrimination under the ADA and under 42 USC 1985(3) which prohibits discrimination of a person or "class of persons", based on their age and or their disability, as the state actors "stated we do not evaluate kindergarteners" at Seagate elementary school, located in the CCSD.

158.    CCSD'S refused to apply the "child find" provisions under Section 504, in light of multiple red flags and parental requests to evaluate her child for a disability, during the kindergarten year, their deliberate indifference created A.D.-F.'S educational deficiency.

159.    CCSD **employees** at Seagate deprived T.D.-F. the knowledge of her rights, to file a state complaint, when they stated, "here at Seagate, we implement an AIP for your failing child", they failed to provide written notice of their refusal to evaluate, and the parents rights if she disagreed, with their actions, thus T.D.-F., was lead to believe that agreeing to the AIP was the only way her child would or could get the help she needed, 42 U.S.C 1985(3).

160.    CCSD'S staff's intentional actions in January 2006 deprived A.D.-F and T.D.-F their rights of nondiscrimination protection under the ADA.

161.    Ms. Soper and Ms. Heath devised no more then an academic improvement plan (AIP) using "the wait to fail model" for A.D.F at the January 2006 meeting a referral to the RTI model and appropriate evaluations was not provided, under Section 504 or the IDEA.

162.    CCSD'S AIP of January 2006 did not trigger the evaluation process "time line" under Section 504 and CCSD did not provide T.D.-F her procedural safeguards, it never initiated the evaluations process but it did reassure the Seagate staff, that the child was slipping further behind her non-disabled peers, to obtain "the wait to fail gap."

163.    A.D.-F, was placed on an academic improvement plan (AIP) "the wait to fail model" in January 2006, by Seagate staff, instead of being referred to a "CAST" team or referred for disability related evaluations, under Section 504.

164.    T.D.-F., agreed to the AIP in January, but did not agree that the "AIP", would dissolve or forfeit her rights under Section 504 and be used instead of the mandated procedural process consistent with "child find" under Section 504,  because the state actors, initiated the AIP, without referring her to their SP&P manual.

165.    T.D.-F was not provided a CCSD consent form, in January 2006, to evaluate her child for eligibility under the IDEA and her child was not referred by a CCSD employee for identification, evaluations or placement under the IDEA in her Kindergarten year.

166.    A.D.-F did not receive "RTI" interventions, because CCSD was not implementing the "RTI" mode, but continued to use the "AIP" (wait to fail model), RTI is a tool to be used, prior to referring a child for special education services under the IDEA, and it can be and should be used in implementing a Section 504 plan.

167.    T.D.-F was not provided written "Notice of Refusal" to evaluate A.D.-F for a disability under Section 504; in December 2005 or January 2006, or March 2006 or in May 2006, in fact the Plaintiff had never heard of or received the same, the entire time the child was a CCSD student.

168.    A.D.-F., failed to make improvements under the AIP and in February 2006, the parent was made aware, but not in a "written notice" fashion consistent with the IDEA, by Brian Castellani (school principle) and an actor of the state, that her child would be retained in Kindergarten for the 2006-2007 school year. The child was not referred for evaluations and continued to make no progress under the AIP "made to fail" model and in fact, acquired more documented educational deficiencies, **see Exhibit (D).**

169.    The January AIP failed to show any progress of the child access of meeting her educational goals in the general curriculum as adequately as her non disabled peers, but it did created a clear record and history of a greater educational discrepancy from December 2005 to May 2006.

170.    CCSD'S refusal to initiate and provide any scientifically proven and evidence based early interventions, with the presents of multiple "red flags" showing the child's high potential for a disability was done in bad faith. Their refusal to initiate the procedural process under Section 504 which excluded the child from learning was a total denial of the potential presents of an underlying disability and their neglect/lack of actions were a display of deliberate indifference of her rights and protections under the ADA. This action created a severe educational discrepancy solely based on the child being excluded from the process.

171.    T.D.-F "voiced her concerns" regarding A.D.-F lack of educational progress with the AIP in February 2006, and when she was notified in writing, by Brian Castellani's intent to retain the child in Kindergarten, for lack of meeting the sunshine standards, she again requested her child be evaluated and again her requests were ignored and she was denied the process.

172.    CCSD employees of Seagate Elementary Susie Heath and Ms. Soper, in March
2006, stated "We do not evaluate kindergarteners", we believe that their problems are
based on immaturity only, their opinions and approach of a "kindergarteners" civil rights
is a violation of 42 U.S.C. 1985(3) which prohibits a conspiracy formed "for the purpose
of depriving, either directly or indirectly, any person or class of persons of the equal
protection of the laws, or of equal privileges and immunities under the laws.

173.    Seagate's elementary schools principle Mr. Castellani, supported and validated
his staffs, decisions, position and lack of actions, of their refusal to evaluate T.D.-F's
child for a disability, because, she was a kindergarten student, under 34 C.F.R. Section
104.32(b) and 34 C.F.R. Section 300.532(f).

174.    A.D.-F had constitutional rights and protections as a "kindergarten age students",
for they are a "class of persons" and "disabled kindergarteners are a "Class of persons"
eligible for equal protection from discrimination of the law and a violation under Section
1985(3).

175.    Kindergarten is mandatory in the state of Florida, which makes "kindergarteners"
a class of individuals deserving of their constitutional rights to a FAPE, under Section
504 and the IDEA.

176.    The Gifted Seagate school staff's reckless disregard for disabled kindergarteners
civil rights, to be evaluated for a disability, because of their age under 20 U.S.C. 794,
Section 504, which supports that they were motivated in their actions by an invidious
animus against the disabled, 42 U.S.C 1985(3)'s protection extends to a "class of
persons" deserving of "the property of an education," 42 U.S.C. 1983.

177.    The Seagate Elementary staff, is very proud of their 3% special education population, they had an agenda under color of law, and conspired to withhold Section 504 disability identification and evaluation process information from the parent, which was an intentional act of discrimination with conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, 42 U.S.C. 1985(3).

178.    T.D.-F was denied all knowledge and a referral for evaluations under the IDEA process necessary to identify child's disabilities, to make her eligible for services under the IDEA, during the August 2005-September 2006 kindergarten period.

179.    T.D-F requested a meeting with Mr. Castellani in May 2006, to discuss her concerns of his intent to retain her child, without offering to provide any help to her over the 2006 summer

180.    T.D.-F, obtained and paid for a written referral/request from Dr. Duncan, because CCSD was refusing to evaluate her child and provided it to the state actor Mr. Castellani, in May 2006, as a written request to evaluate A.D.-F consistent with a Psychological and learning disability; he refused to initiate the evaluation process time line, upon receipt of the Doctors written referral, under Section 504, but gave parent NO written refusal.

181.    The same meeting produced a "written form of evidence" that prior to that meeting in May 2006, during the entire 2005-2006 kindergarten school year of attendance, even in light of her planned retention, Mr. Castellani had not referred A.D.-F., to any services to include the CAST process and had NOT been provided the "CAST" teams, educational support, but that he was now assuring the parent that he would provide

the child the same, when she returned and was retained in Kindergarten in August 2006, at Seagate Elementary, **EXHIBIT E**

182.    T.D.-F, as a person with her own language based disability, values the importance of a beneficial education and the necessity for meaningful early interventions, disagreed with CCSD'S deliberate indifference to her child's needs, as evidence by their only offer of intervention was "retention" in Kindergarten.  Plaintiff was lead to believe, from the CCSD staff, that her child would not be evaluated as a Kindergartener

183.    CCSD employees lack of referral actions after one year of a history and a documented record of academic failure, was an intentional deprivation and delay, in light of the parents multiple written concerns the longer the delay the greater the failure and the larger the educational discrepancy model, to increase the likeliness that the child's year long failure, securing eligible for IDEA funding.

184.    CCSD actions continued to cause injury to A.D.-F and T.D.-F as she continued to be denied the opportunity to equal access of appropriate referral for services to include the CAST team support, until next year, after she was retained in August 2006.

185.    CCSD was made aware at the May 2006 meeting, that the parent disagreed to another 3 month educational and evaluation delay, before the child received any help and only after she would be retained Kindergarten; then she would be referred for the CAST evaluation process.

186.    CCSD'S actor Brian Castellani, the LEA and Seagate's principle, supported his teachers choices during the 2005-2006 school year and did not refer the child, in a timely fashion, to the process of the CAST team, he did not refer the child to the evaluation process, and did not provide the parent with "written notice of refusal" or her procedural

41

safeguards under Section 504 or make reference to his SP&P, during the Kindergarten year.

187.    A.D.-F did not benefit or make educational progress in the general curriculum, during August 2005-August 2006, as evidence by her need to be retained.  The child was deprived the "property of an education" while a kindergarten student.

198.    A.D.-F NEVER met or had an opportunity to equal access of the sunshine state standards of Education as adequately as her non-disabled peers, while a CCPS student.

189.    CCSD actions in May 2006, denied T.D.-F's written notice of refusal and they withheld her procedural safeguards under Section 504.

190.    T.D.F,  advised and informed the state actor, Castellani, at that May 2006 meeting, that she would not let the summer go by without interventions; because her child was already a year behind educationally, and that retaining the child in Kindergarten was not an appropriate intervention in lieu of evaluations.

191.    T.D.-F, advised the state actor, Castellani, that because they were refusing to evaluate her child, she would have to obtain a private evaluation and tutoring for her child over the summer, to prevent more educational regression.

192.    The state actor failed to inform and withheld all knowledge of a parent's rights to a FAPE or her Section 504 Procedural safeguards or CCSD'S (SP&P) manual under the IDEA process related to IEE'S.

193.    CCSB's Head of psychological services and the Section 504 coordinator, Laurence Ruble acted under color of state law, when he refused to initiate the evaluate process for A.D.-F, in May 2006, upon T.D.-F's verbal request and consistent with Dr.

Duncan's written request and refused to provide the parent written notice of her parental

safeguards under Section 504

194.    T.D.-F, Notified Lauren Ruble in May 2006, that she would have her child

evaluated privately, due to their denials and delays, he failed to provide the parent her

written notice and procedural safeguards related to all things disability, to include but not

limited to "the appropriate procedural process of evaluations" under Section 504 and the

IDEA.

195.    T.D.-F., without the knowledge of her IDEA procedural safeguards and after

being denied the rights to; clear knowledge of the disability related procedural process of

appropriate evaluations, appropriate educational interventions and the complaint process

under all, she would initiated a private independent educational evaluations (IEE) and

obtained  private tutoring fro her child over the 2006 summer.

196.    T.D.-F., requests for evaluations under Section 504 (for a disability) were ignored

and denied in total, by CCSB'S actors, and her procedural rights information withheld

upon her request for the same, was a deprivation of due process under color of law, by

CCSD'S Section 504 Coordinator, Laurence Ruble in May 2006.

197.    Laurence Ruble failed to provide the Parent Written notice of his refusal to

initiate the Section 504 evaluation process and withheld her written notice of her

procedural safeguards under Section 504, which denied her access to due process of law

under, 29 U.S.C. 794 and 42 U.S.C. 1983.

198.  Laurence Ruble, violated A.D-F's rights to equal access of the "child find"

provisions under Section 504 and his refusal was a deliberate indifference to the child's

needs solely based on her disabilities and reckless disregard for T.D.-F's rights to the

knowledge of the same, which deprived her of the right to exercise her procedural

safeguards, under the 42 U.S.C. Section 12101 the ADA, 42 U.S.C. 1985 and liable under

42 U.S.C. 1983

199.    A.D.-F was a child with a disability who was denied equal access to the benefit of

an education in the general curriculum, solely based on her disabilities, under Section 504

and the ADA, which caused damages under 42 USC 1983.

200.    During A.D.-F's kindergarten year, August 2005 till September 2006, she was

deemed by the CCSD staff, to have deficient educational progress, which they

contributed to and only her rude, inappropriate and defiant behaviors see Soper's written

statements, in Dr. Duncan's evaluation form, paid for by the parent dated May 2006, **see**

**Exhibit (F).**

201.    A.D.-F's disabilities were intentionally ignored and she was denied the

protections from discrimination and accommodations under Section 504 and the ADA.

202.    CCSD displayed deliberate indifference and discriminated against A.D.-F. by

denying her equal access to an education as adequately as her non disabled peers, due

solely based on her disabilities under Section 504 and the ADA.

203.    A.D.-F did not make educational progress in the general curriculum and did not

benefit from CCPS'S public educational setting and was denied the access to the right to

a FAPE, during this time, under Section 504 guidelines.

204.    A.D.-F was not referred to the IDEA process during kindergarten, she did not

have an IEP, CCSD and its employees as persons and actors "acting under color of state"

made NO reference to the IDEA procedural process, and T.D.-F., was not provided her

IDEA procedural safeguards or "written notice of refusal" consist with the IDEA process,

during this time, thus the IDEA strictures do not apply to protect CCSD during the 2005-2006 school year, from liability consistent with Section 504, the ADA and relief and remedies under 42 U.S.C. 1983.

205.    T.D.-F was denied all knowledge of; the procedural process related to a child likely to have a disability and that Section 504 forbids disability discrimination by federal grantees, including local school districts and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–50 forbids disability discrimination by state and local governments, again including school districts, during the Kindergarten year.

206.    T.D.-F., requested a Section 504 due process hearing through her minor child (A.D.-F) for the noted actions and violations and denial of rights and protections under Section 504 and ADA for all above alleged claims against the defendants (CCSB).

207.    T.D.-F's Section 504 claims were and are separate and distinct in nature from their IDEA violations at the administrative level, those claims and violations must stand alone, for Section 504 and Title II of the ADA are separate and distinct laws, which protected her and her child from discrimination, during the refusal of the IDEA procedural process application.

208.    CCSD is liable for the costs and related damages, of Dr. Duncan's visit May 2006, because TDF only requested his services, to obtain a written request/referral to evaluate ADF for a disability, solely based on CCSD refused to validate the parents requests for a disability evaluation and their deliberates indifference to her child's disability needs, under Section 504, the ADA and 42 U.S.C Sections 1985 and 1983.

209.    CCSD is liable for the costs and related damages, of Dr. Mack's visits in June 2006, because TDF was referred to her, from Dr. Duncan to obtain a disability diagnosis

solely because  CCSD refused to recognize ADF as a child with a disability and blamed

the child and discriminating against her because of her oppositional and defiant behavior

in their school setting, solely based on CCSD refused to validate the parents requests for

a disability evaluation and their deliberates indifference to her child's emotional

disability related needs, under Section 504, the ADA and 42 U.S.C. Section 1983.

