## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

TERRY L. DUNN-FISCHER,
individually, and the parent and next
friend of A.D.F., a minor,

            Plaintiff,

v.                                     Case No:  2:10-cv-512-FtM-29CM

DISTRICT SCHOOL BOARD OF
COLLIER COUNTY,

            Defendant.

_____

## REPORT AND RECOMMENDATION[1]

Before the Court is the Motion for Judgment on the Record and Incorporated Memorandum of Law of the District School Board of Collier County (the "District") (Doc. 171).   This matter was referred to the undersigned by the Honorable John E. Steele, Senior United States District Judge, for a Report and Recommendation.   For the reasons set forth below, the Court respectfully recommends that the motion be granted, judgment be entered in favor of the District, and the Final Order of the Administrative Law Judge ("ALJ") be affirmed.

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

I.      **Case Summary and Procedural History**

This case arises out of a lengthy and contentious dispute between the District School Board of Collier County and Plaintiff Terry L. Dunn-Fisher, whose minor child, A.D.F., suffers from learning disabilities.   *See, generally,* Docs. 76, 112. A.D.F. was a student at a District public school, Seagate Elementary School ("Seagate" or the "School"), in Naples, Florida, beginning in kindergarten from August 2005 until December 2008.   In late 2008/early 2009, Plaintiff withdrew A.D.F. from Seagate and enrolled her child in Pinewoods Elementary School, which is located in the Lee County, Florida, School District.   Plaintiff alleges that the District denied her child a free and appropriate public education ("FAPE"), among other things, in violation of the Individuals with Disabilities Act (the "IDEA").

After participating in administrative hearings before an Administrative Law Judge with the Florida Department of Administrative Hearings ("DOAH") in which she was represented by counsel, Plaintiff, proceeding *pro se*,[2] filed her initial complaint in this Court on August 23, 2010 against the District, individual defendants and the Florida Departments of Education and Administrative Hearings alleging violations of the IDEA, Section 504 of the Rehabilitative Act of 1973 ("Section 504"), Title II of the Americans with Disabilities Act (the "ADA"), 42 USC § 1983, and sections 413.08 and 760.07, Florida Statutes.   Doc. 1.   Plaintiff also sought *de novo*

---

[2] "Parents enjoy rights under the IDEA; and they are, as a result entitled to prosecute IDEA claims on their own behalf."   *Winkelman v. Parma City School District*, 550 U.S. 516, 535 (2007).   As noted, however, Plaintiff was represented by counsel in the administrative hearings below.   FO at [unnumbered] 1.

review of the ALJ's IDEA and Section 504 determinations.   *Id.*   All Defendants moved to dismiss, but Plaintiff was permitted to file an Amended Complaint, which she filed on December 3, 2010.   Doc. 39.   Plaintiff was informed that she could bring certain claims on her own behalf, but could not "represent" her minor child, A.D.F. Doc. 52.

With leave of Court, Plaintiff filed a Second Amended Complaint on May 5, 2011.   Doc.   61.   On August 30, 2011, then-United States Magistrate Judge Sheri Polster Chappell[3] entered a Report and Recommendation ("R&R"), recommending that the District's motion to dismiss be granted to the extent that the named individual Defendants should be dismissed, only Plaintiff's claim for reimbursement under the IDEA against the District should proceed, and Plaintiff's Section 504, ADA and Section 1983 claims against all Defendants should be dismissed without prejudice.   Doc. 76 at 18.   The R&R also recommended that a motion to dismiss filed by the Florida Departments of Education and Administrative Hearings be granted and those defendants be dismissed with prejudice.   *Id.*   No objections to the R&R were filed, and the R&R was adopted and incorporated by Judge Steele by Order dated October 5, 2011.   Doc. 82.   Plaintiff was permitted to file a Third Amended Complaint, which was filed on May 1, 2012.   Doc. 112.

On August 31, 2012, Plaintiff filed a Second Motion for Leave to Amend Plaintiff's Third Amended Complaint with a proposed Fourth Amended Complaint. Doc. 129.   The proposed complaint contained Count II, which alleged that the

---

[3] Judge Chappell has since been appointed as a United States District Judge.

District "denied [the] minor child a free and public education because it violated substantive provisions in the IDEA."   Docs. 129-1 at 15-16, 131 at 4.   The violations Plaintiff alleged in Count II included the Individualized Educational Plan's ("IEP") failure to close the gap between A.D.F. and the rest of the student body, to provide summer services for the years 2005-2009, and to meet the standards of 20 U.S.C. § 1414.   Docs. 129-1 at 15-16, 131 at 5.   In her Report and Recommendation on Plaintiff's motion to amend the complaint, Judge Chappell recommended denying the motion to amend in its entirety and specifically held that "Count II clearly allege[d] violations of the IDEA which the court dismissed in its prior ruling."   Doc. 131 at 5. Judge Steele accepted and adopted Judge Chappell's Report and Recommendation, emphasizing that all other aspects of the IDEA claims except for reimbursement were dismissed.   Doc. 137 at 3.

Judge Steele also granted in part and denied in part the District's Motion to Dismiss Plaintiff's Third Amended Complaint, leaving only Count III to survive.   *Id.* at 10.   The Order struck most of Plaintiff's allegations, including the District's failure (1) to perform and conduct an initial eligibility evaluation on A.D.F., (2) to provide the identification process, comprehensive evaluations, re-evaluations, and written notice to Plaintiff and A.D.F., and (3) to identify A.D.F.'s dyslexia.   Doc. 112 ¶¶ 41-47, 53, 59, 254, 306, 324-25, 345.   Judge Steele noted that even Count III only survives to the extent it alleges a reimbursement claim under the IDEA, as most of the allegations within Count III are outside the scope of reimbursement.   Doc. 137

at 8-9.   As a result, the Third Amended Complaint, which in its present form, as partially stricken, is now the operative complaint.   *See* Docs. 112, 137.

Pursuant to 20 U.S.C. § 1415 and 30 C.F.R. § 300.516, the District now moves for judgment on the record on the grounds that the District complied with the procedures of the IDEA with respect to Plaintiff and provided her child, A.D.F., with a FAPE.   Doc. 171 at 1.   The District therefore argues that Plaintiff is not entitled to reimbursement under the IDEA.   *Id.*   Plaintiff filed an Amended Answer/Objection to the District's Motion for Judgement [sic] on the Record ("Plaintiff's Response").   Doc. 204.