210.    CCSD is liable for the costs and related damages, of Ms. Marsha McGinness

(certified in tutoring a child with ADHD) tutoring services from June 2006 until

September2006, who was referred to T.D.-F by Dr. Mack in June 2006, based on the

child's planned grade retention, stemming from her failure to make beneficial academic

progress while a kindergarten student in CCSD, due to their deliberates indifference and

reckless disregard of her child's disability related needs, under Section 504, the ADA and

42 U.S.C. Section 1983.

211.    CCSD is liable for the total costs and damages, of Christopher McGinnis's private

evaluation performed over the 2006 summer, under Section 504 and 1983, because as the

private evaluation was undertaken due to CCSD employees depriving actions and their

deliberate indifference to her educational protections to stop the injury and because the

district was planning a grade level retention while refusing to provide evaluations based

on her academic failure.

212.    McGinnis found that the child educational gap was twice as large as the state

standard for IDEA eligibility and it was crucial to have her assessed for a disability, to

prevent more academic failure. McGinnis's report documented that because CCSD

refused to evaluate for a disability at an earlier time as identified in (December 2005), the

child now had a 32 point discrepancy "gap", the different between the child's IQ and ability to apply information, after the kindergarten year at Seagate Elementary.

213.    CCSD employees refused to apply or refer A.D.-F., to the procedural process, under the IDEA they refused to provide T.D.-F, "Written Notice of Refusal" or "Written Notice" to refer A.D.-F. for evaluations, and  failed to provide T.D.-F., her procedural safeguards under 20 U.S.C 1400-1415 et seq., during the (12 months) from August 2005 to August 2006 time frame.

214.    A.D.-F did not have an IEP during the August 2005-August 2006, time frame under the IDEA 1997 or IDEA 2004.

215.    T.D.-F. was not provided a referral to the procedural process of the IDEA during the 2005-2006 periods, thus her Section 504 and ADA claims stand alone and are not subject to the IDEA "umbrella" standards of review or its strictures.

216.    The parent complied with Dr. Duncan's request and initiated a private IEE'S over the summer of 2006, Plaintiff took the child to a Psychiatrist, as per the Dr. Duncan's, submitted request to CCSD and referral, for evaluation, at her own expense. Psychiatrist Dr. Mack referred child to a child Psychologist for a diagnostic Psychological-Educational evaluation and referred the Plaintiff to a "reading tutor". Plaintiff complied with referrals and paid for all services, out of her own pocket. She had not been given "notice of her procedural safeguards" or been referred to FAPE, in *toto* by CCSD.

217.    Because CCSD refused to comply with Section 504 child find mandates, T.D.-F., was made to obtain, at her own expense, through private providers, the help her child needed to progress in the general curriculum, as adequately as her non disabled peers.

218.    T.D.-F., is a single parent with a limited income, who works full time, to support her children and pay her living expenses, she is not a special education attorney and had no prior knowledge of the Federal Laws that protect individuals who have a disability or student who are unable to access an education in the general curriculum, and no understanding of the FAPE provision.

219.    T.D.-F., has the Constitutional and civil rights to Relief for Review and Remedies, associated with and consistent with violations, and actions of discrimination under Section 504, see *W.B. v. Matula*, 67 F.3d. 484 (3rd Cir. 1995),

"Plaintiff, on behalf of her disabled child, seeks damages for the persistent refusal of certain school officials to evaluate, classify and provide necessary educational services. Plaintiffs then sued for compensatory and punitive damages incurred in the period before the school agreed to provide these services, with an IEP. Despite the finding that E.J. suffered from ADHD and was thus entitled to Section 504 services, defendants did not provide them. Concerned that the evaluation had not fully assessed E.J., W.B. asked defendants to fund an independent evaluation. Defendants refused."

220.    There are significant differences between Section 504 and IDEA, perhaps the most significant is that Section 504 is a civil rights law, and IDEA is an educational benefit law.

221.    Section 504 is designed to level the playing field for individuals with disabilities. Its purpose is to ensure that individuals with disabilities have the same access to education that individuals without disabilities have. It does this by eliminating barriers that exclude individuals with disabilities from participating in protected activities, including a free and appropriate public education.

222.    Thus Civil rights claims and Section 504 claims can not to be held to the "strictures" on damages under the IDEA, when the IDEA process was not the applicable law.

48

223.   Section 504 evaluations do not require parental consent; they are initiated when there is a history or a record of a potential disability but Section 504, has no financial reward, to a school district.

224.   A Parent's request for evaluations, does trigger, providing a parent her procedural safeguards/parental rights under Section 504, which were denied.

225.   The IDEA is an educational benefit law, which offers additional services and protections for those with disabilities that are not offered to those without disabilities.

226.   Section 504 and the IDEA are also distinguished by their different eligibility requirements and the benefits they provide. The definition of a disability is much broader under Section 504 than it is under IDEA. All IDEA students are covered by Section 504, where as not all Section 504 students are protected under IDEA: an initial referral is usually NOT an IDEA matter. Special Educators may advise or assist the 504 committee or coordinator, but a full 504 consideration should take place before referring the child to special education

227.   The CCSB is supervisory agent over all of the CCSD schools and is responsible and liable for all of its employees actions and deliberate indifference to the federal and state laws, that protected disabled children from discrimination and deprivation of their civil and constitutional rights, they are liable for their actions of "inadequate supervision" of Constitutional violations that was the causative agent of A.D.-F and her parent T.D.-F injury and acquired damages under 42 U.S.C. Section 1983.

## ALLIGATIONS OF HEARING OFFICER ABUSED HER DISCRETION AS AN ACTOR UNDER COLOR OF LAW IN HER RULINGS

228.    Plaintiff incorporates by reference the allegations contained in paragraph 101

through 227 of Plaintiffs' Complaint as if rewritten herein.

229.    The hearing officer applied erroneous agenda standards and restrictions, when she

had the knowledge that the FDOE, had NOT revised their state statues to be consistent

with the 2004 IDEA regulations and CCSD continued to use the 1997 IDEA guidelines,

while A.D.-F was a CCSD student and they did not send out a notice to the schools to

apply the new IDEA 2004 Regulations, until 2010.  The statue of limitations had no

bearing or influence on plaintiff's claims.

230.    CCSB'S attorney had this knowledge but still initiated the protection of the statue

of limitations, consistent only with the 2004 IDEA.

231.    The hearing officer, abused her discretion when she applied her "colorable under

the law agenda" of protection to CCSD, by placing the Plaintiffs "entire" Section 504 and

ADA claims /violations, under the IDEA standards, to apply the IDEA strictures, to

protect CCSD from liability of damages under 1983, during the Kindergarten period.

232.    The hearing officers colorable agenda and failure to give "NOTICE" or disclose

that she intended to place the kindergarten period, 2005-2006 an non IEP time frame,

under the statue of limitations and standards and strictures of the IDEA.

233.    T.D.-F is a parent with a learning disability, who requested at all relevant times

"as an accommodation" written clarification to access the procedural process, during the

due process hearing phase, but was deprived of the same by DOAH.

234.    Congress intended to allow ALL parents (non attorneys) to represent their

children's rights and their own individual rights to a FAPE, under the IDEA at the due

process hearing, and allow them the ability to exercise their procedural safeguard rights,

through the entire time their child is in need of services under the IDEA and is forever protected by the constitutional protection for their disabilities.

235.    CCSD'S attempted to initiate the umbrella strictures of the IDEA with their "colorable under law agenda" to try and apply the IDEA statue of limitation strictures, to T.D.-F's deprivation of protection claims and denial of equal access to the evaluation process mandatory under child find provisions of Section 504 claims and their deliberate indifference and reckless disregard for A.D.-F., educational needs and emotional needs during the kindergarten period under title II of the ADA.

236.    CCSB'S attorney initiated the statue of limitations under the IDEA, by objecting to the plaintiff's kindergarten time frame evidence and testimony of the 2005-2006 school year, which was the causative agent of the child severe academic discrepancy model "gap" and the initial deprivation of FAPE under Section 504 and violations of the ADA, and all other Constitutional and civil rights, denied to the Plaintiff and her child, while a student in the CCSD.

237.    DOAH'S hearing officers agenda of initiating the protection to CCSD of the IDEA for T.D.-F., Section 504 claims, dissolving and deprived her of her Constitutional right to due process of law under section 504, the ADA and all other Constitutional rights and claims of relief related to the same, under 42 U.S.C. 1983 and 1985.

238.    The Hearing officers agenda in her finding of fact that states, Laurence Ruble offered to evaluate the child in May 2006 and the parent declined is a self created blatant fabrication of the truth and clearly inconsistent with the evidence, facts, history and his own testimony during the Section 504 due process hearing.

239.    The hearing officer's application of the IDEA standards, when the CCSB was not protected under the IDEA process, during the 2005-2006 Kindergarten year, was an abuse of her discretion, an attempt to protect CCSD from liability of damages under Section 504, the ADA, and 42 U.S.C 1983 and done in bad faith.

240.    DOAH, through their hearing officer applied the IDEA standard to the Plaintiff's Section 504 claims, during the time period that the IDEA procedural process was not being applied.

241.    DOAH'S hearing officers application of using the 2004 IDEA strictures, to "cloak" T.D.-F's Section 504 claims, under the "umbrella" of the IDEA, was an attempt to allow CCSB's deliberate actions and violations of depriving the child and the parent of the protections from discrimination and to escape from liability of damages under Section 504, the ADA and 42 U.S.C 1983 and 42 U.S.C. 1985.

242.    DOAH'S hearing officer attempted to dissolve the Plaintiff's Section 504, and ADA claims consistent with 42 U.S.C 1983 rights, by applying the IDEA standard to include the statue of limitations during the 2005-2006  period, which would allow CCSB and its state actors to escape under the "cloaking" of the umbrella of the IDEA strictures, was applied in error.

243.    T.D.-F., is now an informed parent and CCSB'S and its employees should not be able to escape, because of the Plaintiff's disability, under the "cloaked" umbrella of the IDEA'S protection from liability, associated with their "deliberate indifference and reckless disregard" of A.D.-F's disabilities, and T.D.-F., needs for identification and accommodations under Section 504 and the ADA, their actions caused and created

52

damaging consequences, consistent with the availability of relief under 42 U.S.C 1983, during the 2005-2006 time frame.

244.    CCSD refused to provide T.D.-F, "written notice of refusal" to evaluate her child during the kindergarten period, which deprived her of the knowledge and right to initiate due process of law, under her constitutional rights.

245.    CCSD deprived A.D.-F., her Federal Protected Rights, Civil Right, and liberties to the property of a Free Public Education, while a kindergartener as evidence by her need to be retained in Kindergarten, in May 2006, under the 14th Amendment and vindicated under 1983.

246.    CCSD deprived A.D.-F., from her civil rights and liberties of protection from discrimination as a child with a disability under Title II of the ADA, when they denied her equal access to the right to be evaluated for a disability, while in Kindergarten.

247.    CCSD deprived T.D.-F., of her Constitutional Rights to Procedural and Substantive due process of Law, when they intentionally withheld their "Written Notice of Refusal" to evaluate her child in kindergarten, as state actors and agents under "Color of state law".

248.    The "FDOE", was the supervisory agency who acted "under color of law", when they displayed deliberate indifference and inadequate supervision to, T.D.-F's rights to a timely 45 day hearing process and allowed the hearing officers to unnecessarily delay her rulings, up to 17 months, their lack of actions, caused T. D.-F., unnecessary additional financial injury and damages, 42 U.S.C. Section 1983.

249.    The "FDOAH". was the supervisory agency who acted "under color of law, when they ignored T.D.-F.'S  requests for accommodations, clarification of her Section 504

hearing contract, a timely and non biased due process hearing, they deprived her of her rights to due process of law, their deliberate indifference and failure to supervise caused injury under, 42 U.S.C. Section 1983.

250.   DOAH'S hearing officer's colorable agenda to apply inconsistent legal standards, create false findings of facts, and accommodate the plaintiff for her disability, created an unfair biased due process hearing, depriving T.D.-F. equal protection under the law, which caused injury to the plaintiff and her child, under 42 U.S.C. Section 1983 and Section 1985(3).

## IDEA VIOLATIONS and INTERSECTING SECTION 504 VIOLATIONS DURING THE 2006-2007 YEAR

251.   Plaintiff incorporates by reference the allegations contained in paragraph 228 through 250 of Plaintiffs' Complaint as if rewritten herein.

252.   A.D.-F obtained a 32 point educational gap in Kindergarten and was administratively placed in the first grade at Seagate Elementary in August 2006, by the state actor, Brian Castellani, who was the Schools Principle.

253.   A.D.-F was referred to the IEP team, not the CAST team in August 2006.

254.   CCSD employees failed to provide Plaintiff her written notice of procedural safeguards manual under the IDEA, prior to drafting their ADHD IEP.

255.   CCSD provided T.D.-F. a CCSD form to evaluate her child under the IDEA, plaintiff gave "written consent" to perform, what she was lead to believe a was a necessary Initial Comprehensive Eligibility Educational Evaluation, for CCSD to identify all of her child's disabilities and their manifestations and to assess and support if the child qualified for special educational and what services she needed that were, necessary to

54

support the severity of the child's inability to access the general curriculum, as
adequately as their non-disabled peers, under the IDEA.

256.   CCSD also encouraged Dr. Duncan to diagnosis A.D.-F as ADHD, for they
forwarded him a CCSD form to sign off on the diagnosis of ADHD.

257.   CCSD failed to inform T.D.-F that A.D.F- was being made eligible for IDEA
services, based on their actions to obtain a diagnosis of ADHD from Dr. Duncan's, to
meet the OHI category under the IDEA.

258.   CCSD failed in form the T.D.-F in September 2006, that they were denying and
refusing to use Dr. McGinnis's Independent Educational Evaluation (IEE) data,
diagnosis's and recommendations, as an eligibility evaluation for a learning disability and
deemed it as an incomplete "comprehensive evaluation for a learning disability" because
he did not perform a math subtest, but CCSD used his ADHD diagnosis for eligibility to
fit the category of Other health Impaired "OHI" only, under the IDEA process.

259.   Because CCSD failed to advise and inform T.D.-F, in **"written notice of refusal"**
fashion, that they were refusing all other professional data and diagnosis related to the
possibility of A.D.-F have an underlying SLD greater then ADHD, she was unaware that
they ignored Mr. Mack's, Dr. Duncan's and Dr. McGinnis finds of the likeliness and
potential of a SLD as the parent had suspected the inherited possibility and  presence of
"dyslexia."