Plaintiff seeks a *de novo* review of the Final Order of the ALJ, which was entered May 28, 2010.   Doc. 204 at 1, 17.[4]   The administrative hearing conducted by ALJ Carolyn Holifield was held over a period of five days: May 27-29, 2009 and August 26 and 27, 2009.   FO[5] at [unnumbered] 1.   Following the hearing, the ALJ entered a Final Order, in which she addressed whether: (1) the IEP developed for A.D.F. in October 2008 provided her with a FAPE under the IDEA; (2) A.D.F. received her procedural safeguards including participation in the IEP and re-evaluation process; (3) A.D.F. received appropriate individualized services in her IEPs; (4) A.D.F.

---

[4] Plaintiff initially moved to file a fifty-page response to Defendant's Motion for Judgment on the Record (Doc. 171) and attached to the motion a copy of the proposed response, which included the cross-motion requesting a *de novo* review.   *Id.*   The Court denied Plaintiff's request and allowed Plaintiff to file a response not to exceed thirty-five (35) pages.   Doc. 203 at 4.   Thus, the Court only will consider the arguments raised in the present Plaintiff's Response (Doc. 204), which includes Plaintiff's request for a *de novo* review.

[5] Citations to the Final Order of the Administrative Law Judge are designated herein as "FO at (p. no) ¶ (no.)."

was appropriately evaluated by the District and identified with the appropriate special education category; and (5) Plaintiff was entitled to certain reimbursements.[6] FO at 1-2; *see also* Doc. 171 at 2.

The ALJ found for the District on all issues.   *See generally* FO; Doc. 171 at 2. First, she found that there was no evidence that the District failed to comply with the procedures of the IDEA.   FO at 71 ¶ 234.   The ALJ further found that the District committed no procedural violations, and the IEPs met A.D.F.'s needs and provided her with a FAPE.   FO at 72 ¶ 235; 89 ¶ 290.   The ALJ also found that Plaintiff was not entitled to reimbursement for any of the privately-obtained independent evaluations.   FO at 94 ¶ 301.[7]

Plaintiff asserts that the ALJ's findings are contrary to law, and the ALJ abused her discretion.   Doc. 204 at 1. Plaintiff further argues that the ALJ erred in concluding that the District was not entitled to reimbursement under the IDEA.   *See* Docs. 204 at 22, 35; 204-1 at 1-3.

Upon review of the administrative record and the parties' briefs, and with consideration of the appropriate deference to be provided to decisions of the ALJ and

---

[6] The ALJ also issued a Recommended Order to the District addressing Plaintiff's Section 504 and ADA claims.   Doc. 171 at 2.   The District approved the Recommended Order and it was included as part of the administrative record submitted to this Court.   The Court, however, will not address the ALJ's findings in the Recommended Order because those findings relate to the Section 504 and ADA claims; and, as noted, Judge Steele dismissed the Section 504 and ADA claims from this action, as they arise from the same factual allegations as the IDEA claims.   Doc. 137 at 7-9.

[7] The ALJ noted that Plaintiff sought relief for certain things that the ALJ did not have the authority to provide, including costs for compensatory education, physician evaluations, and attorney's fees.   FO at 93 ¶ 299.   The ALJ stated that she is only authorized to consider reimbursement for costs associated with the independent evaluations of A.D.F obtained by Plaintiff.   FO at 94 ¶ 300.

educational professionals, the Court issues the following recommended findings of fact and conclusions of law.

## II.    Legal Framework

### a.  Standard of Review

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Implicit in this purpose is the requirement that the education confer some educational benefit upon the disabled child. *Bd. of Educ. of the Hendrick Hudson Cent. Dist. v. Rowley*, 458 U.S. 176, 201 (1982); *see also Weiss v. Sch. Bd. of Hillsborough Cty.,* 141 F.3d 990, 991 (11th Cir. 1998) (stating that "[i]ntegral to the concept of 'appropriate' education is the notion that the services provided must be tailored to serve the individual needs of the child"). "To effectuate that purpose[,] federal funds are made available to state and local educational entities which are required through an evaluation process to identify children with disabilities and to develop for each child an annual individualized education program or IEP." *Walker Cty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1294 (11th Cir. 2000). If the parents of the child are dissatisfied with the IEP, they are entitled to an impartial due process hearing to be conducted by the State educational agency or by the local educational agency. *Id.* (citing 20. U.S.C. § 1415(f)). "Any party aggrieved by the result of the

administrative proceedings in the state system" may bring a civil action in the district court.   20 U.S.C. § 1415(i)(2)(A).

An appeal of an administrative decision under the IDEA is subject to a *de novo* review.   *Sch. Bd. of Collier Cty., Fla. v. K.C.,* 285 F.3d 977, 981 (11th Cir. 2002); *see also Bennett,* 203 F.3d at 1295 n.6 (11th Cir. 2000); *Loren F. ex rel. Fischer v. Atlanta Indep. Sch. Sys.,* 349 F.3d 1309, 1313 (11th Cir. 2003) (stating that whether an IEP provides a FAPE is a mixed question of law and fact subject to a *de novo* review). The court may hear additional evidence if needed or, after reviewing all the evidence, may issue judgment on the record even when there are material facts at issue.   20 U.S.C. § 1415(i)(2)(C)(i)-(ii); *Loren F.,* 349 F.3d at 1313.   The court also has discretion to determine the deference given to the administrative decision.   *Bennett,* 203 F.3d at 1297-98 (citing *Jefferson Cty. Bd of Educ. v. Ala. Dep't of Educ.,* 853 F.3d 853 (11th Cir. 1988); *Doe v. Ala. Dep't of Educ.,* 915 F.3d 651 (11th Cir. 1990)).   The court must consider the administrative decision but is free to accept the conclusions of the ALJ that are supported by the record and reject those that are not.   *Bennett,* 203 F.3d at 1297-98.   Additionally, the factual findings of the ALJ are considered prima facie correct, and if the reviewing court fails to adhere to them, it should explain why.   *M.M. v. Sch. Bd. of Miami-Dade Cty.,* 437 F.3d 1085, 1097 (11th Cir. 2006) (quoting *Loren F.,* 349 F.3d at 1314 n.4).   The "court must be careful not to substitute its judgment for that of the state educational authorities."   *Bennett,* 203 F.3d at 1297 (citing *Rowley,* 458 U.S. at 176).