260.   The parent was not made aware, that they deemed McGinnis's IEE, as an
incomplete evaluation, because he left out a math subtest until in March 2008, when Julie
Cosgrove stated, that the IEP team did not use McGinnis' data in the IEE to support the
identification of a SLD, back in 2006.

261.    The IDEA under 20 U.S.C. Section 1415(f),  provides the clarification that the

IDEA can not restrict or limit a parents rights, procedures, and remedies available under

the Constitution, Title V of the Rehabilitation Act of 1973 protecting the right of children

and their parents.

262.    The IDEA is more then a "pamphlet." The IDEA is supported by a comprehensive

Procedural Manual that explains the procedural process, a public school must follow to

insure a child is receiving a beneficial education, because CCSD receives federal funding

they must follow its 'IDEA" mandated provisions and actions to be in compliance with

the production of an IEP that is individualized to provide educational benefit, necessary

to secure a FAPE, to a child identified as having a disability and is eligible for specially

designed instruction and related services to meet ALL her needs.

263.    Thus, no statue of limitations under the IDEA applies to this case because, the

Defendant's withheld this imperative knowledge from the plaintiff until March 2008 and

Plaintiff was unable to act on the ongoing violations caused by the same or able to

enforce her procedural process safeguards, without clear knowledge of the same.

264.    CCSD obtained a medical diagnosis from Dr. Duncan for ADHD and performed

NO MORE, then an addendum as an "evaluation" to McGinnis report, to support Dr.

Duncan's ADHD diagnosis.

265.    Parent was lead to believe that the "consent to evaluate" she signed in September

2006 was to perform a public school comprehensive eligibility educational evaluation,

she was never informed that the CCSD took specific actions to obtain the label of

"ADHD" from the pediatrician for "ADHD" and noting more, so that she could fit the

category of OHI, under the IDEA.  This deliberate action was done; to ignore the data

from the IEE in 2006 that supported the child very likely had an underlying learning disability, greater then "ADHD."

266.    The IDEA is an educational based problem solving procedural process, designed to ensure that children with disabilities are provided appropriate assessments and interventions, based on their disabilities manifestations and exceptionalities, and their educational ability deficits' enforceable under state laws, federal laws, and to be consistent with their protections under their Civil Rights and liberties, under the Constitution of the United States.

267.    Section 504 states a federally funded agency can not ignore or deprive a disabled person their rights to equal access, to include the problem solving educational procedural process of the (IDEA) if eligible based on the severity of their disability, to ensure they are not deprived of their right to a FAPE.

268.    CCSD never referred the parent, to their Special Procedure and Policy Manual, (SP&P) which is a detailed manual that explains **their** procedural process role and obligations to provide a FAPE as mandated and consistent under the Federal Constitutional laws of the IDEA process.

269.    CCSD violated the primary purpose of the Individuals with Disabilities Education Act (IDEA), which is to ensure that all children with disabilities receive a free appropriate public education (FAPE), including specially designed instruction and all needed non exhausting related services that are "designed to meet their unique needs and prepare them for further education, employment and independent living," (20 U.S.C. 1400-1415 et seq.)

270.    T.D.-F was deprived of the right to know that CCSD was actually refusing to perform a comprehensive individualized needs based educational evaluation of A.D.-F., because CCSD employees refused to place their "refusal" in the "Written Notice of refusal" format consistent with the IDEA, the entire time (40 months) her child was a student at Seagate Elementary.

271.    T.D.-F was not aware, her child never received a "FREE" "comprehensive educational evaluation from CCSD", the entire time her child was a CCSD student, until finally Laurence Ruble stated the same "**in writing in March  2008**, which the plaintiff had to "squeeze" the truth out of him, after his multiple attempts to divert the issue, and keep the Plaintiff in the dark and ignorant of the CCSD'S violation under , 20 U.S.C 1400-1415 et seq.

272.    The Individuals with Disabilities Education Act  IDEA 1997 and 2004 includes the Child Find mandate, requires all school districts to identify, locate and evaluate all children with disabilities, regardless of the severity of their disabilities. This obligation to identify all children who may need special education services exists even if the school is not providing special education services to the child (20 U.S.C. 1400 -1415et seq.)

273.    CCSD failed to meet the child find requirements under the IDEA during the 2006-2007 time frame when they refused to identify the child disabilities, through the initial appropriate evaluation process and reevaluation process by not providing T.D.-F a informed consent for a full evaluation and not conducting a full and individual evaluation of A.D.F, to meet the procedural standards of the eligibility process under the IDEA, (20 U.S.C. 1412(a)(3).

274.   The IDEA states that before the school may proceed with the evaluations, parents must give their informed written consent. This consent is for the evaluations only and should include an assisted technology evaluation, to assess for alternative devices.

275.   CCSD deprived T.D.-F of her rights to their "written notice of refusal" to perform a comprehensive eligibility evaluation under the IDEA in September 2006.

276.   CCSD failed to provide T.D.-F "inform consent" and they failed to provide TDF adequate "written notice" that they intended to performed "no more then" an addendum to support a diagnosis of ADHD, to support their OHI category placement, in September 2006.

277.   T.D.-F was not aware at the time and was not given "written notice of refusal" that CCSD disagreed with her child's Dr. Duncan's and Dr. Mack's requests for a comprehensive "SLD" evaluation, not screening, at no cost to parents.

278.   CCSD employees under color of state law, displayed deliberate indifference and reckless disregard for the parent's requests and concerns to appropriately reevaluate the child in December 2006 for the child's lack of progress under her current IEP and educational placement, she requested extra help related to her child's learning, behavior, and social development.

279.   CCSD was informed and aware, that T.D.-F provided the child tutoring over the summer and would continued to provide the private tutoring services for her child the entire school year, of 2006-2007, at the parents' expense and failed to mention their responsibility and obligation to provide this as a service in her IEP, as a provision of FAPE.

280.   T.D.-F was not given "written notice" that A.D.-F's 2006-2007 IEP focused on
and provided no more then accommodations, in the general education classroom setting,
consistent with an ADHD "Section 504 educational accommodation plan", but now could
obtained funding, under the IDEA for an IEP'S matrix number.

281.   A.D.-F was under the influence of ADHD medication, the entire 2006-2007,
school year, while she failed to make progress under her ADHD IEP and was retained.

282.   A.D.-F was provided, as her IEP services, no more then 45 minutes a day, in the
resources room late in the afternoon, at 1:30 pm, to review and make a scrap book, of Ms.
Richardson's general education curriculum, for the entire 2006-2007 school year.

283.   CCSD employees failed to initiate an IEP meeting, in December 2006, in light of
the child's "failing" status and advised TDF, that retention of the child in first grade was
inevitable and the only intervention they proposed,  due to her child's continued
kindergarten present levels of performance, under her present IEP.

284.   T.D.-F agreed to their intervention of retention, solely based on her lack of
imperative knowledge and failure of CCSD to provide her clear "Written Notice" of their
obligation to provide more evaluations, more or different interventions, and continues to
reevaluate for lack of process, under the IDEA in December 2006.

285.   CCSD refused to take appropriate action in December 2006, in first grade.
Ms. Richardson the child's (first grade teacher) and Mary Myers her (ESE teacher),
attended a Parent conference with Plaintiff to address the child's "lack of progress" and
high potential for "retention", as was consistent with "CCSD" request for the same in
Kindergarten.  CCSD employee's never referred the child for further evaluations, or
requested an IEP team meeting, they relied on the parent's ignorance, lack of knowledge

60

and understanding due to her own "language based disability" to violate the "continual

evaluations and reevaluation provisions" under the IDEA.

286.    Plaintiff agreed with the CCSD'S employees' clarification that her child made

no academic progress in first grade under her current IEP as evidence by, her continues

Kindergarten present levels and larger educational gap.

287.    Plaintiff disputes the concept that by identifying the child's lack of progress and

remedial needs as early as December 2005 and need to again be retained, that she

willingly forfeited her rights the reevaluations necessary and her right to due process to

enforce CCSD'S compliance of the mandated procedural process under the IDEA.

288.    CCSD employees refused to inform T.D.-F of the proper process of their

responsibility to initiate further evaluates and call an IEP meeting to initiate more or

difference interventions and services into the child's IEP, instead they let her slip further

and further behind, so she could redo first grade, see <u>Amanda C. v. Clark Co Sch. Dist. &</u>

<u>Nevada Dept. of Ed. (9th Cir. 2001),</u> **see exhibit D.**

289.    Plaintiff was advised in writing, on or about February 2007, by Defendant Mr.

Castellani that the child would have to be retained, in first grade. Mr. Castellani, failed to

supervise his employees to ensure the IDEA process of timely reevaluations and the

continues evaluation process consistent with IDEA was being applied; when a child, with

an IEP is not progressing and advised the parent of her rights per her procedural

safeguards to request the same. The child was denied ESY services over the summer

school, just the provision of retention, for her lack of progress, see <u>Zachary Deal v.</u>

<u>Hamilton County TN Board of Ed</u> (6th Cir. 2004).

290.    T.D.-F was not provided, a clear understanding of the federal laws, related to a
child with a disability, a parent seeking a public education for that child, or the public
schools responsibilities to provide a free appropriate public education (FAPE) as a
constitutional right, she received **no more** then a one page pamphlet, in September 2006,
labeled due process rights, she didn't even know what due process meant.

291.    T.D.-F had no clear knowledge, that the IDEA was a federal law that outlined the
schools procedural process obligations to insure and protect her child's educational
rights; she believed that the pamphlet was to be used, for due process actions, only.

292.    T.D.-F was denied access or a referral to a parent friendly IDEA support group or
organization.

293.    CCSD'S one page **"pamphlet"** did not meet the requirements of **"Giving
Parental written Notice,"** for CCSD one page pamphlet did not specify if it was of the
1997 IDEA regulations or the new 2004 IDEA regulations, it did not clarify that the
IDEA was a federal law, enacted to protect a child with a disability to insure the school
district complied with the provisions, and what the school districts responsibilities were,
it did not explain what or how a parent can enforce the district to comply, it also was not
written in a simple clear easily understood basic "laymen's term fashion for all
educational level parents, is was not designed to allow a parent with a language based
learning disability equal access to the information,  to be able to follow the procedural
process, when to know how a district violated the mandated, provisions, CCSD
employees failed to refer T.D-.F to their SP& P manual in 2007.

294.    Every step of the IDEA process that was being denied or refused by CCSD should

have produced written notice to the parent, as a form of notice to trigger an action

appropriate for relief under her rights to due process of law.

295.    The IDEA requires the school system to notify parents in writing that it would

like to evaluate their child or that it is refusing to evaluate the child and their clear

rational why.

296.    CCSD failed to provide T.D.-F., any "written notice" and or their "Written Notice

of refusal" It is not enough for the agency to tell parents that it would like to evaluate

their child or that it refuses to evaluate their child.

297.    The school must also: explain why it wants to conduct the evaluation (or why it

refuses); describe each evaluation procedure, assessment, record, or report used as a basis

for proposing the evaluation (or refusing to conduct the evaluation); where parents can go

to obtain help in understanding IDEA'S provisions; what other options the school

considered and why those were rejected; and a description of any other factors that are

relevant to the school's proposal (or refusal) to evaluate the child.

298.    The IDEA'S purpose behind this thorough explanation is to make sure that

parents are fully informed, understand what is being proposed (or refused), understand

what evaluation of their child will involve (or why the school system is refusing to

conduct an evaluation of the child), and understand their right to refuse consent for

evaluation, or to otherwise exercise their rights under IDEA'S procedural safeguards if

the school refuses to evaluate.

299.    All written communication from the school must be in a form the general public

can understand. It must be provided in parents' native language if they do not read

English, or in the mode of communication they normally use (such as Braille or large print) unless it is clearly not feasible to do so. If parents' native language or other mode of communication is not a written language, the school must take steps to ensure: that the notice is translated orally (or by other means) to parents in their native language or other mode of communication, that parents understand the content of the notice, and that there is **written evidence** that the above two requirements have been met.

300.    CCSD at all times relevant, while A.D.-F was a CCSD student, deprived T.D.-F., of the right of **any referral to or mention of the provision of a FAPE**, or that she had constitutional rights to due process of law, or that had an obligation to appropriately evaluate and reevaluate, Nothing was ever placed in writing to meet these requirements, under the IDEA and Section 504.

301.    **Written Notice may not be a prerequisite to a due process of law actions but it is clearly an "intrigue" foundational piece of the puzzle necessary, for a parent who is not informed of the necessary knowledge is unable to exercise their rights for violations under all Laws, in a timely fashion.**

302.    T.D.-F, was not aware, that she had a parental right to be an equal member of the IEP team and if she disagreed with any action or lack action, of CCSD employees, she had the right to request medication, to "file a due process complaint", a state complaint and even an OCR complaint, to enforce CCSD employees compliance responsibilities and to stop the violations and prevent further violations, of her child's rights to benefit from her education.

303.   T.D.-F is not a special education attorney, had no prior experience with the
Federal Laws and protections under the Constitution related to disabilities and suffers
from her own learning disability.

304.   T.D.-F would have followed the procedural process under the IDEA, if she had
been aware, of the steps necessary to enforce and exercise her rights to the same.

305.   CCSD never provided T.D.-F, their "Written Notice of Refusal" to follow the
IDEA procedural process, consistent with of her procedural safeguards under the IDEA.

306.   At all times relevant T.D.-F, never forfeited or waive her parental and individual
rights (to any part of the procedural process) to include but not limited to or agreed to
allow CCSD to waiver from their responsibilities to comply with the mandated provisions
of; her procedural safeguards, written notice, written notice of refusal, individual based
identification, comprehensive evaluations, continues reevaluations, appropriate early and
ongoing interventions, present level assessments, progress monitoring, goal mastering,
requests for due process hearings, scientifically proven and present level reimbursement,
of the IEP process under the IDEA guidelines and mandates..

307.   The IDEA clearly states,  that parents are to afforded equal participation in the
IEP process, the parent could not agree or disagree to CCSD responsibility to provide
"Written Notice of Refusal" to revise the IEP, in December 2006, for she was not
afforded the right to the written knowledge of the same.

308.   The CCSD failed to monitor and reassess the child's progress in a timely fashion,
or lack of the same under the IEP process, they failed to collect ongoing data in a
consistent data collection process, to allow the child access to reach her shot term and
long term goals.

309.    CCSD has no evidence to support that they informed, advised, or provided the parent ANY, such written notice, to support their position.

310.    CCSD employees failed to give the parent "written notice" of her procedural rights to request an IEP meeting, and failed to given written notice of refusal to follow the IDEA procedural evaluation process.