"The ALJ[, however,] is not entitled to blind deference." *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014). The court must base its decision "on the preponderance of the evidence, [and] shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *R.L.*, 757 F.3d at 1178. This relief can include reimbursement of costs incurred by parents while pursuing an alternative placement or an award of compensatory education to compensate for a past deficient program. *R.L.*, 757 F.3d at 1178. The burden of proof is on the party challenging the agency decision. *See* 20 U.S.C. § 1415(i)(2)(A); *Barnett v. Fairfax Cty. Sch. Bd.,* 927 F.2d 146, 152 (4th Cir. 1991); *see also Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 58 (2005) (noting the burden of proof in an administrative hearing held under the IDEA falls on the party seeking relief); *L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cty., Fla.*, No. 05-60845-CIV, 2014 WL 4771750, at *6 (S.D. Fla. Sept. 24, 2014).

### b. *Reimbursement under the IDEA*

As noted, Plaintiff has only one viable claim remaining in this matter: a reimbursement claim that stemmed from the District's alleged violation of Plaintiff's right to a FAPE. Doc. 76 at 13. All other aspects of the IDEA claim, such as the IEP's alleged failure to provide extended school services for the years 2005-09, to meet the standards of 20 U.S.C. § 1414, and to include goals and services for math and writing, are no longer relevant because in the Order issued on July 23, 2013, Judge Steele clearly held that the Court already had dismissed these claims and struck them from the Third Amended Complaint. Docs. 129-1 at 15-16, 131 at 5, 137.

In addition, the Court need not consider Plaintiff's reimbursement claim for her Independent Educational Evaluations ("IEE") because this claim does not stem from the District's alleged violation of a FAPE.   A parent's claim for reimbursement of IEEs arises from the parent's right to an independent expert opinion, and is governed by a regulatory provision that sets forth an independent criteria for reimbursement.   *Philips C. ex rel A.C. v. Jefferson Cty. Bd. of Educ.*, 701 F.3d 691, 697-98 (11th Cir. 2012);[8] 34 C.F.R. § 300.502(b)-(e).    Specifically, 34 C.F.R. § 300.502(c)(5) states that "[a] parent is entitled to only one independent evaluation at public expense each time *the public agency conducts an evaluation with which the parent disagrees.*"   34 C.F.R. § 300.502(c)(5) (emphasis added); *see Jefferson Cty. Bd. of Educ. v. Lolita S.*, 581 F. App'x 760, 765 (11th Cir. 2014).

In deciding a reimbursement claim under the IDEA, the court takes a two-step approach: "(1) whether the state actor has complied with the procedures set forth in the IDEA and (2) whether the IEP developed pursuant to the IDEA[9] is reasonably calculated to enable the child to receive educational benefit."   *Sch. Bd. of Collier Cty.*, 285 F.3d at 982.   According to these standards and the Court's previous orders and

---

[8] When Judge Steele entered the Order dismissing most of the Third Amended Complaint's allegations on July 23, 2012, the validity of 34 C.F.R. § 300.502, the regulation that requires state and local agencies to reimburse parents for IEEs, was under review before the Eleventh Circuit.   Doc. 137; *Philips C.*, 701 F.3d at 693.   Five months later, on November 21, 2012, in *Philips C.*, the Eleventh Circuit upheld the validity of 34 C.F.R. § 300.502.   701 F.3d. at 693.   Hence, the Eleventh Circuit's decision and the regulation provide a separate legal framework for Plaintiff's reimbursement claim for IEEs in this matter.

[9] An IEP must meet the requirements set forth in 20 U.S.C. 1414(d).   *Loren F.*, 349 F.3d at 1311-12.   Here, as noted above, the claim that the IEPs did not meet the requirements of 20 U.S.C. § 1414 is no longer before the Court because the Court already dismissed this claim.   Doc. 131 at 5; Doc. 137 at 3.

opinions in this case dismissing all other claims of violation of the IDEA, the Court need only consider whether (1) the District complied with the procedures of the IDEA, and (2) the IEPs were reasonably calculated to enable A.D.F. to receive educational benefits. *See id.*; Docs. 76, 105, 131, 137.

The Court's inquiry, however, does not end there. *Id.* Even if the Court finds that the District's IEPs do not meet the above-noted standards, the Court still can deny reimbursement "if a parent's own actions frustrated the school's efforts," or "if parents fail[ed] to give the school proper notice that they reject[ed] the school's IEP and/or [were] removing their child from the school." *Loren F.*, 349 F.3d at 1312-13.

## III.   Findings of Fact

The District is a government agency subject to both Florida and federal law and is the recipient of federal funding. Doc. 154 ¶ 1. As noted, A.D.F. was a student at the School within the District, from August 2005 until December 18, 2008. FO at 6 ¶ 1. Plaintiff later enrolled A.D.F in an elementary school in the Lee County School District. FO at 7 ¶ 2.

### a. *The 2005-2006 school year*

A.D.F was born in February of 2000 and was enrolled in the School as a kindergarten student at age five and a half. FO at 7 ¶ 3. During the 2005-2006 school year, A.D.F. struggled academically, particularly in reading. FO at 7 ¶ 3. After Plaintiff received two progress reports and two report cards indicating that A.D.F was struggling in reading, she contacted the School and requested that A.D.F be placed in a special reading class and assigned a one-on-one tutor. FO at 7 ¶ 2-3;

Pet. Ex. E [10] (student progress report indicating that A.D.F.'s ability to read frequently used words was an area of concern); Pet. Ex. G at P-557 (handwritten note from Plaintiff on back of progress report requesting that A.D.F. be placed in a special reading class, if possible).   Although A.D.F.'s kindergarten teacher, Ms. Soper, and the School's curriculum director, Susie Heath, advised Plaintiff that those particular services were not available to kindergarteners, later that month Ms. Soper and Ms. Heath developed an Academic Improvement Plan ("AIP") for A.D.F.   FO at 7-8 ¶ 5-6.[11]   Later that year, the School developed a second AIP for A.D.F.   FO at 9 ¶ 9.

Even after implementing the AIPs, A.D.F. continued to struggle academically, particularly in her reading, and the School recommended that A.D.F. be retained in kindergarten or promoted with remediation.   Pet. Ex. J.   Plaintiff testified she requested that Ms. Heath evaluate A.D.F., but was told that the School did not evaluate kindergarten-age children (five and six-year olds) because of their immaturity.   Tr. 138-39;[12] FO at 9 ¶ 11.   Subsequently, on May 19, 2006, Plaintiff brought A.D.F. to Dr. Raymond L. Duncan, a pediatrician in Naples, Florida, who performed a physical examination of A.D.F. and gave Plaintiff a written request to submit to the School to have A.D.F. evaluated.   Tr. 140; Pet. Ex. L.   Dr. Duncan

---

[10] The parties admitted numerous exhibits during the hearing. Those exhibits were attached to the transcripts and made a part of the administrative record.   The Court will reference Plaintiff/Petitioner's exhibits as "Pet. Ex. (Letter)." and the Defendant/Respondent's exhibits as "Resp. Ex (Number)."