311.    CCSD employees failed to initiate and refer the child for and to the necessary reevaluation process, under the IDEA based on the child's lack of educational progress, under her 2006-2007 IEP, in December 2006.

312.    A.D.-F's retention plan in December 2006, in first grade, was for the same reasons as in December 2005, her inability to meeting the sunshine standards, her lack of making adequate educational progress to be promoted, her need for remediation, all valid reasons and red flags to reassess and modify her IEP, interventions, services and goals, which CCSD failed to do.

313.    CCSD failed to request or  provide an IEP meeting from December 2006-May 2006, to address the child's lack of progress under her IEP, the provision of an opportunity to obtain 2006, summer educational help of ESY or summer school, was ignored and denied.

314.    CCSD failed to comply with the IDEA'S guidelines of progress monitoring, in a timely fashion, to assess the child's educational progress and "lack of" response to her "ADHD" based provided interventions and services in her IEP.

315.    At all times relevant, it was CCSD responsibility, to continuously monitor and reassess, the child's educational response and progress of her IEP interventions and services, in a timely fashion.

316.   At all times relevant, it was not the parent's responsibility to provide private tutoring/reading services, as a form of supplemental aids and services, in lieu of CCSD refusal to follow the IDEA procedural process.

317.   Retention is not an appropriate intervention when, the causative agent is a school districts refusal to provide alternative appropriate direct instruction, by a highly qualified teacher who is certified in providing scientifically proven evidence based instruction for a child with a learning disability of ADHD and or Dyslexia.

318.   CCSD general education teachers, special education teachers and reading coaches, under the IDEA must be highly qualified and cognizant of the applicable appropriate reading programs under the Florida Center for Reading Research (FCRR) the Florida states research which supported and shows that "Dyslexia is a genetic mutation that can be passed down from parent to child for many generations. "The hereditary qualities of dyslexia should be considered by a school district, when performing evaluations, to assess when and why a child is not making educational progress and continues to struggle to read", as stated by Dr. Diane J. Sawyer who is the holder of the Chair of Excellence in Dyslexic Studies and an internationally recognized scholar in the field of reading.  FSU in Tallahassee was performing a genetic based dyslexia study.

319.   Seagate's Elementary school reading teacher, state to T.D.-F., at the October 2008 IEP meeting, "she didn't real know what dyslexia was," **see IEP transcript.**

320.   TDF never agreed to allow CCSD to use of the same unsuccessful reading instruction all over again for a second year, she had requested numerous times, that CCSD provide her child the appropriate evaluations, and had submitted a private comprehensive educational evaluation to the school in July 2006.

321.    At all times relevant, T.D.-F made every attempt via phone calls, emails, and writing to her child's teachers, the school's principal, Mr. Castellani, and the head of Psychological Services, Mr. Ruble and the Director of Special Education, Dr. Sartoria and her assistant Dr. McBride, from the school district, to obtain the help her child needed, to obtain a free appropriate public education, from her public educational setting, to no avail, see Jarron Draper v. Atlanta Independent School System (11th Cir. 2008),

322.    The CCSD employees refused to initiate an appropriate evaluation of the child. Based on a teacher's recommendation, observations, or results from tests given to all children in a particular grade, a school may recommend that a child receive further screening or assessment to determine if he or she has a disability and needs special education and related services. The school system must ask parents for permission to evaluate the child and parents must give their **informed written permission** before the evaluation may be conducted.

323.    The parents' permission to provide special education services to the child requires a separate "INFORMED" consent.

324.    CCSD failed to provide parent notification and parent consent to the initial evaluation for eligibility process under the IDEA, as the law requires.

325.    CCSD failed to perform and conduct the initial full eligibility evaluation within the 60 day period of time, after the parent gave her consent.

326.    Under the 2004 IDEA, the initial comprehensive eligibility evaluation must be conducted **within 60 days** of receiving parental informed consent for the evaluation and at no cost to the parent.

327.    CCSD continuously failed to meet the IDEA standards and comply with the Scope of an eligibility evaluation and continued to refuse to reevaluation A.D.F, when she failed to make beneficial academic progress under the IDEA and as a student with an IEP.

328.    Because CCSD refused to provide the child a *full and individual,* initial evaluation which would have provide clear baselines, areas of weakness', strengths, writing styles, spelling difficulties, and math problems, to be placed with in the IEP to create a road map of specially designed interventions and reassessment tools, but failed to do so, which is a longstanding provision of IDEA, the child failed to made progress under her diagnosed ADHD based IEP and was retained to do it all again, another year.

329.    CCSD failed to provide present level in reading fluency and comprehension at the end of the school year, in May 2007, it is reasonable to say this data would have shown that she was now at least 2 years, behind her non disabled peers.

330.    CCSD refused to comply with the IDEA procedural evaluation process which states, the school system must ensure that "the evaluation" is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified, resulted in the child's failure to benefit from her educational setting.

331.    CCSD used no more then teacher observation as a tool for lack of appropriate reevaluations of the child under the IDEA during the 2006-2007 time frames.

332.    The IDEA evaluation process means much more than the child sitting in a room with the rest of her class taking an exam, the data produced from the child performs on such exams will contribute useful information to an IDEA-related evaluation, which is

necessary to obtain baselines, present levels of performance and mastery of goals on an IEP.

333.   CCSD violated the IDEA process when they did no more then provide teacher observation based data during group-administered instruments, to diagnose and support their obtained ADHD disability diagnosis from Dr. Dunkin which was impossible, to determine what, if any, special education or related services the child might need, let alone plan an appropriate educational program for the child.

334.   CCSD violated the IDEA procedural process when they failed to provide a variety of assessment tools and strategies in their 2006 "addendum" in lieu of appropriate evaluations to gather relevant functional, developmental, and academic information about the child, including the clear diagnosis of "an under lying learning disability" greater then ADHD, in Dr. Christopher McGinnis private educational evaluation, performed in July 2006 and provided to CCSD by the parent in August 2006.

335.   The IDEA states, that when conducting an initial evaluation, it's important to examine all areas of a child's functioning to determine not only if the child is a child with a disability, but also determine the child's educational needs. This full and individual evaluation includes evaluating the child's: health, vision and hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.

336.   CCSD is liable for the reimbursement costs, of A.D.-F's private tutor Ms. Marsha McGuinness, M.S.ED. (certified in tutoring a child with ADHD) tutoring services from October 2006 until May 2007, because CCSD failed to provide TDF the knowledge of a FAPE under the IDEA, they failed to provide a clear and understandable IDEA

procedural safeguards manual and failed to provide TDF and "written notice" of the procedural IDEA process related to obtaining appropriate evaluations, to establish educational needs necessary to support special education and related services.

337.   The IEP team, was made aware, by T.D.-F, that intended to continue to use the private tutors services for the school year, at the September 2006 IEP meeting, in fact Ms. McGuinness, attendance the meeting, to provide information and because CCSD refused to provide a reading instructors services and the child would not be placed in a special reading class, at the IEP meeting.

338.   The IEP team members, did not dispute that the child's educational deficit did not warrant or support the need for a private tutors, but refused to place a goal for reading that supported the service of a reading teacher/ tutoring on her 2006-2007 IEP.

339.   A.D.-F'S September IEP, offered no more then a 45 minute block of time in the resources room at 1:30 in the afternoon, daily and failed to inform the parent of what direct instruction or scientifically proven evidence based interventions would be used to allow her child to obtain the necessary remedial help to catch up with her non disabled peers, in the general curriculum.

340.   The Special Education IDEA, Procedural Safeguards are Parent Rights for Special Education Programs which are enforceable and provide mandated procedural guidelines and district compliance of/with: The functions of the <u>Individualized Education Program</u> (IEP) team; <u>Identification</u>, <u>Assessment</u> and  <u>Evaluations;</u> <u>Parent Participation</u> in IEP team meetings and parent consent; Filing <u>formal complaints, mediation, due process hearings,</u> and appeals; Interim alternative educational settings; Parent placement of their children in

private schools; Civil court actions; Development of an <u>IEP;</u> Placement decisions and <u>Specially Designed Instruction</u> and related services.

341.    The IDEA states a school must monitor progress and a parent has a right to be an equal member, to understand and follow the monitoring process, if the type and amount of instruction, interventions, and methodology is not documented, how can a school system provide more or different and how can a parent participate as an equal member in her child education, if she is unable to track her own child's progress, to call an IEP meeting to request more or different, interventions at an IEP meeting.

342.    T.D-F and A.D.-F's primary Residence was located in Collier County, Florida from July 2003 to March 2011, when she lost her primary residential property, under fear of Foreclosure status via a short sale, due to the prolonged due process time line (17 months) and her need to provide educational transportation costs for longer then 45 days, she was unable to drive her child 5 days a week for she works 12 hr shifts, the continues denial of FAPE and lack of equal protection of due process, she was constructively evicted from the state by state actors agenda under COLOR OF LAW.

343.    T.D.F lost all monies invested in her primary residence over the 8 years, to include but not limited to, equity, mortgage payments and remodeling costs, claimed as damages under 42. U.S.C. 1983, for depriving T.D.-F., written notice to the knowledge necessary to access her due process rights necessary to stop the injury and prevent more, academic regression.

344.    T.D.-F. and A.D.-F., were injured when the defendant's failed to regard her child as possibly having more then an ADHD disability and refused to initiate the mandated

child find protections "to seek out and find" all disabled children, within their county, under the IDEA process.

345.    CCSD employees refused to Identifying A.D.-.'s, Specific Learning Disabilities of severe Dyslexia its related manifestations of the same.

346.    CCSD failed to apply appropriate Progress Monitoring, which is to be used to assess a child's academic performance and evaluate the effectiveness of the applied instruction.

347.    CCSD was deliberately indifferent to A.D-.F's lack of progress and failure under their "ADHD" IEP'S, of 2006-2007, her failure was due, to CCSD refusal to use more or different interventions consistent with the IDEA 2004 regulations.

348.    CCSD failed to offer or even mention, to the parent the related services of ESY, tutoring, or summer school to A.D.-F., over the 2006, 2007, 2008 summer months, in light of her continues inability to meet the sunshine standards and failing grades.

349.    CCSD failed to use, the RTI process, consistent with Progress monitoring, which is an essential component of RTI. With RTI, schools must closely monitor student progress, measure the responsiveness to instruction, and adjust the required intensity of instruction and intervention.

350.    CCSD failed to use, Identification models that incorporate RTI represent a shift in special education toward goals of better achievement and improved behavioral outcomes for children with SLD.

351.    T.D.-F., was not aware that CCSD refused to use the RTI model, because they were still using the IDEA 1997 Regulations as advised by the Florida Department of education, because they failed to make their state statues consistent with the IDEA 2004,

regulations, until March 2009, after ADF was placed in a Lee county school as a "safe harbor", while and during the due process hearing.

352.    CCSD refused to use the IDEA 2004 regulations which give districts the option of using RTI procedures as part of the evaluation process for Special Education Eligibility

353.    T.D.-F., was forced to obtain multiple IEE'S during the IDEA time frame, from September 2007-December 2008, which were provided to CCSD and supported the etiology of A.D.-F manifestations and exceptionalities associated with the child's underlying severe dyslexia and related disabilities, to no avail, CCSD continued to withhold the necessary interventions, to allow the child to make academic progress.

354.    Experts in the field of learning disabilities believe that many children identified with specific learning disabilities are "victims of poor teaching," and the statement that many children identified as LD are "teaching disabled" is often accurate. Almost **all** children can learn to read if taught appropriately and comprehensive assessment is still required under the reauthorized IDEA law.

355.    The ALJ, displayed reckless disregard, of plaintiff's expert witness testimony, by ignoring and disqualifying the experts who evaluated the child and produced objective data to support the child's manifestations, of her specific learning disabilities to include but not limited to severe Dyslexia.

356.    The ALJ abused her discretion, by creating her own "findings of facts" inconsistent with CCSD employees testimony and applied a myopic approach to all evidence, produced and submitted by plaintiff, to include **state given "objective" test data**, that showed significant educational deficits, after being a CCSD student for 40 months.

74

357.    The ALJ, displayed intentional biased discretion and deliberate indifference in her findings of facts to support her rulings, when she applied the 2004 IDEA regulations, to protect CCSD, to include but not limited to the 2004 statue of limitations, to Plaintiff's IDEA claims and Section 504 claims, in her rulings, because the IDEA 1997 regulations, did not have a statue of limitations.

358.    CCSD deprived A.D.-F., her Constitutional Rights, Civil Right, liberties  and protections to the property of a Free Appropriate Public Education, while a special education student, as evidence by her need to be retained in first grade, in May 2007

359.    CCSD and its employees' refusal to initiate an IEP meeting in December 2007 to address the child's lack of progress and to inform the parent of the IDEA process to initiate reevaluations and more or different interventions for the remainder of the school years was an intentional withholding of the IDEA process, the lack of appropriate actions continued to cause inquiry consistent with the denial of FAPE.

360.    CCSD employees refused to inform the parent of their refusal to comply with the procedures set forth in the IDEA, which resulted in A.D.-F's inability to exercise her rights to due process to obtain an individualized educational plan (IEP) developed through the IDEA'S procedures to be reasonably calculated to enable the child to receive educational benefits, during the 2007-2008 school year, see" Board of Education of Hendrick Hudson Bd. of Ed. v. Rowley 455 U.S. 102 S.Ct. at 3034, 3051 553 IDELR 656 (1982).

## IDEA VIOLATIONS DURING THE 2007-2008 YEAR/1ST GRADE/2 YEAR

361.    Plaintiff incorporates by reference the allegations contained in paragraph 251 through 360 of Plaintiffs' Complaint as if rewritten herein.

362.    A.D.-F was retained in the first grade, with the same teacher, because she continued to be performing at a Kindergarten level in May 2007 in all academic areas.

363.    Failure of CCSD to apply the IDEA process to create a beneficial IEP and their refusal to identify her disability in a timely fashion was the foundation of the failure.

364    Failure to appropriately evaluate the child and identify her true disability created and environment conducive to their application as they were teaching to the disability and blaming the child for not making progress and falling to learn to read, spell or apply math in their gifted school setting.

365.    A.D.-F's present level of performance in all areas in May 2007, prior to summer break, showed that she was then 2 years behind her non disabled peers, academically.

366.    Because the IEP team failed to call an IEP meeting in December 2006, and in February 2007, and again in any month following, their identification of the intervention was the need for retention, the child was denied the related service of ESY over the 2007 summer.