[11] Under the Florida Administrative Code, Rule 6A-6.0331, intervention strategies, including AIPs, must be implemented for students with learning difficulties before referring those student for an evaluation.   FO at 8 ¶ 6.

[12] References to the administrative hearing transcript will be denoted as "Tr. (page number)."

opined that A.D.F.'s behavior was indicative of attention deficit hyperactivity disorder ("ADHD") and referred Plaintiff to Patrice C. Mack, M.D., a child psychiatrist.    FO at 10 ¶ 13; Tr. 142; Pet. Ex. O.

One week later, on May 26, 2006, Plaintiff gave Dr. Duncan's report to Brian Castellani, the School principal.   Tr. 142-43.   Mr. Castellani advised Plaintiff that because the School had up to sixty (60) school days to evaluate A.D.F., the School would perform an evaluation of A.D.F. at the beginning of the following school year. Tr. 703; FO at 11 ¶ 16.   A.D.F.'s year-end student progress report indicated that A.D.F. continued to struggle with reading, language arts and writing, and mathematics.   Pet. Ex. K.

On May 30, 2006 and June 5, 2006, Plaintiff took A.D.F. to Dr. Mack for a private evaluation, who performed a psychiatric evaluation of A.D.F. and gave the child a presumptive diagnosis of attention deficit disorder ("ADD") with possible dyslexia.   Tr. 217; Pet. Ex. O.   Dr. Mack recommended that A.D.F. have full academic testing, and, if found to have learning disabilities, attend first grade in the coming year with the support and assistance of special education teachers.   Pet. Ex. O at P-642.

Dr. Mack then referred Plaintiff to J. Christopher McGinnis, Ph.D., to perform a comprehensive psychological evaluation of A.D.F.    FO at 13 ¶ 23; Tr. 219; Pet. Ex. P at P-625.   On June 26, 2006, July 3, 2006 and July 10, 2006, Dr. McGinnis administered a series of tests and procedures including clinical interviews and records reviews.   Pet. Ex. P.   In a letter dated July 10, 2016 summarizing his

findings and recommendations, Dr. McGinnis found that A.D.F. had poorer than expected sight-word reading and much lower ability to apply basic academic skills. *Id.* at P-625.   He confirmed A.D.F.'s diagnosis of ADHD, which he concluded seemed to be negatively impacting her learning process and adaptive functioning.   *Id.*   Dr. McGinnis recommended that the District consider whether A.D.F. was eligible for special education under the other health-impaired ("OHI") classification of the IDEA. *Id.*   After receiving the results of the evaluations, Plaintiff retained Marsha McGuiness to tutor A.D.F. during the summer of 2006.   FO at 16 ¶ 35; Tr. 225.   Mrs. McGuinness continued to work with A.D.F during the 2006-2007 school year.   FO at 16 ¶ 35; Tr. 225.

    b.  *2006-2007 school year*

In August 2006, before the start of the school year, Plaintiff submitted Dr. McGinnis' and Dr. Mack's reports to Dr. John Kelly at the District, who then referred them to Julie Cosgrove, the District's psychologist assigned to A.D.F.'s School.   Tr. 217, 220; FO at 16-17 ¶ 36.   After reviewing Dr. McGinnis' report, Dr. Cosgrove provided an addendum to the report, which concluded that Dr. McGinnis' report should be referred to the School Multidisciplinary Team ("MDT") for consideration of A.D.F.'s educational placement.   Pet. Ex. EEE at P-650; FO at 17 ¶ 38.   Plaintiff then met with Mr. Castellani, who informed Plaintiff that A.D.F. would be put in Mrs. Becky Richardson's first grade class, with which decision Plaintiff agreed.   Tr. 221-22.

- 14 -

On September 28, 2006, the first Individual Education Plan ("IEP") meeting was held, and the MDT determined that A.D.F. was eligible for placement in an Exceptional Student Education ("ESE") program under the Florida Department of Education.   Pet. Ex. Q; FO at 20 ¶ 47; *see* Fla. Admin. Code r. 6A-6.030152.   The MDT determined that A.D.F. qualified under the category of OHI,[13] which included A.D.F.'s ADHD.   Fla. Admin. Code r. 6A-6.030152(1); FO at 20 ¶ 49.   Present at the meeting were Ann C. Riggs, LEA Representative; Dr. Julie Cosgrove; Mary Myer, ESE teacher; Marta McCaughna, speech/language pathologist; Becky Richardson, A.D.F.'s current classroom teacher; Plaintiff and Plaintiff's tutor, Marsha McGuinness (the MDT or "IEP Team").   Pet. Ex. Q at P-411.   During this meeting, Plaintiff received a booklet explaining her procedural safeguards.   Tr. 223. Plaintiff did not have any objections to A.D.F.'s placement in the ESE program under the OHI classification.   FO at 20 ¶ 48.

During the meeting, the IEP team developed an initial IEP for A.D.F., and Plaintiff consented to the proposed IEP.   Tr. 224; FO at 20-21 ¶ 50.   The IEP was initiated on October 3, 2006 (the "October 2006 IEP").   FO at 21 ¶ 51; Pet. Ex. Q at P-411.   The October 2006 IEP discussed A.D.F.'s present level of academic performance related to basic reading, reading comprehension, math, and independent functioning.   *See generally* Pet. Ex. Q.   The IEP noted that Plaintiff stated that

---

[13] OHI is defined as "having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems."   Fla. Admin. Code r. 6A-6.030152(1).

A.D.F. had dyslexia and ADHD. *Id.* at P-413. The IEP stated, "[d]ue to medical concerns related to ADHD, [A.D.F. did] not demonstrate decoding and/or word recognition skills at the same level as her peers in the regular education classroom." *Id.* The IEP also indicated that A.D.F.'s reading comprehension skills were on a very simple level. *Id.* at P-415. With respect to math, A.D.F. recognized and could count numbers up to ten, but she lacked number sense and had difficulty following patterns. *Id.* at P-416.

Based on the assessments of A.D.F., the IEP set measurable goals for A.D.F. in each of the four academic areas. *Id.* at P-413-18. The goals for A.D.F. included "correctly identify[ing] upper and lower case letters and be[ing] able to write them without seeing them" and answering questions about a story's setting and characters on her independent reading level at 75% target achievement. *Id.* at P-413, P-415. In addition, progress would be reported to A.D.F.'s parents by progress reports at least as often as that of A.D.F.'s general education peers. *Id.* at P-413. The IEP also set short term objectives or benchmarks for A.D.F. *Id.* at P-413-18. To help A.D.F. achieve these goals, the IEP offered to provide the following special education services and accommodations to A.D.F.: offering instruction in basic academics, organization, or study skills four days per week; checking work to determine level of understanding; providing A.D.F. extra time to complete tasks, individual assistance, and preferential seating; and securing A.D.F.'s attention before giving directions. *Id.* at P-419.