367.    Clear Disputes arose between CCSD and T.D.-F when the parent demanded a comprehensive educational evaluation in lieu of the child's retention in September 2007.

368.    T.D.-F was denied written notice in September 2007, when she disagreed with the IEP teams "agenda" and disputes the teams IEP draft, to continue with the same services, without more evaluations.

369.    T.D.-F refused to allow another "redo" of first grade, for fear her child would continue to fail. CCSD new drafted IEP lacked appropriate evaluation criteria and due to the parents disagreement with the teams, plan she should have been referred to the Districts SP&P Manual, to advise her and assist her in her rights to due process of law,

for any violations of their refusal to appropriately evaluate to include and meet the necessary evaluation criteria standards, enabling her to exercise her rights to enforce their compliance of the IDEA procedural identification and application process, she was denied the same.

370.    CCSD employees agenda was to reuse the prior years IEP, moving forward for the 2007-2008 year, in the face of academic failure and the child's need for retention.

371.    CCSD agenda at the September 2007 IEP meeting, was to again deny T.D.-F., her requests for a comprehensive specific learning disability evaluation, and to again provide no more then a couple tests, to support their ADHD category, they denied the parent written notice of their clear agenda and denied her "written notice of their refusal" of her and her Dr. Mack's requests to perform comprehensive evaluations consistent with the IDEA process to create a beneficial IEP.

372.    CCSD'S IEP team attempted to bully the parent into agreeing and signing their drafted IEP, prior to obtaining any new evaluation data, parent disagreed and refused to sign any IEP in September 2007.

373.    T.D.-F., again as in kindergarten disagreed which CCSD'S continues use of "retention as an intervention" necessary to close the educational gap, which was obtained while a Kindergarten student and continued to grow due to CCSD'S refusals to provide appropriate evaluations and reevaluations, and more or different interventions consistent with the IDEA process.

374.    A.D.-F., was again being denied the opportunity to equal access to achieve her educational goals as adequately as her non disabled peers, because CCSD refused to

identify her specific learning disability, as evidence by her failure as early as December

2006, in the first grade under her accommodated ADHD disability.

375.    CCSD refused to refer A.D.-F., for comprehensive evaluations to seek out, find

and identify the true underlying reason her child continued to fail in school and to

implement more or different services, consistent with the problem solving process under

the IDEA.

376.    CCSD, had failed to initiate more comprehensive evaluations and reevaluations,

during the 2006-2007 school year, in clear light of the child's inability to access an

education as adequately as her non-disabled peers even with and IEP, as evidence by her

child's consistent and ongoing  need to be retained in the first grade.

377.    CCSD had the obligation under the IDEA to perform and comply with the

IDEA'S procedural and substantive evaluation process, consistent with the protections

provided under Section 504 and the ADA.

378.    In September 2007, T.D.-F, attended an IEP meeting and requested a "Dyslexia

evaluation" by way of Dr Mack's, most recent assessment and presented Dr. Mack's

written request to further evaluate to insure the child was being provided the appropriate

services to meet her educational needs, since the child made no measurable progress in

the prior year, as evidence by their retention plan, **see exhibits**_____

379.    T.D.-F's as a parent and as an individual parent with a learning disability had

Section 504 and ADA rights to equal access to written format knowledge and federally

protected Rights of due process under the equal protection clause, as an equal member of

the IEP team.

78

380.    T.D.-F., requested CCSD IEP team to perform more evaluations, consistent with

Mr. Mack's 2007 summer assessments, of the likeliness that the child may have Dyslexia,

her requests were based on the child's more severe academic "gap" and educational

failures and her now more emotional reactions and diversion tactic behaviors to reading

as an outcome of CCSD'S employees dilate indifference to the child's educational and

emotional needs, to provide a FAPE.

381.    The SLD of Dyslexia is a recognized disability under Section 504 which affects 1

in 5 children, ranging from mild to profound. Because dyslexia is so common every

public and private school should have at least 1 teacher, reading or learning specialist, or

school psychologist who knows how to do and conduct an accurate in-depth screening for

dyslexia. Screening is also extremely valuable for Reading or Learning Specialists and

every speech-language therapist should know how to do this.   It takes more than just test

scores to accurately determine if a child has dyslexia. You must look at the entire child --

their genetic, developmental, and educational history; every prior testing report; their

current strengths and weaknesses; and the results from 8 screening tools.

382.    The parent's requests to further evaluate was initiated because the parent and

doctor believed that a greater then "ADHD disability" was the root cause of A.D.-F's,

continues failure, during and from Kindergarten denied her access to make progress

under the current ADHD based services provided in her 2006-2007 IEP.

382.    CCSD employees at the IEP table, again intended to deprived and ignored the

child needs and the parents verbal request and Mr. Mack's written requests, and denied,

by their actions to recognize the child's multiple exceptionalities and did not perform

"further comprehensive evaluations" as mandated by IDEA, or a SLD evaluation to seek

out and find if the child may have an underlying dyslexia related disability.

384.    In fact, the IEP team presented a "Parent Consent Form", which parent signed for

an evaluation, which later showed, that the CCSD only checked the box for testing to

support their ADHD/OHI category.

385.    It does not matter "how" the parents asks the IEP team to evaluate their child, it is

the CCSD employees to follow the procedural process under the IDEA and perform, the

required and necessary ongoing non exhausting evaluations, to enable them to create an

IEP that is beneficial, to provide a FAPE.

386.    The IEP team did not give the parent "written notice of refusal" to perform a

complete dyslexia evaluation, thus parent was lead to believe that CCSD was going to

finally receive a public school "Comprehensive Educational Evaluation to identify if she

had an underlying "Specific Learning Disability" consistent with her rights under her

Procedural Safeguards, see Weast v. Schaffer (4th Cir. 2004) and Muller v. East Islip

(2nd Cir. 1998).

387.    The IEP team members did not give the parent prior written notice that they

intended to remove the "math goal" in the child's IEP for the upcoming year.

388.    On or around October 2007, the IEP team reconvened to discuss the findings of

the "evaluation".  At no time did CCSD give the parent "written notice of refusal" that

they never intended to perform the parent and doctors requested comprehensive

evaluation.

389.    CCSD'S process testing, did not identify or meet the eligibility requirements for

more or different interventions, direct instruction or services under the category of SLD.

390.   The Plaintiff clearly disagreed with the Testers (school psychologist) outcomes and findings, for they were inconsistent with her present levels of academic performance in all area and questioned her about her lack of "having the child write anything during the evaluation" or 'assessing the child's classroom written expression".

391.   The Plaintiff was extremely upset with the finding and questioned Ms. Cosgrove testing material, the school Psychologist Ms. Cosgrove stated "there is no such thing as Dyslexia".

392.   At no time did the IEP team, advised the parent in "written notice fashion," that under her procedural safeguard," under IDEA that she had a due process Right to request and IEE at public expense, but her request must be in writing and submitted with in 10 days, if she disagreed with CCSD finding and or the IEP teams decisions, because CCSD, failed to provide any written notice format for the same. Plaintiff was deprived the right to be heard in a meaningful way at a meaningful time, to address their actions, lack of appropriate actions, and for violations  consistent with the denial of FAPE, under the IDEA, and the deprivation of equal access under Section 504 and the ADA.

393.   In fact, Because the Plaintiff disagreed with the evaluation results, she contacted Ms. Cosgrove's, supervisor, Laurence Ruble, related to the confusing and inconsistent evaluation process and results for lack of testing areas in the evaluation, to request and demand an investigation of the evaluation format and incongruence of performing a SLD evaluation, without assessing the child's writing, spelling and math skills.  She also requested the same of Mr. Castellani, the LEA and building principle, **see exhibit G.**

394.   In November 2007 the Plaintiff meet Mr. Laurence Ruble "head of Psychological services", he was the overseer of evaluations and was also the 504 coordinator (29 U.S.C.

81

794), to discuss and resolve her disagreement with the his employee's evaluation process and results, because the lack of progress the child made under the OHI category of IDEA and the likeliness of an underlying learning disability of Dyslexia.

395.    T.D.-F, met again December 2007, to discuss her disagreement of Julie Cosgrove's October 2007, testing to support the ADHD category, <u>Laurence Ruble</u> who was the Head of Psychological Services and the 504 Coordinator in the School District, he did not disclose that the "testing" Cosgrove did was not a qualified comprehensive educational evaluation, per Dr. Mack's July 2007 written request to evaluate A.D.-F for the SLD of dyslexia

396.    The outcome of the meetings, was that based on the schools evaluation in October 2007, the child did not have a SLD, but Mr. Ruble did provide the parent articles related to "parent burn out" of a child with a SLD and dyslexia information.

397.    At no time, did Mr. Ruble or Mr. Castellani, advice the parent in "written notice" fashion that they "CCSD" refusal to perform the requested comprehensive educational based SLD evaluation back in October 2007.

398.    Mr. Ruble at the November and December 2007 meetings did not clarify that her child's public school evaluations, were never comprehensive evaluations, but merely process test.

399.    At no time, did CCSD provide the parent a clear understanding under the IDEA or Section 504 procedural safeguards, that allowed access to the information the IDEA was a law, that provided a procedural process format they must follow to insure that the parent is able to understand when or how a school district's actions are in violation of the

procedural process, enabling a parent to exercise her due process rights under, 20 USC 1400-1415.

400.    At no time did Mr. Ruble give the parent written notice of the proper procedure to follow if she disagreed with an evaluation to obtain a "IEE' at public expenses" under (20 USC 1400-1415).

401.    CCSD continued to refuse to provide appropriate evaluations and reevaluations under the IDEA process and their deprivations and deliberate indifference to the child, the parents, and the law, was a discriminatory acts under Section 504 and the ADA, and withholding the knowledge of the same, by refusing to provide a parent clear written notice of their refusals; bars a parent from recognizing the school district actions are deprivations causing injury of a parents Constitutional and civil rights to the protections of due process of law under 42 U.S.C. 1983.

402.    Because CCSD refused to provide written notice of the same, in December 2007, the plaintiff went out and obtained 2 more private evaluations to seek out and find if the child had an underlying unrecognized SLD.

403.    Finally in March 7-9 2008, Mr. Laurence Ruble, finally provided the parent in writing that "NO CCSD, HAS NEVER PERFORMED A SLD EVALUTATION ON THE CHILD", see exhibit M and N.

404.    At no time, did any person in the IEP team, to include Dr. Elizabeth Mc Bride, Brian Castellani, and Laurence Ruble, inform, clarify, advise or provide her the knowledge necessary to exercise her procedural safeguards if she disagreed with the procedural or substantive IEP process under (20 U.S.C. 1415, see exhibits J.

405.   On or around March 2008, the Plaintiff received an email with an attached letter, from FDOE ESE director, Bambie Lockman, in support of CCSD teacher's assessment that the child was making progress.

406.   Ms. Lockman did not disclose that the plaintiff's ESE filed lack a school given comprehensive educational evaluation, since 2007 to present.

407.   Dr. Victoria Sartorio did not disclose that the plaintiff's ESE filed lack a school given comprehensive educational evaluation, since 2007 to present.

408.   Dr. Elizabeth McBride, also had a history of depriving the plaintiff imperative information and also failed to disclose that the plaintiff's ESE filed lack a school given comprehensive educational evaluation, since 2007 to present .

409.   Dr. Victoria Sartorio, CCSB"S director of ESE displayed deliberate indifference to the Plaintiff's multiple concerns and requests, by phone and via email, for help to get her child the educational help she needed and the ineffective interventions and lack of appropriate services in her child IEP.

410.   CCSD ESE director was an actor of the state and acted or refused to act under color of the law, she ignored and thus deprived her of the knowledge she needed to exercise her due process rights, she deprived her of the knowledge of CCSD'S SP&P Manual, and never acknowledged the parents requests or delegated her support staff, to do the same. She is liable for the damages; her actions caused, 42 U.S.C. 1983.

411.   T.D.-F submitted Dr Chang's evaluation results to the IEP, which was rejected.

412.   CCSD did not provide "written notice of their refusal" to use the data that supported that child had been identified as having a SLD greater then their ADHD diagnosis.

413.    CCSD stated, but refused to place in writing, that Dr. Chang used one outdated test, in her evaluation, which allowed CCSD to reject and refuse the entire evaluation results, and present level data, which clearly showed the child's present level supported the fact that she had a SLD and that her educational discrepancy "gap" continued to grow larger.

414.    Because of CCSD'S rejection of the second ( in March 2008) IEE results and its supportive data and their continues deprivation of performing their own comprehensive evaluation for more necessary to collect true present level or different interventions to support the child's SLD exceptionalities and manifestations needs, the parent obtained another third IEE, again at her own expense and submitted it to the IEP team at an IEP meeting she requested, in April 2008, thus far the child was still working under her old 2006-2007 IEP, because the parent refused to sign anything in October 2007 and refused to be bullied into agreement.

415.    The third IEE was performed by Dr. Grout, who had been a school psychologist and agreed to accompany the parent to the IEP meeting, to advocate for the child's need to have more or different intervention and goal placed in her IEP, in the hopes her child could now after 3 years, benefit from her education.

416.    The IEP meeting the parent requested turned into an eligibility meeting with Dr. Grout in tow and the IEP team finally agreed to place the category of SLD on the child's IEP.

417.    The parent requested at the eligibility meeting (April 2008) that her child receive summer school, CCSD declined stating "she does not qualify for summer school because

only ESOL child get summer school." They further clarified that ESOL children are "English as a Second language" students.

418.    T.D.-F then requested that her child receive ESY services, for reading over the 2008 summer, to prevent more regression, the IEP team declined.

419.    In May 2008 the IEP team reconvened to create a new IEP for the coming year, the child's SLD was placed on the IEP draft in the category section, but they failed to change their interventions or methodology and failed to use Dr. Grout's data, suggestions, or recommendations, their draft was still consistent with the same prior two years IEP for ADHD.

420.    In May 2008 CCSD denied the child qualified for any different scientifically proven evidence based interventions and services under the IDEA under the category of SLD, apparently their agreement to recognize Dr. Grout's IEE, was just another "pacify the parent act" for no true application of the new data and findings was going to be used by this IEP team, the IEP lacked clear interventions and measurable goals.

421.    The CCSD IEP team (Denial Team) again displayed deliberate indifference to the child individual educational needs based on the objective data of the private evaluations and showed reckless disregard for the IDEA procedural process to ensure a FAPE.

422.    The parent signed the IEP in May 2008, not because she agreed but believed that she should take the child to Texas over the summer and have her evaluated for and under a specific Dyslexia Institution.