After the meeting, however, Plaintiff contends that she did not notice any progress with A.D.F.   Tr. 224.   Plaintiff asserts that she was working with A.D.F. on homework every night and continued to use Marsha McGuinness to tutor A.D.F. twice per week, paying out of her own pocket.   Tr. 225, 264.   Plaintiff testified that A.D.F was on Ritalin for her ADHD, getting extra support, and had an IEP but still was not making progress.   Tr. 225-26.

During the 2006-2007 school year, Ms. Richardson worked "intensively" with A.D.F., assisted by Ms. Myer, to help her improve academically, particularly with the child's reading.   FO at 22 ¶ 55; Tr. 411-12.   A.D.F.'s student final progress report indicated that A.D.F. would be retained in first grade.   Tr. 228; Pet. Ex. U (final student progress report dated May 31, 2007 indicating end of year status as "retained").   A.D.F. was again assigned to Mrs. Richardson's first-grade class for the 2007-2008 school year, with which decision Plaintiff agreed.   FO at 23 ¶ 58.

### c.  *2007-2008 School Year*

Early in the school year, Plaintiff provided the School with a copy of Dr. Mack's July 16, 2007 letter and requested a reevaluation planning meeting, which was held on September 24, 2007.   FO at 24-25 ¶¶ 60, 63; Pet. Ex. FF; Resp. Ex. 64 [1664-67].[14] Prior to the reevaluation meeting, Plaintiff received a Notice and Consent for Evaluation/Reevaluation, which she signed and indicated that she consented to the

---

[14] References to the District's exhibits, as noted in the Partial Index of Administrative Record Received from the Florida Division of Administrative Hearings (Doc. 208), and the accompanying CD provided, are designated as "Resp. Ex. (number)."   References to the Bates Stamp numbers on documents on the CD are designated as "[XXXX]".

proposed evaluation and received a copy of the procedural safeguards.   Resp. Ex. 64 [1667].    Plaintiff fully participated in the meeting, which addressed Plaintiff's request that A.D.F. be "evaluated to determine how she process[ed] information so that it [would] aid the teachers and [A.D.F.] in becoming more successful in the school setting."   Resp. Ex. 64 [1664]; FO at 26 ¶ 67.   According to Plaintiff, her child's medication was helping with her ADHD, and A.D.F. was doing "much better" thus far in the school year and was feeling more comfortable with her teacher.   Resp. Ex. 64 [1664].   Plaintiff's concerns for A.D.F., however, were that the child needed more one-on-one assistance to address her dyslexia as a result of her learning disability. *Id.*; Pet. Ex. FF at P-431.    Plaintiff also expressed concerns with A.D.F.'s communication skills.   Resp. Ex. 64 [1664].

After the planning meeting, the IEP team developed a new IEP, effective September 24, 2007 (the "September 2007 IEP").   Pet. Ex. FF.   Similar to the October 2006 IEP, the September 2007 IEP measured A.D.F.'s strengths and weaknesses in three academic areas: basic reading, reading comprehension, and independent functioning.   *Id.* at P-434, P-436, P-438.   The IEP contained various data regarding A.D.F.'s academic performance, such as observations of A.D.F.'s teachers and tests administered to A.D.F.   *Id.*   Based on the data, to further increase A.D.F.'s academic performance, the IEP adjusted goals in reading for A.D.F. to include having A.D.F. recognize high frequency words, blending two to three phonemes to form words, and manipulating phonemes to create new words with 80% target achievement.   Pet. Ex. FF at P-434; FO at 27 ¶ 73.   The goals in reading

comprehension and independent functioning remained unchanged.   Pet. Ex. FF at P-436, P-438.   To assist A.D.F. in attaining these goals, the September 2007 IEP continued to provide services and accommodations similar to the ones the October 2006 IEP offered.   *Id.* at P-440.

Plaintiff signed the September 2007 IEP and indicated that she received a copy of the summary of procedural safeguards.   Resp. Ex. 65 [1668].   Plaintiff also signed the Notice and Consent for Evaluation/Reevaluation, which indicated process and speech-language testing was to be performed.   Resp. Ex. 64 [1667].   Plaintiff stated no objections to the September 2007 IEP.   FO at 28 ¶ 75.   The September 2007 IEP also included a notice to Plaintiff concerning eligibility for a McKay Scholarship to another school if she was dissatisfied with A.D.F.'s progress at the current school. Pet. Ex. FF at P-433; FO at 28 ¶ 77.   The ALJ concluded that the September 2007 IEP:

> accurately describes [A.D.F.]'s present levels of performance, provides measurable annual goals and appropriate short-term objectives/benchmarks, and lists the persons responsible for the goals and objectives/benchmarks. . . The goals and short-term objectives/benchmarks were appropriate and addressed [A.D.F.]'s unique needs.

FO at 27 ¶¶ 70-71.

On October 18, 2007, Dr. Cosgrove performed a psychological reevaluation of A.D.F to assess A.D.F.'s current levels of functioning and processing skills.   Pet. Ex. BB at P-424.   Dr. Cosgrove concluded that A.D.F. continued to exhibit a need for supportive services, and stated that she would share the results with the School to prepare the appropriate recommendation regarding A.D.F.'s ESE programming

needs.   Pet. Ex. BB at P-430.   In a handwritten notation on the final page of her report, Dr. Cosgrove noted "results shared with mother 11-19-07."   *Id.*   In addition, Ms. McCaughna conducted an auditory screening and speech/language evaluation of A.D.F. also in October 2007, which showed the child was within the normal range. FO at 28-29 ¶ 79; Resp. Ex. 63 [1663].

On November 19, 2007, the IEP team received the results of the reevaluation and used that information to develop further recommendations for A.D.F.'s ESE needs and to revise her IEP, as appropriate.   Resp. Ex. 62 [1659]; FO at 33-34 ¶ 97. Plaintiff expressed her dissatisfaction that the reevaluation did not determine that A.D.F. was eligible for ESE services because of her dyslexia.   FO at 34 ¶ 99; Tr. 268-70.   Ms. Cosgrove explained that the process testing was not designed or administered to test for dyslexia and that A.D.F. would continue in the OHI classification and receive whatever services the child needed.   FO at 34 ¶ 99. Plaintiff complained about the evaluations to Laurence Ruble, the supervisor of psychological services for the District.   Tr. 272.   Dr. Ruble promised Plaintiff that he would review the evaluations and met with her twice.   Tr. 272-73.