423.    Parent voiced her concerns at the IEP meeting, that the present levels were inconsistent with both of the recent IEE'S data and that the goals were not measurable,

and that because of this she would be having the child evaluated over the 2008 summer, in Texas for Dyslexia by "the Scottish Rite facility" for a more defined evaluation.

424.    The Parents statements were documented in the May IEP parent comment section, once again the CCSD failed to provide the parent written notice of the proper procedure under the IDEA to obtain another IEE.  The CCSD never did a comprehensive educational evaluation to dispute.

425.    Plaintiff was unable to use the authoritative resource of the "Scottish Rite Hospital" system in Texas, since she did not reside in Texas.

426.    A.D.-F's neurologist Dr. Finkel, referred the child to the "Dyslexia Research Institute" located in Tallahassee, Florida for a Dyslexia Evaluation.

## THE 2008 SUMMER INTERVENTIONAL PLAN

427.    Plaintiff incorporates by reference the allegations contained in paragraph 361 through 426 of Plaintiffs' Complaint as if rewritten herein.

428.    Because of the failure of CCSD employees to follow the mandates of the IDEA, during the IEP process by restricting the child services, to only what was available at the Seagate Gifted school, they intentionally continued their agenda to deny the child and the parent the right to develop an IEP that would provide educational benefit, T.D.-F scheduled a dyslexia evaluation with the, Dyslexia Research Institute in Tallahassee.

429.    T.D.-F also requested mediation in an attempt to stop the injury, damages, and bulling by the CCSD staff at the IEP table.

430.    Plaintiff obtained another IEE her (5th) which was specifically a "Dyslexia Evaluation" in July 2008, and submitted the results to CCSD.

431.   The "Dyslexia IEE" diagnosed the child with multiple dyslexia related disabilities and emotional issues related to her more severe educational deficiency, her educational "gap" was now (38). The parent provided Ed. Schriber a copy of the same, as soon as she obtained the final draft, in August 2008.

432.   Because T.D.-F's child was now at a 1% reading level, per the state given tests still could not read a "STOP" sign and continued to struggle to read kindergarten level book, the child present levels on the private evaluations showed her to be 3 years academically behind her non-disabled peers,

433.   The IDEA mandates that goals are to be measurable, based on this theory CCSD was responsible to provide interventions that helped and aided the child to "close the gap" when in fact their lack of using the mandated procedural process and their refusal to identify her disabilities and provide appropriate interventions, increased the discrepancy model gap.

434.   CCSD deliberate indifference to the child's disabilities in Kindergarten and their refusal to refer her for evaluations but instead used the AIP supports that their "wait to fail model" worked because they created such an educational deficient in kindergarten and first grade, that the child was likely to never "catch up".

435.   The Dyslexia evaluation data shows that the child at age 9 had an IQ of 121 and an ability to apply of 83 the difference was now (38) which is measurable , see <u>Florence County School Dist. IV v. Shannon Carter</u> (4th Cir. 1991).

436.   Plaintiff requested mediation, in August 2008, which was unsuccessful and parent is not privileged to say why.

437.    T.D.-F did provide A.D.-F an "ESE Tutor" over the 2008 summer, it was not the gifted schools referral but she was a CCSD ESE teacher, at her own expense

## IDEA VIOLATIONS DURING THE 2008-2009 YEAR/2[ND] GRADE

438.    Plaintiff incorporates by reference the allegations contained in paragraph 427 through 437 of Plaintiffs' Complaint as if rewritten herein.

439.    T.D.-F. Requested an IEP meeting in August 2008 and that Seagate obtain some present level data at the start of the new school year to bring to the table and that she would like to video tape the testing to insure that the testing was performed in an objective manor, her request to objectively monitor the testing was declined.

440.    The school produced data of August 2008 was consistent with the Dyslexia evaluations present level data and the child at nine years old, only knew 13 words on the dibles list, she still had a kindergarten level reading fluency and was now 3 years behind her non disabled peers.

441.    T.D.-F notified the IEP team that, she would be bringing a court reported to act as an objective "note taker" they did not refuse and in fact brought their own tape recorder.

442.    T.D.-F requested the IEP meeting which was held in September 2008, in an attempted to have the IEP team incorporate the dyslexia diagnosis and all identified needs, intervention, and (SLD) findings in the IEP process, they again refused to use the findings and again failed to provide the parent a "written notice of refusal" consistent with the IDEA

443.    T.D.-F was hoping to discuss and incorporate the dyslexia evaluation data, for she is to be an equal member and have equal power at the IEP table, under the IDEA, she again was denied, but has a transcript to support Ed Schriber's the IEP teams leader

intimidation and "BULLING" efforts and attempts to try and make the parent agree, see transcript of IEP meeting September 2008, **SEE IEP TRANSCRIPT.**

444.   T.D.-F also brought to the IEP table  A.D.-F's recent state give tests, which showed the child was reading at a 3%, then went down to a 1%, while in her second year of first grade, the IEP team disputed those test results.

445.   T.D.-F. attended the September 2008 IEP meeting, with the court reporter in tow, as an advocate for her child's educational needs, but through out the meeting she disagreed with the other 9 CCSD IEP representatives, again refusal to use any different interventions or objective present level data to create measurable goals and refused to use the dyslexia evaluation data, obtained over the summer and refused to use the state given test data in the IEP process.

446.   T.D.-F requested to call a halt to the IEP meeting after 2 hours and requested to reschedule it when she could find an advocate, for she felt like she had no voice and was being bullied into agreement again, the entire meeting was documented by court reporter.

447.   T.D.-F attended the second part of the IEP meeting in October 2008, with a parent advocate from the East Coast and the court reporter in Tow, to document the meeting. Mr. Laurence Ruble advised the parent's advocate, that he was the "504 coordinator", she was not provided a copy of her Section 504 procedural safeguards, during the IEP meeting, see pages from transcript of IEP meeting.

448.   Plaintiff's advised the IEP team members that she was using and paying a private Dyslexia tutor who used the Barton system, which was working for the child, and requested that the IEP team, provide the same services, she was denied.

449.    CCSD credited an IEP for ADF, during the 2006-2009 periods that was based on their gifted school resources, only.

450.    CCSD employee, Laurence Ruble at the time A.D-F. was a CCSD student, from August 2005 to December 2008 (40 months) was individually and professionally responsible for providing, enforcing and ensuring that the parents receive their "Notice of Procedural Safeguards" under Section 504 and evaluations under the IDEA, his actions deprived the parent equal access to the knowledge and violated her right under the 14th Amendment, to include the right to timely due process of law under the equal protection clause and acted under color of law

451.    A.D.-F reported to her mother that she was being discouraged to use the multisensory approach in class, she stated that "the teachers told me not to use the techniques and strategies I was learning from the tutor, in the classroom," see Evans v. Rhinebeck Central School Dist, (S.D. NY 1996).

452.    The IDEA affords disabled children the rights to be free from bulling in the public school setting; a parent should be provided the same rights to be free from bulling under the IDEA and protection of the same under Section 504, during the IEP meetings.

453.    T.D.-F relayed the child's statements to her second grade teacher; Ms. Freno, who now became hostile towards the parent.

454.    During the (28 months) from September 2006 to December 2008, A.D.-F, had an IEP designed to meet the eligibility category of a student with ADHD, without any specially designed instruction or understandable present level or base lines, for which to provide measurable goals.

455.    During the 2006-2008, IEP period, the child failed to meet the sunshine standards.

456.    During the 2006-2008, IEP period, CCSD refused to provide any comprehensive educational evaluations, upon the parents multiple requests and in light of A.D.-F continues academic failures.

457.    A.D.-F., was deprived of a school based referral for further and reevaluations, by CCSD employees to be appropriately evaluated in an non exhausting fashion, under the IDEA procedural process

458.    On or around November 2008, Plaintiff meet with the Lee County reading specialist director, Dr. Larry Thian, and provided the dyslexia evaluation data and the state given tests data, in a request for help.

459.    They discussed the ability to place A.D.-F in a safe educationally beneficial environment for she was now coming home from school emotionally overwhelmed and displayed more diversion behaviors and tactics during home time,.

460.    After careful consideration and with the intent to file for a due process hearing, the mother initiated an interim move, via the McKay scholarship, to Pinewoods elementary school in the neighboring Lee county school system.

461.    The Plaintiff gave adequate "Written Notice", prior to removing A.D.-F from her neighborhood school, in January 2009, via the McKay Scholarship, to place her in a neighboring county school, "LEE County" as a safe harbor, prior to filing a due process complaint and due to CCSD depriving actions that resulted in the denial of FAPE, and continued to cause injury.

462.    CCSD'S Superintendent was made aware, of her intent to place her child, due to CCSD refusing to provide her a FAPE, the entire time she was a CCSD student, based on her severe learning disabilities needs, see Gerstmeyer v. Howard Co. Schools (MD 1994).

463.    Plaintiff was lead to believe, when she removed the child that a due process hearing action must be resolved with in the 45 day period.

464.    T.D.-F objected to the Hearing officers statement; "that a timely hearing process was not relevant" for the child was already placed in Lee County", because the cost of gas and time missed from work to provide transportation was not within her monetary means and was an extra cost of $1068.00 a month, for the 92 miles a day, 5 days a week at 460 miles a week, at $267.00 a week for gas and time missed from work.

465.    A.D.-F attended the Lee County School (as a safe harbor) for the prolonged period of 8 months, to include ESY over the 2009 summer, the total cost to gas was $ 8,544.00 and time missed from work was $6,400.00

466.    The child was "placed" by the parent under McKay scholarship provisions as of January of 2009,  in a neighboring county school district, for 8 months, until the parent ran out of money to provide her the related transportation,  see G. v. Cumberland Valley (3rd Cir. 1999).

467.    The parent had been a home owner (paying property taxes to include public school costs) from 2003 to 2011 and a resident in the town of Naples, located in Collier County, in the State of Florida, within the Collier County School District continuously from July 2003 to September 2009, when the child was age 3-9 years old.

468.    T.D.-F, after the 8 months of the financial hardship of transportation, loss of work, attorney fees, and because her child was not recouping her lost educational deficit, in the Lee county school system, she forfeited her home to the bank, sold most of her personal belongs, placed her son in a FGCU Dorm, quite her job, lost her 401 K, and

spent what little money she had left, to relocate her child to a private Dyslexia school in Texas.

469.   Texas as a State identifies and recognizes Dyslexia in the public education system, in kindergarten and has in place highly qualified dyslexia teachers, who have Masters Degrees and are known as Certified Academic language Therapists, referred As a "CALT", but were not available to help A.D.-F, in the Plano public school system.

470.   Because T.D.-F's child was so educationally deficient and still reading at a Kindergarten level, per Barksdales Elementary assessments, (9/2009-11/2009) she was deemed "un-teachable," in the least restrictive third grade environment.

471.   T.D.-F then placed her in the SW Academy Private dyslexia School, (11/2009-June 2010) where she did obtained the support of a CAST instructor every day, with other children her age, she paid the tuition, drove her child 5 days a week, and worked only on weekends, for the 9 months she was locked in a lease.  T.D.-F did obtain a "Scottish Rite Hospitals" Dyslexia Evaluation, which supports Dr. Hardman's evaluation, data and testimony.

472.   T.D.-F, due to financial strains relocated A.D.-F to Gilbert AZ, her birthplace and rented a house in a low income area, where her child is now able to get the help she needs.

473.   A.D.-F is making measurable academic progress and has finally obtained a Comprehensive Educational Eligibility Evaluation, after 7 years of being educational deprived.  She also has benefited from the use of assistive technology, to assist her to access the general curriculum, which was totally denied by CCSD.

474.   Plaintiff has attached a copy of noted above evaluation as an example, as proof
giving merit to this case, that a public school system can, if willing provide appropriate
comprehensive evaluations necessary to meet create a beneficial IEP, to meet a child's
needs, consistent with the provision of a FAPE, see **Exhibit** F, which gives merit that
CCSD'S addendum of 2006 and process testing of 2007, failed to be a valid "evolution
process under the IDEA, and section 504.

## ALLEGATIONS UNDER THE DUE PROCESS HEARING PHASE UNDER
## THE IDEA AND SECTION 504 INTERSECTING CLAIMS

475.   Plaintiff incorporates by reference the allegations contained in paragraph 438
through 474 of Plaintiffs' Complaint as if rewritten herein.

476.   The Plaintiff filed an initial written request for a due process hearing, *pro se* in
February 24, 2009 under IDEA and claimed Section 504 violations, a ESE due process
hearing request form, which were ignored by FDOE, CCSD and DOAH.

477.   The Plaintiff then filed an addendum in March 2009, to the ESE form and
requested a Section 504 hearing for all separate and intersecting violations, which was
again ignored by FDOE, CCSD and DOAH.

478.   The Plaintiff's requested DOAH (hearing officer Mandry) in a motion to clarify,
if her was authorized to hear Plaintiff's section 504 issues in a due process hearing and
requested confirmation if CCSD or FDOE had contracted him for the same,  in lieu of
responding to plaintiff's filed Motion for Clarification,  he removed himself from the
case.

479.   Since Plaintiff's requests for a Section 504 hearing were being ignored, Plaintiff
requests a copy of her "CCSD Section 504 Procedural Safeguard Manual" from Laurence

95

Ruble, in writing; he provided her the **one page** CCSD Section 504 "parent's rights" sheet, as an attempt to denying her access to the full clarification necessary, to exercise her rights to a section 504 hearing process.

480.    T.D.-F again requested the CCSD SECTION 504 MANUAL from Mr. Ruble, who then forwarded the "MANUAL" via email, which provided the clarification the steps a parent must take, obtain a due process Hearing for section 504 violations.

481.    Pursuant to the CCSD MANUAL, the parent requested a Section 504 hearing, through the CCSD Section 504 Coordinator, Mr. Ruble himself, in writing.

482.    T.D.-F then filed her Amended due process Hearing request on March 23, 2009 for violations under IDEA 8/2006-1/2009 and for separate "Kindergarten"2005-2006 violations under Section 504; she did NOT claim or identify her Section 504 violations as "intersection violations" under the IDEA, they were separate and distant in nature and time, since the child did not have an IEP and CCSD is not allowed the strictures of the IDEA for separate Section 504 Claims.

483.    CCSD did not responded in objection to her Amended Hearing Request of March 23, 2009.

484.    In the interim the plaintiff was made to hire a local attorney to help in her child's representation under her Section 504 claims, because ALL of the state actors were refusing to provide her clarification the same as an accommodation, which was necessary for her to have an opportunity of equal access, due to her language based learning disability, to a fair unbiased administrative due process Hearing.