Plaintiff engaged two private providers to independently test A.D.F. without providing notice to the District.   FO at 37 ¶ 110; Pet. Ex. DD, EE; Tr. 279, 283. First, on February 1, 2008, Plaintiff had A.D.F. examined by neurologist Michael F. Finkel, M.D.   Pet. Ex. DD.   Based on his evaluation of A.D.F. and review of her medical records, Dr. Finkel opined that that A.D.F. "clearly" had ADHD, combined type, but also was held back by her dyslexia.   *Id.*

Second, on referral from Dr. Finkel, Plaintiff had A.D.F evaluated by Lori Chang, Ph.D., a clinical and licensed school psychologist.   Pet. Ex. EE at P-689.   Dr. Chang made several recommendations regarding A.D.F.'s curriculum and instructions, such as receiving individualized tutoring in a phonics-based approach to reading.   *Id.* at P-694-95.   The District, however, did not accept Dr. Chang's evaluation of A.D.F because Dr. Chang used an outdated test to evaluate A.D.F. Resp. Ex. 58 [1646]; Tr. 289.   Furthermore, as noted by the ALJ, the "interventions recommended by Dr. Chang had already been implemented by the School IEP team," and A.D.F. "already had 'ESE status' and had begun receiving special student services."   FO at 39-40 ¶ 120.

In response to Plaintiff's concerns, Mr. Ruble sent an email and a letter to Plaintiff in February and March 2008, reassuring Plaintiff that regardless of what the labels were, the IEP addressed A.D.F.'s current needs and that A.D.F. was eligible for ESE services under the OHI exceptionality.   Pet. Ex. II at P-356; Pet. Ex. HH at P-312.   On March 7, 2008, Mr. Ruble further clarified that A.D.F. was not fully referred for evaluation because the private evaluation previously had been done by Dr. McGinnis, who diagnosed A.D.F. with ADHD.   Pet. Ex. II at P-358.   Mr. Ruble stated that because of that diagnosis and with supporting statements from a medical doctor, additional evaluation was not deemed necessary at that time.   *Id.*

On March 10, 2008, Plaintiff brought A.D.F. to Dr. Christine B. Grout, Ph.D., for another psychological assessment.   Pet. Ex. B at P-701.   After administering a series of tests for A.D.F., Dr. Grout made recommendations for A.D.F., which included

special education services under the Special Learning Disability ("SLD")[15] program,
an interesting and varied curriculum, and certain modifications to A.D.F.'s
curriculum.   *Id.* at P-708.   On March 12, 2008, Laurie Frydenlund, a dyslexia
specialist, prepared a report from a recent screening she had done on A.D.F.   Pet.
Ex. LL at P-709.   On March 12, 2008, Plaintiff also obtained another speech and
language evaluation of A.D.F. from Anne Chidsey.   Resp. Ex. 56 [1638].

On March 24, 2008, a reevaluation planning meeting was held in which
Plaintiff participated.   Resp. Ex. 48 [1613-15].   The meeting report shows that the
District was fully aware of the recent private evaluations of A.D.F.   *Id.* at 1613.
During the meeting, Plaintiff expressed disbelief that A.D.F. was performing all of
the tasks indicated by the evaluations and teacher observations because A.D.F. was
unable to perform such tasks at home.   *Id.*   Plaintiff stated that A.D.F. not only
needed the academic services but the "label."   *Id.*   On the contrary, the report noted
that A.D.F. had progressed from the prior year and that her spelling, phonics, and
math abilities all had improved.   *Id.* at 1614.   A.D.F.'s classroom teacher also
indicated that she was using a variety of teaching methods, including using word
families and focusing on A.D.F.'s previous knowledge of words, to help her learn new
words.   *Id.*   At the end of the meeting, the team concluded that no additional

---

[15] According to the District, "[s]pecific learning disability means a disorder in one or
more of the basic psychological processes involved in using language, spoken or written, that
may manifest itself in an imperfect ability to listen, think, speak, read write, spell, or do
mathematical calculations."   Pet. Ex. TT at P-463.

information on A.D.F. was necessary, and Plaintiff as well as the others present at the meeting signed the report.   *Id.* at 1615.

Based on the private evaluations submitted by Plaintiff and the various tests performed on A.D.F., the District determined at that time that A.D.F. continued to be eligible for assignment in OHI and met the eligibility criteria for assignment in SLD.   Resp. Ex. 50 [1617].   The team recommended that A.D.F. be placed in a general education class.   *Id.* at 1618.   In the area of the report for parental consent, Plaintiff marked "n/a," not indicating whether she agreed or disagreed with the placement.   *Id.*   Plaintiff did, however, sign off on the form.   *Id.*

Eight months after the September 2007 IEP meeting, on April 30, 2008, the IEP team held a meeting to develop a new IEP (the "April 2008 IEP").   Pet. Ex. SS at P-451.   Plaintiff along with several of A.D.F.'s teachers and school board members were present at the meeting.   *Id.*   The IEP used various data of A.D.F., such as the evaluation of her intelligence scale, her school grades and her classroom teacher's observations, to measure A.D.F.'s strengths and weaknesses.   *Id.* at P-454-56.   In contrast to the previous IEPs, the April 2008 IEP included an assessment of A.D.F.'s writing skills for the first time.   *Id.* at P-458.

The assessments revealed that because of A.D.F's SLD and ADHA, A.D.F. continued to exhibit weaknesses in the areas of basic reading, reading comprehension, writing, and independent functioning.   *Id.* at P-454, P-456, P-458, P-460.   Accordingly, the IEP adjusted goals in each of the four areas to A.D.F.'s present level of academic performances.   *Id.*   Notably, the IEP indicated that in

writing, A.D.F. also demonstrated difficulties and displayed the qualities of an early initial writer.   *Id.* at P-458.   The IEP's new goal in writing was for A.D.F. to correctly form strategies, use prewriting techniques, write a draft, revise and refine the draft, and write a final product.   *Id.*   To help A.D.F. reach these goals, the IEP continued to offer the same accommodations and services that the September 2007 IEP provided.   *Id.* at P-461.   Plaintiff signed off on the plan.   *Id.* at P-451.