485.    DOAH'S first assigned hearing Officer, Mandry, removed himself from this case, after he refusing to identify, recognize and afford the plaintiff her requested

96

accommodations, refused to clarify if he had been contracted by FDOE and or CCSD to hear the Plaintiff's Section 504 claims and he also refused to recognize her requests for accommodation, consistent with her disability.

486.     Prior to Mandry's recusal, T.D.-F did pull in a "non disabled" person as an advocate during the telephone conference to documents and lay witness to his refusal to clarify if he had been contracted, he refused to answer the question.

487.     DOAH reassigned the case to the hearing officer Holifield, who held a telephone conference as a case management conference, and stated she was authorized to hold a section 504 hearing and a date was set for the hearings.

### ALLEGATIONS OF HEARING OFFICERS ERRONIOUS RULING/SELF CREATED FINDINGS OF FACTS/BIASED AGENDA/DELIBERATE INDIFFERENCE AND ABUSE OF DISCRETION IN HER IDEA AND SECTION 504 RULINGS AND RECOMMENDATIONS

488.     Plaintiff incorporates by reference the allegations contained in paragraph 475 through 487 of Plaintiffs' Complaint as if rewritten herein.

489.     The Hearing officer abused her discretion by disregarding Dr. Hardman's testimony and testing results, deeming her "incompetent" in her diagnosis.

490.     The Hearing officer abused her discretion, for deeming Dr. Hardman's one day evaluation process incompetent, for lack of contact hours, it was clear by the testing results, that the child was unable to get past the kindergarten content, on most of the reading tests.

491.     The Hearing officer abused her discretion while relying solely upon and giving more weight to Mr. Laurence Ruble's testimony, a CCSD employees, who refused to appropriately evaluate the child for years and was to be "demoted" after the hearing.

492.    The Hearing officer abused her discretion and showed biased application when she gave Laurence Ruble (a masters degree level) CCSD employees the authority to dispute the PHD Level Dyslexia Experts testimony, testing material and her Evaluations findings, data and diagnoses.

493.    The Hearing officers biased agenda and apparently vested interest in CCSD support, is even more prevalent, since the plaintiff has backed up Hardman's Evaluation by submitting a copy of A.D.-F's "Scottish Rite Hospitals" Dyslexia Evaluation, with her prior complaint.

494.    The Hearing officer clearly displayed deliberate indifference to the Plaintiff's documented evidence and exhibits that supported that A.D.-F has and has always been Severe Dyslexia, has a severe educational gap obtained in Kindergarten, is many years behind her non-disabled peers and in 2010 still struggled to read at a kindergarten level.

495.    The Hearing officers abused her discretion when she gave CCSD'S 504 Coordinator, who withheld the plaintiff's Section 504 procedural safeguards from the parent the entire time her child was a CCSD student, testimony more power then a  PHD level professional with more education and experience,  it leads the plaintiff to believe that she would also believes that Laurence Ruble is smarter and more experienced then the Scottish Rite Hospital, PHD'S.

496.    The Hearing officer, was biased when given prior notice from CCSD that Mr. Ruble's employment status, was being terminated, without his knowledge.

497.    The Hearing officer deliberate indifference to the child's state given test data evidence, which proved the child was in the 3% in reading in May 2007 and declined to a present reading level of 1% in May 2008, she relied solely on the CCSD teachers,

subjective testimony of present levels of performance and progress, with no consistent measurable data to support their claims.

498.   The Hearing officer created erroneous rulings and her findings of fact are subjective, myopic in approach, self created and are based solely on the school employee's opinions and self preserving testimony.

499.   The Hearing officer displayed deliberate indifference to the documented evidence.

500.   The Hearing officer abused her discretion when she showed contempt and intentional blindness of all Plaintiffs' exhibits and evidence based proof.

501.   The Hearing officer displayed deliberate indifference and ignored plaintiff's prior time sensitive motions, to incorporate evidence during the due process hearing phase and refused to allow Plaintiff's to submit the "best and true evidence" of the 2008 IEP transcript, which gives solid merit to CCSD'S refusal to comply with the provisions of IDEA and their intimidating and bulling attempts, to make the parent agree.

502.   The Hearing officer abused her discretion and displayed a biased agenda by giving more weight and relying solely upon CCSD employees', who by themselves were "individual persons liable under Color of Law," who participated with a "formed agenda" by withholding knowledge and imperative information, from the parent" they testimony was subjective, self preserving, and inconsistent with the parents data and evidentiary record.

503.   The Hearing officer created her own findings of facts and "went out of her way" to make up findings in support of CCSD.

504.   The Hearing officer displayed deliberate indifference to the fact that CCSD produced NO documentation and had NO evidence to prove that they ever gave T.D.-F,

Written Notice or written notice of refusal, for the whole 3.5 years, when they were
obligated to refer the child for evaluates and refused

505.    The Hearing officer errors in her decisions, by granting "CCSD the protection of
the Statute of Limitations" under IDEA 2004 for Section 504, violations.

506.    The Hearing officer errors in her decisions, by applying a 2 year statue of
limitation, for T.D.-F's injury and damages claims under Section 504, when Florida state
statues for the same is 4 years and the 1997 IDEA regulations has no statue of limitations.

507.    The Hearing officer  an non medical professional displayed deliberate
indifference to all four private evaluations which diagnosed the child as having a severe
learning disability greater then ADHD.

508.    The Hearing officer, a non medical person, displayed a biased agenda approach
and intentionally disputes the child has Dyslexia, to protect CCSD' refusal to implement
the appropriate interventions and services.

509.    The Hearing officer abused her discretion by her agenda of blind denial that A.D.-
F is an individual with multiple disabilities who is eligible for protection from
discrimination under Section 504 and the ADA.

510.    The Hearing officer agenda was clearly biased when she tried to apply a state
statue dated 2008, to protect CCSD'S refusal to identify the child's SLD, "dyslexia" as a
valid reason, to withhold appropriate services.

511.    The Hearing officer abused her discretion by taking a myopic approach to A.D.-
F's diagnosed multiple disabilities, except for the diagnosis of ADHD/ADD to support
CCSD'S ADHD based IEP'S from 2006-2009.

512.    The Hearing officer abused her discretion when she made the finding of fact, that: "the Parent "misunderstood" when the evidence supports that T.D.-F., was deprived, mislead and uninformed of her rights due process rights and protections under Section 504 and the IDEA.

513.    The Hearing officer created and produced inflammatory and untrue statement, in her rulings and stated "T.D.-F made a "demand for a one-on-one tutor", in Kindergarten.

514.    The Hearing officer, abused her discretion when she failed to clarify, what IDEA regulations/standards and state statues, she would be using to base her decisions on, because the 2004 regulations were not in affect, per FDOE while the child was an active CCSD student.

515.    The Hearing officer abused her discretion and failed to provide the plaintiff a fair unbiased due process hearing, under her Section 504 claims, by intertwining, combining, and referring her Section 504 violations back to the IDEA strictures, in Kindergarten.

516.    The Hearing officer colorable agenda to who maliciously induced her own self created inconsistent with the record findings of facts, belittled and insulted the Plaintiff for her disability, withheld imperative knowledge of her intent to deny and dissolve the plaintiff's individual Section 504 and ADA claims, during Kindergarten, by making them all intersecting claims under the  "umbrella" agenda.

517.    The Hearing officers intentional acts to bar and dissolve the plaintiffs Section 504 and the ADA claims, denied her due process under the protection of the Constitution for all Section 504 claims, was a deprivation of her rights, at the state level realm.

518.    The Hearing officer's deliberate indifference to the plaintiffs' financial needs to be afforded the protection of a timely due process hearing caused the plaintiff injury and

unnecessary financial ruin.  Her reckless disregard of T.D.-F., due process rights and protections and her self created unnecessarily prolonged of the rulings, created extra attorney costs.

519.   The Hearing officer errors in placing the "kindergarten" Section 504 violations under the "umbrella IDEA standard", the plaintiff stresses that the Section 504 appropriate education standard requires "a comparison between the manner in which the needs of disabled and non-disabled children are meet."

520.    The hearing officer errors in her ruling because the IDEA is not an exclusive remedy and that the appropriate education duty under IDEA is not identical with that under section 504.

521.    The Hearing officer incorrectly assumed that the IDEA and Section 504 standards are identical.

### FIRST CLAIM FOR RELIEF

**29 U.S.C.A. § 794 -Section 504 of the Rehabilitation Act of 1973**

DELIBERATE INDIFFERENCE TO DISABILITIES and DEPRIVATION OF
PROTECTED RIGHTS and REFUSAL TO APPROPRIATE ACTIONS

522.    Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 521 of Plaintiffs' Complaint as if rewritten herein.

523.    CCSD (federal grantees) violated plaintiff's rights to be free from discrimination, when they showed deliberate indifference and reckless disregard of her child's rights and protections to be identified as a person with a disability,  in a timely fashion which caused emotional, educational and financial injury to the plaintiff and her child, because her child was a kindergartener.

524.    CCSD actors deprived the plaintiff's child the right to be identified as a child with a disability, when they refusing to refer her to and follow the identification process under the child find provisions, as a kindergartener.

525.    CCSD actors deprived the plaintiff's child the right to have equal access to the property of a public education, solely based on her disability, which caused her to loss the first year of her education, of as a kindergartener.

526.    CCSD actors deprived the plaintiff's child the right to an opportunity to have equal access to the evaluation process under the child find provisions, which caused a delay in identification of her disability, as a kindergartener.

527.    CCSD actors deprived the plaintiff's child the right to an opportunity to have equal access to a beneficial public education as adequately as her non-disabled peers, which caused her educational failure, as a kindergartener.

528.    CCSD actions deprived the plaintiff's child the right to be successful in the general education setting, by withholding the child find provisions which caused her emotional injury, as a Kindergartener.

529.    CCSD actors deprived the plaintiff's child the right to an opportunity to have equal access to disability related support, services and accommodations, which created a severe educational deficit, as a kindergartner.

530.    CCSD actors withheld and deprived the plaintiff of her procedural safeguards, which barred her from; the ability to exercise her procedural due process rights, to be heard in a meaningful way and at a meaningful time, and prevented her from stopping the educational and emotional injury caused by their deliberate indifference, of her child's right to an education, as a kindergartner.

531.    CCSD actors withheld and deprived the plaintiff of her procedural rights to "written notice" and written notice of refusal, when they intentionally refused to refer her child for evaluations, which allowed the educational and emotional injury to be prolonged and cause more severe damages, while in kindergarten.

532.    CCSD employees, as actors of the state deprived the plaintiff's child the provision of protection against harassment, bulling, reprimanding and emotionally abusing her for her behavior, which was solely based on her disability, because they refused to recognize her behavior as a manifestation of her disability, and blamed her for the same, while in Kindergarten.

533.    CCSD employees, as actors of the state deprived the plaintiff the provision of protection against harassment, bulling, and intimidation, when requesting her child be evaluated for a disability, when they denied her the right to the child find provisions knowledge consistent with the child's record and history of the same, while in Kindergarten.

534.    CCSD deprived the plaintiff of the knowledge of their obligations "to seek out and find" all disabled children in their district in need of early interventional services, which caused the Plaintiff's child to acquire a severe educational discrepancy, which injured her because she was never able to recoup the loss.

535.    CCSD actions deprived the plaintiff's child the right to have equal access to the provision of a FAPE, under 34 C.F.R. § 104.33(a).

536.    The conduct of the CCSB and their employees reckless and showed a deliberate indifference to plaintiff's and her child's constitutional rights and protections.  Plaintiff is entitled to economic and punitive damages as relief against the defendants

537.    Pursuant to 29 U.S.C.A. § 794 -Section 504 of the Rehabilitation Act of 1973 and

under 42 U.S.C. Section 1983, and such further relief as the court deems just and

equitable.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1988,   Attorney Fee/Court costs

537.    Plaintiff incorporates and repeats by reference the allegations contained in

paragraph 1 through 537 of Plaintiffs' Complaint as if rewritten herein.

538.    CCSB and its employees denied the plaintiff "effective access" to the judicial

process as a parent with a disability of a child with a disability, when they refused to give

her proper notice of her procedural safeguards, as a person with civil rights grievances.

539.    Pursuant to 20 U.S.C 1415, T.D.-F is entitled to attorney fees if she is prevailing

party.

540.    Pursuant to 29 U.S.C.A. § 794 -Section 504 of the Rehabilitation Act of 1973 and

under 42 U.S.C. section 1983, T.D.-F is entitled to attorney fees if she is the prevailing

party.

541.    T.D.-F demands judgment against the Board for attorney's fees, court costs, and

all related production of document costs, in pursuing her legal rights, and such further

relief as the court deems just and equitable.

## THIRD CLAIM FOR RELIEF

### 20 U.S.C.A. §§ 1400–1415 et seq. Individuals with Disabilities Education Act (IDEA)

### INTERSECTING IDEA AND SECTION 504 CLAIMS 2006-2009

### VIOLATIONS OF THE IDEA PROCESS; IDENTIFICATION, ELIGABILITY, EVALUTIONS, REEVALUTIONS, REFUSAL TO MONITOR, PROCEDURAL

SAFEGUARDS, WRITTEN NOTICE, DEPREVATION OF DUE PROCESS
RIGHTS, DELIBERATE INDIFFERENCE, BULLING, DISCRIMINATION,
COSTS, EDCUATIONAL DEPRIVATION, CAUSITIVE INJURY, FAILURE
TO PROVIDE A BENIFICIAL IEP, DENIAL OF FAPE and DAMAGES

542.    Plaintiff incorporates and repeats by reference the allegations contained in

paragraph 1 through 541 of Plaintiffs' Complaint as if rewritten herein.

543.    T.D-F's child was entitled to a free appropriate public education ("FAPE")

pursuant to the IDEA and "Section 504."

544.    The CCSB (federal grantees) and its employees "state actors" refused to follow

the procedural process as mandated under the IDEA.

545.    The CCSB refused to initiate the IDEA procedural process when they; refused to

identify, appropriately evaluate, reevaluate,  monitor in a measurable fashion, collect

objective consistent data, apply appropriate interventions, initiate IEP meeting in light of

academic failure, withheld written notice and written notice of refusal, bullied and

intimidated the parent and child, withheld; imperative knowledge, clear informed

consent, and refused to refer the parent to a IDEA clear and understandable procedural

process manual, which deprived her and preventing her from the opportunity of equal

access to their "guarded"  information, thus she was unable to exercising her parental

rights and protections, be an equal member of the IEP team and be heard in a meaningful

way at a meaningful time, to stop her child's educational and emotions failures and

injuries consistent with the denial of a FAPE.