On May 2, 2008, the School issued a SLD report on A.D.F. to Plaintiff.   Pet. Ex. TT at P-463.   The report included the District's various observations of A.D.F. in school.   *Id.* at P-463-64.   Plaintiff signed off on the report, indicating that it reflected her conclusions regarding A.D.F. and she was in agreement with it.   *Id.* at P-465.   Although Plaintiff received and agreed with the SLD report, Plaintiff took A.D.F. to Hardman & Associates, Inc., for another private evaluation on July 31, 2008.   Pet. Ex. A.

### d.  2008-2009 School Year

The IEP team held another IEP meeting on September 22, 2008 (the "September 2008 IEP").   Resp. Ex. 22 [1502].   Plaintiff, A.D.F's teachers, and various school board members attended the meeting.   *Id.*   Before the meeting, Plaintiff signed a form that she received the summary of the procedural safeguards. Resp. Ex. 23 [1517].   In developing a new IEP, the team again considered various data to assess A.D.F.'s academic strengths and weaknesses.   *Id.* at 1508.

As noted in the April 2008 IEP, the September 2008 IEP stated that A.D.F. did not demonstrate decoding, word recognition, and writing skills at the same level as

her peers.  *Id.* at 1504, 1508.   A.D.F. also continued to exhibit strengths and weaknesses in writing and independent functioning similar to those reported in the April 2008 IEP.   Pet. Ex. SS at P-458, P-460; *Id.* at 1508, 1510.   The September 2008 IEP, however, newly noted that A.D.F. demonstrated significant encoding difficulties.   Resp. Ex. 23 [1508].   Based on the new measurements of A.D.F.'s academic performance, the IEP included new goals for A.D.F. in reading, writing, and independent functioning, such as recognizing high frequency words, answering questions, and writing a paragraph at the second grade level.   *Id.* at 1505-08.

To help A.D.F., the September 2008 IEP offered using "the resources in the classroom (i.e. word wall words, dictionary, textbook, spell check, etc.) to assist her." *Id.* at 1510.   Furthermore, the IEP continued the services the April 2008 IEP provided, such as providing instruction in basic academics and organization/study skills.   Pet. Ex. SS at P-461; *Id.* at 1515.   This IEP also added new accommodations and services: having material broken down into manageable parts to A.D.F., providing frequent feedback and praise and printed copies of board notes to A.D.F., and giving no penalty for spelling errors.   Resp. Ex. 23 [1515].

For this particular IEP meeting, Plaintiff appeared with a court reporter. Resp. Ex. [624].   The transcript demonstrates that Plaintiff had opportunities to express her concerns and ask questions during the meeting.   First, the transcript shows that Plaintiff expressed disagreement with the tests performed by Dr. Cosgrove the prior year and asked whether the School tested for dyslexia.   *Id.* at 664. Mr. Ruble responded that the School's role was to look at the District's expectations

and to determine if the child was progressing based on those expectations. *Id.* at 664, 666.   The transcript also demonstrates that the IEP team explained the measurable goals and objectives for A.D.F. to Plaintiff, and Plaintiff agreed with the team's goals and objectives. *Id.* at 684-89.   The IEP team, however, suspended the meeting to allow Plaintiff an opportunity to review the IEP and bring an advocate with her to the next meeting. *Id.* 712-13.

One month later, on October 13, 2008, the IEP team held a final IEP meeting. Resp. Ex. 16 [1481].   Before the meeting, Plaintiff sent an email to Mr. Castellani, confirming that she and her advocate would attend the meeting.   Resp. Ex. 18 [1500].   In fact, Plaintiff attended this particular meeting with an advocate.   Resp. Ex. 16 [1481].   Plaintiff signed the IEP as a participant and also indicated that she received the summary of procedural safeguards. *Id.*

Again, the IEP contained detailed observations of A.D.F.'s academic performance based on psychological reports, various evaluation results, and observations of A.D.F.'s teachers. *Id.*   Most of this IEP's assessments of A.D.F.'s academic performance were very similar to ones in the September 2008 IEP. *Id.* at 1481-97.   For example, in the area of reading, the IEP indicated that A.D.F. was reading at grade level with accommodations for the first grade, of which the previous IEP also noted. *Id.* at 1483.   As a result, many of A.D.F.'s annual goals remained unchanged. *Id.* at 1484-85, 1487, 1489, 1491, 1493.   For example, A.D.F.'s reading goals still included using a variety of reading strategies to recognize high frequency words at the second grade level with 85% accuracy. *Id.* at 1484.   In contrast to the

previous IEP, however, this particular IEP included the assessment of A.D.F. in a new area of social emotional behavior. *Id.* at 1493. To help A.D.F. achieve the goals, the IEP not only continued to provide the same services and accommodations the previous IEP offered but also allowed A.D.F. to repeat or rephrase questions. *Id.* at 1495.

Following the IEP meeting, Mrs. Frino provided a schedule to Plaintiff, which showed how much time she spent with A.D.F. on certain reading programs and accommodation. Tr. 350. Plaintiff and Mrs. Frino used a notebook to ask questions and respond, which they sent back and forth with A.D.F. Tr. 351. Plaintiff, however, stated that she and Mrs. Frino started having problems and that she began to face a hostile environment. Tr. 351-54. Therefore, Plaintiff decided to withdraw A.D.F. from the Collier County School District and transfer her to a school in Lee County. Tr. 356. Thus, when Plaintiff received A.D.F.'s progress report dated November 24, 2008, despite it showing A.D.F. had satisfactory progress in all major domains, Plaintiff wrote on the progress report her request to transfer A.D.F. to a Lee County school per the McKay scholarship. Tr. 357.

## IV.   Analysis of Plaintiff's Reimbursement Claim under the IDEA

In deciding a reimbursement claim under the IDEA, the court takes a two-step approach: "(1) whether the state actor has complied with the procedures set forth in the IDEA and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit." *Sch. Bd. of Collier Cty.*, 285 F.3d at 982. According to these standards and the Court's previous orders and

opinions in this case dismissing all other claims of violation of the IDEA, the Court need only consider whether (1) the District complied with the procedures of the IDEA, and (2) the IEPs were reasonably calculated to enable A.D.F. to receive educational benefits.  *See id.*; Docs. 76, 105, 131, 137.