546.    The CCSB actions deprived the plaintiff's child the opportunity to a FAPE and

was the causative agent that denied her the opportunity to be afforded an appropriate IEP,

designed to meet her Individual Educational needs, as provided under the IDEA process.

547.    The CCSB failed to provide FAPE to A.D.-F by failing to design a beneficial needs based appropriate Individual Educational Plan ("IEP") for A.D.-F.

548.    The CCSB has failed to provide FAPE to A.D.-F by falling to implement an appropriate IEP for A.D.-F.

549.    The CCSB has failed to provide FAPE to A.D.-F and T.D.-F by failing to fund multiple independent educational evaluations for A.D.-F.

550.    The CCSB has failed to provide FAPE to A.D.-F and T.D.-F by failing to fund appropriate reading services.

551.    The CCSB has failed to provide FAPE to A.D.-F and T.D.-F by failing to provide transportation for necessary placement.

552.    The CCSB has failed to provide protection from bulling and injury by failing to initiate appropriate referrals and provide appropriate interventions and services, necessary to provide to A.D.-F and T.D.-F a FAPE.

553.    Pursuant to 20 USC sections 1400-1415et seq. , plaintiff is entitled to all reimbursement costs of private evaluations, services, transportation, advocates, production of documents, court costs, and attorney fees, in pursuing her legal rights and such further relief as the court deems just and equitable.

## FOURTH CLAIM FOR RELIEF

**42 U.S.C.A. §§ 12131–50 Title II of the Americans with Disabilities Act (ADA),**

Deliberate indifference -Disability Discrimination
34 C.F.R. § 104.33(a) FAPE

554.    Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 553 of Plaintiffs' Complaint as if rewritten herein.

555.    CCSB'S actions against A.D.-F and T.D.-F barred the Plaintiff from protection

under Title II of the ADA, for they showed deliberate indifference and reckless disregard toward and against the child and her parent's disabilities, by refusing to identify and provide protection from discrimination.

556.   A.D.-F was, at all times relevant a qualified individual with a Disability and because of her disabilities' the CCSD employees' deemed her disability related behaviors as, rude, disruptive, disrespectful and her learning ability as "low", they bullied her, harassed her, and excluded her from participation in and denied her the benefits of the services, programs, or activities of a public entity and be subjected her to discrimination, under 42 U.S.C. § 12132.

557.   A.D.-F. is an "individual with a "disability" as defined under the ADA because she has a mental impairment that substantially limits one or more of her major life activities (reading, spelling, math) she has a record and a history of such an impairment and is regarded as having such an impairment, under 2 U.S.C.§ 12102(2).

558.   T.D.-F is an "individual with a disability" entitled to bring a claim under the ADA, individually and as a parent of A.D.-F.

559.   T.D.-F is the parent of A.D.-F. who also suffers from the language based disability of Dyslexia and struggled in school to grasp the clear perception of the English language, in verbal communication and written word, she has an inability to obtain knowledge as adequately as her non disabled peers, and has requested accommodations to have the opportunity of equal access of her procedural due process actions, at all times relevant.

560.     CCSD denied T.D.-F and her child the protection form discrimination entitlement during the kindergarten year which does not hinge on IDEA eligibility, but does provide protection against harassment, intimidation, bulling and abuse.

561.     CCSD employees were given notice by T.D.-F in 2005, that she also struggled in school, and has a history of the same, but was not diagnosed in grade school.

562.     CCSD had a responsibility to ensure that A.D.-F was not denied the protection of discrimination based on her disabilities, they refused to comply with their obligation to identification and evaluate for a disability and to enable the child the opportunity of equal access and participation of the benefits of the services, programs, or activities of a public entity as adequately as her non-disabled peers.

563.     Seagate Elementary has a custom or policy of refusing to identify disabled children who are Kindergarteners.

564.     The CCSB, school "Seagate Elementary" customs and policies of not identifying a child in kindergarten, who may have a disability, caused A.D.-F to loose her opportunity to the property of an education and created a severe educational discrepancy and adverse behavioral problems, related to her academic failure, she was injured and damaged and my never recoup her academic losses.

566.     The CCSB employees displayed deliberate indifferent, to the parents requests for educational help and refused to evaluate her child, based on their interpretation of her failures as nothing more then "immaturity".

567.     As a result of CCSB and its employees actions A.D.-F and T.D.-F were denied a FAPE under Section 504 and have been damaged, under 34 C.F.R. § 104.33(a) FAPE.

568.    Pursuant to 42 U.S.C.A. §§ 12131–50 Title II of the Americans with Disabilities Act (ADA) and as a proximate result of CCSB'S intentional depriving actions plaintiff is entitled to compensatory, economic, and punitive damages, and such further relief as the court deems just and equitable.

## FIFTH CLAIM FOR RELIEF

### CIVIL RIGHTS-PROCEDURAL DUE PROCESS
### UNDER 42 U.S.C. 1983 and 1988

569.    Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 568 of Plaintiffs' Complaint as if rewritten herein.

570.    At all times relevant, the CCSB and its agents were acting within the course and scope of their employment.

571.    At all times relevant, the CCSB and its agents were state agents,

572.    At all times, relevant, the CCSB and its agents were acting under the color of law,

573.    The CCSB, pursuant to 20 U.S.C. 1415 owed T.D.-F a duty to provide her "written notice" and "written notice of refusal" and informed consent.

574..    The CCSB, pursuant to 20 U.S.C. 1415 owed T.D.-F a duty to provide a clear and understandable Procedural Safeguard Manual under the IDEA that would allow her equal access to exercise her due process rights in a meaningful way and at a meaningful time.

575.    The CCSB, pursuant to 20 U.S.C. 1400-1415 et seq. owed T.D.-F a copy of their procedural safeguard manual, when they denied her child be evaluated for a disability in Kindergarten.

576.    The CCSB denied the parent her right to all knowledge of Section 504, while her child was a CCSB student with a disability.

577. The CCSB'S failure to produce written notice deprived T.D.-F of her right to procedural due process under the United States and Florida Constitutions.

578. By violating T.D.-F' constitutional rights, the CCSB deprived T.D.-F of her civil rights pursuant to 42 U.S.C. 1983.

579. The CCSB has a custom or policy of failing to provide parents records to include school provided comprehensive eligibility evaluations, reevaluations, "written notice', "written notice of refusal", Section 504 procedural safeguards, objective data based measurable goal progress, IDEA procedural safeguards Manuals, and a refer to their SP&P manual, if a parent displays that she is struggling to follow the process or displays"reaching out for help" behaviors, for lack of adequate access to the information of the procedural process under the IDEA.

580. The CCSB'S custom or policy of failing to provide records, "written notice' and "written notice of refusal", Section 504 procedural safeguards, objective data based measurable goal progress, IDEA procedural safeguards Manuals, and their SP&P manual to parents of children with disabilities and to parents with disability, was the moving force behind the deprivation of A.D.-F civil rights.

581. As a result of the deprivation of her civil rights, A.D.-F and T.D.-F have been damaged.

582. T.D.-F demands judgment against CCSB for damages together with her legal cost under, 42 U.S.C 1983 and 1988, and such further relief as the court deems just and equitable.

## SIXTH CLAIM FOR RELIEF

CIVIL RIGHTS-SUBSTATIVE DUE PROCESS
UNDER 42 U.S.C. 1983 and 1988

583. Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 582 of Plaintiffs' Complaint as if rewritten herein.

584. The CCSD failed to produce and refused to provide the parent A.D.-F records to include school provided comprehensive eligibility evaluations, reevaluations," written notice', "written notice of refusal", Section 504 procedural safeguards, objective data based measurable goal progress, IDEA procedural safeguards Manuals, and a refer to their SP&P manual depriving T.D.-F of her right to substantive due process under the United States and Florida Constitutions.

585. T.D.-F demands judgments against CCSB for damages pursuant to 42 U.S.C. 1983 and 1988, and such further relief as the court deems just and equitable.

## SEVENTH CLAIM FOR RELIEF

### CIVIL RIGHTS-FEDERAL STATUTE

42 U.S.C. 1983

586. Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 585 of Plaintiffs' Complaint as if rewritten herein.

587. A.D.-F was entitled to the protection of a free and appropriate public education "FAPE" under Section 504, at no cost to the parent.

588. A.D.-F was entitled to a free and appropriate education "FAPE" pursuant to the IDEA.

589. As a result of the denial of FAPE, A. D.-F has sustained grave loss of educational benefit and T.D.-F has incurred over whelming expenses and damages to provide educational and related services to A.D.-F.

112

590.   At all times relevant, the CCSB and its agents were acting within the course and scope of their employment.

591.   At all times relevant, the CCSD and its agents were acting under the color of law.

592.   The CCSB'S failure to provide a FAPE pursuant to the IDEA to A.D.-F and deprived A.D.-F of her civil rights pursuant to 42 U.S.C. 1983.

593.   The CCSB has a custom or policy of failing to provide FAPE to children with disabilities.

594.   The CCSB has a custom or policy of refusing to identify a child's disability in Kindergarten

595.   The CCSB has a custom or policy of withholding imperative knowledge from parents in the form of "written notice" and "written notice of refusal", necessary to access and exercise their parental rights to a FAPE through the procedural due process realm, in a timely fashion.

596.   The CCSB'S custom or policy of failing to provide FAPE to children with disabilities was the moving force behind the deprivation of A.D.-F civil rights.

597.   T.D.-F demands judgment against the CCSB for damages, and compensatory education costs, together with her economic damages, attorney and court costs pursuant to 42 U.S.C 1983 and 1988, and such further relief as the court deems just and equitable.

### EIGHT CLAIM FOR RELIEF

### CIVIL RIGHTS VIOLATIONS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE CONSITUTION OF THE U.S.A.

42 U.S.C.A. § 1983 AND 42 U.S.C.A. § 1985(3)

598.   Plaintiff incorporates and repeats by reference the allegations contained in paragraph 1 through 597 of Plaintiffs' Complaint as if rewritten herein.

113

599.    Defendants CCSB and its actors under color of law, created a group of persons, who displayed an agenda of depriving A.D.-F her right to have equal access to a disability related procedural process to afford her the ability to obtain  and benefit form the "property of an education."  The Fifth and Fourteenth Amendments to the U.S. Constitution, prohibits all levels of government from arbitrarily or unfairly depriving individuals of their basic constitutional rights to life, liberty, and property

600.    Seagate Elementary staff, all employees of CCSB intentionally withheld the knowledge that they had never performed a Comprehensive eligibility educational evaluation on A.D.-F, in 2006 or 2007, and every member of that group had knowledge of the same and the "denial team" acted in a conspiratorial agenda fashion to withheld this imperative knowledge from the parent, at every group meeting over 4 years, thus depriving her of her rights to due process under her procedural safeguards, to be heard in a meaningful way and at a meaningful time.  Their actions were deliberate, financial motivated and was the moving force for their denial, delay and agenda to keep the disabled out of the Seagate elementary school environment.

601.    Seagate Elementary staff, all employees of CCSB has a custom or policy of failing to provide FAPE to children with disabilities was the moving force behind the "KLAN'S" intentional deprivation of A.D.-F civil rights and T.D.-F's civil rights.

602.    The CCSD deprived T.D.-F , the concept of due process in that its individuals actors deprived  T.D.-F of life, liberty, or property without notice and an opportunity to defend themselves.

603.    T.D.-F demands judgment against the CCSB for damages, punitive and actual, for compensatory education costs, together with her economic damages, attorney and court

costs pursuant to 42 U.S.C 1983 and 42 U.S.C 1985, Section  1988, and such further

relief as the court deems just and equitable

## DEMAND FOR JURY TRIAL

1.    Plaintiff demands for a jury trial.

## PRAYER

WHEREFORE, Plaintiff prays for judgments against all defendants and be awarded all

costs as follows:

1.    A declaration that defendants violated plaintiff's state and federal rights;

2.    Vacate; hearing officer's rulings under the IDEA and recommendations under

intersecting/perceived "supplemental" 29 U.S.C. 794 Section 504 claims;

3.    Reimbursement costs for of all out of pocket expenses for denial of FAPE; (4)

evaluations, tutoring services, transportation, advocates, support persons (court reporter)

and attorney fees in the amount of sixty thousand dollars ($60,000) under, 20 U.S.C.

1400-1415 et seq. and under 42 U.S.C Section 1983;

4.    Economic "actual" damages; (to obtain disabilities identification evaluations,

educational service, medical expenses, travel and all other related expenses and losses) in

the amount of Fifty five thousand dollars ($ 55,000) under 29 U.S.C. 794 (Section 504)

and 42 U.S.C. §§ 12131–50;

5.    Compensatory damages; in the amount of four million dollars ($4,000,000) for

Compensatory Education costs for 4 years (48 months) and loss of property of an

education, denial of the opportunity of equal access to obtain the property of an

education, all related court costs to include expert witness and attorney fees, and for

severe emotional distress and financial ruin, educational placement costs, dissolution of family, and loss of property, in the amount of six million dollars ($ 6,000,000) for defendants acts of deliberate indifference, reckless disregard, and deprivation of Plaintiff's and child's disability rights of the benefit of protections entitlement to them to include due process of law under; 29 U.S.C. 794 Section 504, 42 U.S.C.A. §§ 12131–50, 42 U.S.C Section 1983, and 42 U.S.C.A. § 1985;

6.    Attorney fees and costs in the amount of ninety thousand dollars ($ 90,000) under 42 U.S.C.A. §§ 1988 and 29 U.S.C. 794 Section 504, 42 U.S.C.A. §§ 12131–50;

7.    Punitive Damages in an amount to be determined at trial, in excess of actual and compensatory damages, in a form of punishment awarded in this case for malicious and or willful misconduct by the defendant and their actors, to redress their egregious wrongs perpetrated by the defendant intentional deprivation of T.D.-F Constitutional Rights, liberties and protections under (42 U.S.C. 1983) and 42 U.S.C.A. § 1985.

Terry L. Dunn-Fischer,
Plaintiff, Pro-Se
244 E. Isabella Ave
Mesa, AZ. 85204
239-298-1154

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was sent by regular U.S. first class mail, postage prepaid, with attachments: to Jon Fishbane, Esq., District General Counsel, District School Board of Collier County, Florida,  Attorney of record, at 5775 Osceola Trail, Naples Florida 34109 on this 30th day of April 2012.

Terry L. Dunn-Fischer, pro se

116