First, the Court must assess whether the Distract complied with the procedural requirements of the IDEA.  *M.M.*, 437 F.3d at 1096.  The IDEA's procedures target full parent involvement by requiring a school board to formulate an IEP "during a meeting between the student's parents and school officials."  *Id.* at 1095.  A parent first needs to notify a school board that he or she wishes to place a child in special education services and consents to have the child evaluated.  *Id.*  If the evaluation reveals that the child has a disability under the meaning of the IDEA, then the school forms an IEP team.  *Id.*  Once the IEP team develops an IEP, the school board then decides whether it will provide the special education needs of the child.  *Id.* at 1906.  The parent has three options: he or she may (1) enroll the child in public school if the school elects to provide the services outlined in the IEP, (2) acknowledge that the IEP is sufficiently adequate, but voluntarily enroll the child in a private school or program, or finally (3) notify the school of the parent's rejection of the IEP and challenge the IEP via a due process hearing.  *Id.*

Here, upon *de novo* review of the record and the ALJ's findings, the Court agrees with ALJ's decision that the District complied with the procedures of the IDEA.  FO at 71-72 ¶¶ 233-35.  The District held five IEP meetings in September 2006, September 2007, and April, September, and October 2008, during which

Plaintiff fully participated, received a summary of the procedural safeguards each time, and shared and considered the private evaluations of A.D.F with the IEP team. Pet. Ex. Q, FF, SS; Resp. Ex. 16 [1481-97], 22 [1502-16], 48 [1613-15], 50 [1617], 64 [1664-66], 62 [1659-60], 58 [1646-47].   To keep Plaintiff informed and accommodate her requests regarding A.D.F.'s education, the District also held reevaluation meetings in November 2007 and March 2008.   Resp. Ex. 48 [1613-15], 62 [1659].

During and after the meetings, the District fully explained to Plaintiff its assessments of and educational services offered to A.D.F.   When Plaintiff expressed her concerns that the School did not seem to recognize A.D.F.'s dyslexia, as Dr. Ruble's email to Plaintiff and the transcript of the September 22, 2008 IEP demonstrate, the District informed Plaintiff that regardless of what the labels were, the District understood and provided for A.D.F.'s educational needs.   Resp. Ex. [666], 48 [1613-15], 62 [1659]; FO at 34 ¶ 99; Pet. Ex. II at P-356; Pet. Ex. HH at P-312. Furthermore, as the transcript of the September 22, 2008 IEP meeting shows, the IEP team explained procedures of the IEP step-by-step to Plaintiff.   Resp. Ex. [684]. When Plaintiff expressed her concern that she found the IEP meeting confusing and hard to understand, the District suspended the meeting until October 13, 2008 so that Plaintiff could bring an advocate with her to the next meeting with her.   Resp. Ex. [712-13].   Furthermore, every time the District developed a new IEP, Plaintiff expressly consented to the IEP by signing the consent form.   Resp. Ex. 16 [1481], 23 [1517], 48 [1615], 50 [1618], 64 [1667], 65 [1668]; Pet. Ex. SS at P-451, P-456. Finally, as the District points out and Plaintiff's emails with Mr. Ruble demonstrate,

Plaintiff was in constant communication with School officials, even outside of the IEP meetings.   Doc. 171 at 19; Pet. Ex. HH, II.

Second, the Court must address whether the IEPs were "reasonably calculated to enable [A.D.F.] to receive educational benefits."   *Rowley*, 458 U.S. at 207.   An IEP meets this standard if it provides a "basic floor of opportunity," which consists of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."   *Id.* at 201.   This floor does not require the best program for the child.   *M.M.*, 437 F.3d at 1102.   In fact, the program does not even have to maximize the child's potential or give a parent a right to select among various programs.   *Id.* at 1102-03.   Instead, the program simply needs to provide individualized education and services "sufficient to provide disabled children with some educational benefits."   *Id.* (internal citations omitted).

Here, upon careful review of ALJ's findings, the transcripts, and the evidence, the Court concludes that the District's IEPs were reasonably calculated to provide educational benefits to A.D.F.   *See Rowley*, 458 U.S. at 207.   The Court will not consider Plaintiff's contention that the District failed to perform a comprehensive initial eligibility evaluation required under the IDEA because that the Court already dismissed this argument and struck it from the Complaint.   Doc. 112 ¶ 324-28; Doc. 20 at 8-12.   The Court also dismissed and struck the allegation that the District failed to provide a comprehensive evaluation under the IDEA.   Doc. 112 ¶¶ 330, 367, 371, 375.   Plaintiff's only relevant contention is that the IEPs did not accommodate

to A.D.F.'s dyslexia because the District did not appropriately evaluate A.D.F.   Doc. 204 at 12-13.

"The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education.   A disabled child's individual education plan must be tailored to the unique needs of that particular child." *Heather S. v. Wis.*, 125 F.3d 1045, 1055 (7th Cir. 1997) (stating that whether the child was described as cognitively disabled, other health impaired, or learning disabled is irrelevant); *Rowley*, 458 U.S. at 181.   Moreover, the IDEA does not require that a child be classified by his or her disability as long as the child is receiving the special education and related services.   34 C.F.R. § 300.111(d).

Contrary to Plaintiff's assertions, the record supports the ALJ's findings that regardless of how the District decided to evaluate or educate A.D.F., the District's IEPs provided the requisite educational benefits to A.D.F.   FO at 88-89 ¶¶ 286-90. The IEP and reevaluation meeting records clearly show that the District designed the programs only after fully considering Plaintiff's input, the private evaluations as well as additional evaluations performed on A.D.F., and the teachers' observations of A.D.F. in classroom.   Pet. Ex. Q, FF, SS; Resp. Ex. 16 [1481-97], 22 [1502-16], 48 [1613-15], 50 [1617], 64 [1664-66], 62 [1659-60], 58 [1646-47].   The District was well aware of A.D.F.'s academic strengths and weaknesses based on this data, and tailored its programs to target A.D.F.'s specific needs.   Pet. Ex. Q, FF, SS; Resp. Ex. 16 [1481-97], 22 [1502-16], 48 [1613-15], 50 [1617], 64 [1664-66], 62 [1659-60], 58 [1646-47]. As long as the District provided the requisite education to A.D.F., Plaintiff's desire

for a certain type of tutoring or evaluation could not override the District's choice of programs.   *See M.M.*, 437 F.3d at 1103.

## V.    Conclusion

Based upon the findings of fact and conclusions of law, the Court finds that Plaintiff is not entitled to reimbursement under the IDEA because the District complied with the procedural requirements of the IDEA, and the IEPs were reasonably calculated to enable A.D.F. to receive educational benefits.

ACCORDINGLY, it is hereby respectfully

**RECOMMENDED:**

1.      The Motion for Judgment on the Record and Incorporated Memorandum of Law (Doc. 171) be **GRANTED**, and Judgment be entered in favor of Defendant District School Board of Collier County.

2.      The Final Order of the ALJ be **AFFIRMED**.

**DONE** and **ENTERED** in Fort Myers, Florida on this 16th day of November, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:

Counsel of record
Terry L. Dunn-Fisher, Plaintiff *Pro Se*